## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| DYNAVOX INC., *et al.*,[1] | Case No. 14-10791 (PJW) |
| Debtors. | Joint Administration Pending |

## DECLARATION OF ERIN L. RUSSELL IN SUPPORT
## OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, Erin L. Russell, hereby declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury as follows:

1.      I am the Authorized Representative of DynaVox Inc. ("DynaVox Inc."), DynaVox Systems Holdings LLC ("Systems Holdings") and DynaVox Intermediate LLC ("Intermediate") (collectively, the "Debtors" or the "Company"). I have been a Director of DynaVox Inc. since its formation in December 2009 and have been a member of the Management Committee of DynaVox Systems Holdings LLC since October 2007. I am a Principal with Vestar Capital Partners, a New York-based registered investment adviser, which I joined in 2001. Previously, I was a member of the M&A Group at PaineWebber Inc. in New York. I received my Bachelor of Science degree in commerce, with a concentration in accounting, from the McIntire School of Commerce at the University of Virginia in 1996. I received my MBA from Harvard Business School in 2001.

2.      I am familiar with the Debtors' day-to-day operations, business affairs, and books and records.

---

[1] The Debtors in these cases, along with the last four digits of their federal tax identification numbers, are (i) DynaVox Inc. (7281); (ii) DynaVox Intermediate LLC (****); and (iii) DynaVox Systems Holdings LLC (8157). The mailing address for the Debtors is 2100 Wharton Street, Suite 400, Pittsburgh, Pennsylvania 15203.

3.      Shortly before the filing of this affidavit, the Debtors each filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). The Debtors each continue in the possession of their properties and the management of their business as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. In order to enable the Debtors to preserve the value of their assets and to effectively advance the marketing and sale of such assets, and to avoid or diminish the adverse effects of the Chapter 11 filings, the Debtors have sought various types of relief in "first day" applications and motions filed contemporaneously with the Court.

4.      I submit this affidavit in support of the Debtors' Chapter 11 petitions and "first day" applications and motions in these Chapter 11 cases. Any capitalized term not expressly defined herein shall have the meaning ascribed to them in the relevant first day application or motion. Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge, my review of relevant documents, or my opinion based upon my experience and knowledge of the Debtors' operations and financial condition. If I were called upon to testify, I could and would testify competently to the facts set forth herein. I am authorized to submit this affidavit.

5.      Part I of this affidavit describes the Company's businesses, capital structure and circumstances surrounding the filing of the Chapter 11 petitions. Part II of this affidavit sets forth the relevant facts in support of the Debtors' various first day applications and motions filed concurrently herewith.

# I. BACKGROUND

A.      **Background and Current Business Operations**

6.      DynaVox Inc. is a publicly-traded Delaware corporation and the ultimate corporate parent of the DynaVox group of companies (collectively "DynaVox").  DynaVox Inc. completed an initial public offering on April 27, 2010.   As a result of the IPO and certain other recapitalization transactions, DynaVox Inc. became the sole managing member of and has a controlling interest in Systems Holdings and its direct and indirect subsidiaries.

7.      DynaVox Inc. has been a public reporting entity since April 22, 2010. Subsequent to the Company's delisting from NASDAQ on April 16, 2013, DynaVox filed a Form 15 with the Securities and Exchange Commission on July 1, 2013 to deregister its Class A common stock ("Go Dark").  DynaVox Inc.'s Class A common stock is currently trading on the OTC Markets OTCPink marketplace under the symbol "DVOX".

8.      DynaVox Inc. is the holder and owner of 99.14% of the membership interests in Systems Holdings.   In turn, Systems Holdings is the holder and owner of 100% of the membership interests in Intermediate.  DynaVox Inc., Systems Holdings and Intermediate are holding companies that do not have separate employees or operations.    DynaVox headquarters are located in Pittsburgh, Pennsylvania.

9.      Intermediate is the owner and holder of 100% of the membership interests in DynaVox Systems LLC ("Systems").  Systems and its direct and indirect subsidiaries are the operating entities in the DynaVox group of companies (sometimes collectively referred to herein as the "Operating Companies").

10.      An organizational chart showing the corporate structure of DynaVox is attached hereto as **Exhibit "A."**

11.    DynaVox was founded in 1983 on research completed at Carnegie Mellon University on the use of symbolic language to assist people with serious speech impairments. Nineteen years before the introduction of the iPad, DynaVox recognized the tremendous power of combining mobile computing with an intuitive user experience to unlock speech for a segment of the population that had been unable to communicate.

12.    A corporate timeline showing a history of DynaVox from inception to the present is attached hereto as **Exhibit "B."**

13.    With the introduction of the first DynaVox-branded Augmentative and Assistive Communication ("AAC") product in 1991, the Company established the AAC market by developing application software for use on touch screen computers utilizing its symbolic language, DynaSyms™.   In 2004, the Company acquired Mayer-Johnson which provided access to another broadly-used symbol set. This capability was subsequently combined with DynaSyms™ to form the largest, most widely-used symbol set globally, Picture Communication Symbols™ ("PCS").

14.    In addition to offering PCS and a world class delivery tool, DynaVox also offers "Boardmaker," which is the leading software solution used by therapists and special educators to develop custom, personalized and interactive communication and instructional material, as well as symbol-supported learning materials for students and adults with cognitive, language and communication deficits.

15.    DynaVox has become the industry standard in providing innovative communication and special education solutions to the Speech Language Pathologist (SLP) community, teaching professionals, and school district administrators. Through its product leadership and strong industry relationships, DynaVox established a 65% market share in AAC

4

solutions and an 80% share in special education symbol-based software, resulting in over $84 million in annual revenue in 2012.

16.    For additional information regarding the Debtors' historical financial performance, 2010 Initial Public Offering, recapitalization transactions and other information reported to the Securities and Exchange Commission, please visit http://www.sec.gov/edgar/searchedgar/companysearch.html and search using the ticker symbol DVOX.

**B.    Pre-Petition Secured Credit Facility, Forbearance Agreement and Sale Process**

17.    On June 23, 2008, Intermediate, as guarantor, Systems, as the borrower, and the following direct and indirect subsidiaries of Systems: DynaVox Services Inc. ("Services"), Blink-Twice LLC ("Blink-Twice"), Mayer-Johnson LLC ("Mayer-Johnson"), DynaVox International Holdings Inc. ("International"),[2] Eye Response Technologies, Inc. ("ERT") (Systems, Intermediate, Services, Blink-Twice, Mayer-Johnson, International and ERT are collectively referred to herein as the "Borrower Parties") entered into that certain Third Amended and Restated Credit Agreement, as amended (the "Credit Agreement") with GE Business Financial Services Inc., as administrative agent and lender (the "Agent"), and those certain financial institutions as lenders under the Credit Agreement (collectively, the "Prepetition Secured Lenders"). Pursuant to the Credit Agreement, the Prepetition Secured Lenders agreed, subject to the terms and conditions set forth in the Credit Agreement, to make certain loans and other financial accommodations to the Borrower Parties.

---

[2] International is a holding company that owns the equity interests in (i) DynaVox Systems Ltd., which is a company organized in the United Kingdom, (ii) DynaVox Canada, Inc, which is a company organized in Canada, (iii) DynaVox GmbH, which is a company organized in Germany, and (iv) DynaVox Norway AS, which is a company organized in Norway (collectively, the "International Subsidiaries").

18.     Pursuant to the Credit Agreement and related loan documents (the "Prepetition Loan Documents"), the Agent, on behalf of the Prepetition Secured Lenders, asserts a first priority lien and security interest in and to substantially all of the assets of the Borrower Parties. Neither DynaVox Inc. nor Systems Holdings nor the International Subsidiaries is a borrower or guarantor under the Credit Agreement and the Agent does not have a lien on any of the assets of DynaVox Inc., Systems Holdings or the International Subsidiaries.

19.     On April 27, 2010, as part of the Prepetition Loan Documents, Intermediate and Agent entered into that certain Amended and Restated Pledge Agreement wherein Intermediate pledged its membership interests in Systems to Agent for the benefit of the Prepetition Secured Lenders as collateral security for the obligations owed under the Credit Agreement (the "Intermediate Pledge Agreement").

20.     By letter to Systems, dated April 4, 2013, the Agent notified Systems the Agent was reserving all of its rights and remedies as a result of the existence of an event of default in respect of a financial covenant under the Credit Agreement for the failure of Systems to maintain the Fixed Charge Coverage Ratio required under the Credit Agreement for the quarter ended March 29, 2013 (the "Reservation Letter"). The Agent did not accelerate the obligations under the Credit Agreement in the Reservation Letter, but instead notified Systems that it would monitor the situation on a "day to day" basis. The Agent also reserved its rights, among other things, to terminate the commitment to make loans under the Credit Agreement, to accelerate the obligations under the Credit Agreement and to foreclose on or otherwise realize on its collateral in accordance with the Prepetition Loan Documents. To date, to the best of my knowledge, the Agent has not accelerated the obligations under the Credit Agreement. In addition, no payment default had occurred under the Credit Agreement.

21.    On June 28, 2013, in response to the demand from the Agent, the Borrower Parties were required to prepay a portion of the principal due and owing under the Credit Agreement by an amount equal to $10,000,000.  As of July 29, 2013, the Agent asserted that the outstanding principal balance of the obligations due under the Credit Agreement, after application of such principal prepayment, was at least $15,200,000 exclusive of interest, fees and expenses.

22.    On or about July 29, 2013, the Borrower Parties, the Agent and the Prepetition Secured Lenders entered into a Forbearance Agreement and Fifth Amendment to Credit Agreement (the "Forbearance Agreement").  Among other things, the Forbearance Agreement provided for:

    a.  The Borrower Parties (i) to engage the services of an investment banking firm to assist in developing and conducting a marketing and sale process for the Borrower Parties or substantially all of their assets, and (ii) to negotiate, document and consummate a sale of the Borrower Parties or their assets, acceptable to the Prepetition Secured Lenders;

    b.  The Prepetition Secured Lenders to forbear from accelerating the obligations under the Credit Agreement and exercising any default related rights or remedies thereunder if the Borrower Parties complied with the sale milestones set forth in the Forbearance Agreement in connection with such sale; and

    c.  The consummation of an acceptable sale prior to October 31, 2013.

23.    From July 2013 through the end of October, 2013, the Borrower Parties, with the assistance of its investment banker, Bulger Partners, engaged in a fulsome marketing and sale process to sell the businesses of the Borrower Parties as a going concern in an effort to maximize

7

the value of their assets for all creditor and equity constituencies in the DynaVox group of companies. During that process, the Borrower Parties, through their investment banker, contacted and engaged with 105 potential buyers, including 60 financial buyers and 45 strategic buyers, to determine whether any such parties had an interest in pursuing a transaction with the Borrower Parties.

24.    By the end of October 2013, several interested parties had performed a substantial amount of due diligence on the business and assets of the Borrower Parties and had presented written indications of interest to pursue a transaction. Certain of the proposed transactions provided for consideration in excess of the obligations owing under the Credit Agreement. Notwithstanding the positive progress made by the Borrower Parties as of the end of October 2013, the Borrower Parties were unable to meet the deadline of October 31, 2013 to consummate an acceptable sale transaction pursuant to the terms of the Forbearance Agreement.

25.    As a result, on October 21, 2013, the Agent and the Borrower Parties entered into a certain Consent and Amendments Under Forbearance Agreement (the "Consent"). Pursuant to the Consent, the Agent agreed, among other things, to extend the outside date to consummate an acceptable sale to December 6, 2013.

26.    Thereafter, through the end of 2013 and into the early part of 2014, the Borrower Parties continued to work with those potential purchasers who had made proposals to enter into a transaction in an attempt to finalize, document and consummate a transaction. Despite all best efforts on the part of the Borrower Parties to do so, the Borrower Parties were not able to finalize a transaction with any such potential purchasers that was acceptable to the Borrower Parties or the Agent. As a result, the Forbearance Agreement expired on its own terms and was not extended.

27.     Thereafter, on or about February 2014, the Agent and Prepetition Secured Lenders elected to market and sell the debt obligations under the Credit Agreement (as defined in the Credit Agreement, the "Obligations").  On February 21, 2014, the Agent and Prepetition Secured Lenders in fact sold, assigned and transferred to an entity named JEC-BR Partners, LLC, a Delaware limited liability company ("JEC"), all of their right, title and interest in and to the Obligations and any and all other rights and remedies held by them under the Credit Agreement and the Prepetition Loan Documents.  As a result, JEC became and is the sole owner and holder of the Obligations under the Credit Agreement as well as the rights and remedies thereon and under the Prepetition Loan Documents.

28.     On March 18, 2014, JEC, as successor to Prepetition Secured Lenders and Agent, delivered copies of executed corporate resolutions to the Borrower Parties wherein JEC purported to exercise its rights under the Intermediate Pledge Agreement (and the accompanying Irrevocable Proxy Coupled With Interest dated April 30, 2012) (the "Resolutions").  Pursuant to the Resolutions, JEC removed the existing members of the management committee of Systems and also reconstituted the management committee of Systems with three of its own employees. JEC also executed similar resolutions taking control of the direct and indirect subsidiaries of Systems.  Since then, JEC, through the reconstituted management committee, has been in control of the Operating Companies, including Systems and each of its direct and indirect subsidiaries.

29.     Notwithstanding the delivery of the Resolutions under the Intermediate Pledge Agreement and the actions taken by JEC to wrest control of the Operating Companies from the Debtors, the Debtors believe that JEC failed to comply with the specific terms of the Intermediate Pledge Agreement in respect of the exercise by JEC of its rights thereunder. Specifically, pursuant to Section 6(a) of the Intermediate Pledge Agreement, JEC was required to

provide Intermediate with "notice of its election to exercise the rights and remedies set forth in Section 6(b) …" of the Intermediate Pledge Agreement, which section 6(b) provides for voting rights related to Systems to vest in the Agent.  To my knowledge, JEC did not provide the Debtors with any such notice of its intent to exercise its rights and remedies under the Intermediate Pledge Agreement as required by the specific terms of the Intermediate Pledge Agreement.  The Debtors will reserve all of their rights in connection with JEC's failure to comply with this requirement or any other term or requirement of the Intermediate Pledge Agreement or other Loan document and any claim against JEC, including, without limitation, any right or claim to avoid the exercise of voting control by JEC and to re-take control of the Operating Companies as a result.

30.    Since March 18, 2014, the Debtors have not had access to the Operating Companies, including their books, records and management, and do not know what actions the JEC-controlled management committee of Systems has taken in respect of the Operating Companies, their assets and businesses.

31.    On March 21, 2014, JEC issued notice to the Debtors that JEC had scheduled a sale, at public auction, of 100% of the membership interests that Intermediate owns in Systems (the "Systems Membership Units") for March 31, 2014 (the "Public Sale").  Thereafter, on March 27, 2014, JEC issued notice to the Debtors that JEC had extended the date for the Public Sale from March 31, 2014 to April 7, 2014 at 10:00 a.m.

32.    As a result of the commencement of the Chapter 11 case for Intermediate on April 6, 2014 (followed by the filing of Chapter 11 cases for DynaVox, Inc. and DynaVox Systems Holdings, LLC on April 7, 2014), my understanding is that any sale of the Systems Membership Units has been stayed by the automatic operation of section 362(a) of the Bankruptcy Code.  It is

10

also my understanding that the Systems Membership Units are indisputably property of Intermediate's chapter 11 bankruptcy estate subject to sale and administration in these Chapter 11 cases pursuant to section 541(a) of the Bankruptcy Code.

## C.    TOBII Letter of Intent

33.    On April 4, 2014, the Debtors received an acquisition proposal dated April 3, 2014 (the "Proposal") from Tobii Technology AB, a Swedish corporation ("Tobii"), offering cash in excess of the amounts necessary to satisfy the Obligations for the Systems Membership Units, subject to the performance by Tobii of due diligence and other conditions, such as agreement on mutually agreeable deal documentation.    The Proposal is not subject to any financing contingency.    The Proposal specifically contemplates a fulsome bankruptcy auction process for the Systems Membership Units, and Tobii is fully aware that if the Proposal culminates in an offer, it will be shopped to determine whether a higher and better offer can be obtained.  A copy of the Proposal is attached as Exhibit A to the Access Motion (defined below). Tobii is a high-technology company that develops and sells products for eye control and eye tracking.  Tobii has put together a team of qualified professionals to allow it to immediately commence and complete due diligence in respect of the Operating Companies in approximately three (3) weeks (assuming full access to the necessary due diligence).

34.    To permit diligence while also protecting the interests of DynaVox (including the Operating Companies) in confidential information, on April 4, 2014, Tobii and DynaVox Inc., on behalf of itself and its direct and indirect subsidiaries, entered into that certain Confidentiality and Nondisclosure Agreement ("NDA") (a copy of which is attached to the Access Motion as Exhibit B) wherein DynaVox Inc. agrees to disclose, and will use its best efforts to cause its direct and indirect subsidiaries (i.e., the Operating Companies) to disclose, certain confidential

11

financial, technical and other business information to Tobii, which information is subject to, and required to be kept strictly confidential in accordance with, the terms of the NDA.

35.     In addition and in order to facilitate the due diligence and  a competitive sale process, as well as to evidence its commitment to the Proposal, on April 4, 2014, the Debtors and Tobii entered into a funding arrangement pursuant to a Secured Funding Agreement for Post-Petition Debtor-in-Possession Financing Facility ("Funding Agreement"), wherein Tobii has committed to fund an amount up to $350,000 (the "DIP Loan") subject to the terms and conditions in the Funding Agreement, to be used solely: (i) to pay professional fees, costs and expenses of the Debtors incurred in connection with preparing and prosecuting the Debtors' bankruptcy cases and a sales process involving the equity in Systems or assets of the Systems and the Operating Companies (the "Target"); and (ii) any fees required to be paid under 28 U.S.C. §1930.  As described below, the Debtors have filed a motion with this Court for the approval, on an interim and final basis, of the DIP Loan pursuant to the terms of the Funding Agreement.

36.     One of the conditions to the availability of funding under the proposed DIP Loan is that the Debtors provide prompt access to the books, records and management of the Operating Companies so as to enable Tobii to perform their due diligence of the Operating Companies and firm up and finalize the Proposal quickly.  Furthermore, this condition is not limited to Tobii. Indeed, it requires that access be made available for all potential bidders, subject to commercially reasonable confidentiality restrictions, like those contained in the NDA with Tobii.

### III.  FACTS IN SUPPORT OF FIRST DAY MOTIONS

37.     Concurrently with the filing of this affidavit, the Debtors are filing a number of applications seeking entry of orders (the "First Day Orders") which the Debtors believe are

necessary to enable them to enter Chapter 11 with minimal disruption and to advance the goal of maximizing the value of the Debtors' assets, specifically through the sale process utilizing the Proposal from Tobii.  The Debtors respectfully request that each of the First Day Orders be entered as a critical element in stabilizing and maximizing the value of the Debtors' assets during these Chapter 11 cases.  A brief description of the relief requested and the facts supporting each of the First Day Orders is set forth below.

**MOTION OF THE DEBTORS FOR AN ORDER DIRECTING JOINT ADMINISTRATION OF RELATED CHAPTER 11 CASES**

38.     By this Motion, the Debtors seek entry of an order directing joint administration of these Chapter 11 cases for procedural purposes only pursuant to Bankruptcy Rule 1015(b) and Local Rule 1015-1.

39.     The Debtors also request that the Clerk of the Court maintain one file and one docket for all of the Debtors' Chapter 11 cases, which file and docket shall be the file and docket for Dynavox Inc.

40.     The joint administration of the Debtors' Chapter 11 cases will permit the Clerk of the Court to utilize a single general docket for these cases and combine notices to creditors of the Debtors' respective estates and other parties-in-interest.  The Debtors anticipate that numerous notices, applications, motions, other pleadings and orders in these cases will affect all Debtors. Joint administration will permit counsel for all parties-in-interest to include the Debtors' respective cases in a single caption on the numerous documents that will be filed and served in these cases.  Joint administration also will enable parties-in-interest in each of the above-captioned Chapter 11 cases to be apprised of the various matters before the Court in all cases.

13

41.    The entry of an order of joint administration will significantly reduce the volume of paper that otherwise would be filed with the Clerk of the Court, render the completion of various administrative tasks less costly and minimize the number of unnecessary delays. Moreover, the relief requested by this Motion will simplify supervision of the administrative aspects of these cases by the Office of the United States Trustee.    Accordingly, the relief requested is warranted and will ease the administrative burden for the Court and the parties.

**EMERGENCY MOTION OF THE DEBTORS FOR AN ORDER (I) DIRECTING DYNAVOX SYSTEMS LLC, THE DEBTORS' OPERATING SUBSIDIARY, TO GRANT THE DEBTORS ACCESS TO THE BOOKS, RECORDS AND MANAGEMENT OF DYNAVOX SYSTEMS LLC AND ITS SUBSIDIARIES FOR THE PURPOSE OF CONDUCTING DUE DILIGENCE, AND (II) FOR RELATED RELIEF**

42.    By this Motion, the Debtors seek entry of an order directing the Operating Companies, under the control of the JEC-appointed management committee, to provide the Debtors with access to the books, records and management of the Operating Companies so that the Debtors can in turn allow Tobii to perform due diligence of the Operating Companies pursuant to the terms of the Proposal.    All such due diligence will be subject to the strict confidentiality provisions of the NDA executed by Tobii and referred to above.    Attached to the Motion as Exhibit C is a list of the due diligence items that Tobii has requested in respect of the Operating Companies in connection with the Proposal.    The Debtors and Tobii are willing to accept reasonable conditions on, or restrictions related to, such due diligence imposed by this Court so long as Tobii is provided the due diligence it requires to firm up and finalize the Proposal.    In addition, the Debtors request that this relief apply to other potential bidders who similarly are prepared to agree these confidentiality restrictions.

43.    Pursuant to the DIP Funding Agreement, it is a condition of availability under the DIP Loan that the Debtors obtain an order of this Court to provide Tobii (and other potential

bidders) with such access and due diligence within five (5) days after the filing of these chapter 11 cases. Moreover, given the control being exercised by JEC over the Operating Companies and the need for certainty as to the future of the Operating Companies, it is critical that the Debtors be provided such access so as to advance a sale of the Operating Companies, which in turn will provide sufficient consideration to fully repay the obligations to JEC under the Credit Agreement (to the extent such obligations are allowed by this Court) and to return a significant recovery to the creditors of the Debtors and ultimately the equity owners of the Debtors. As a result, the Debtors are seeking the relief on an emergency basis.

44.    In addition to the request for access to the books, records and management of the Operating Companies as set forth above, the Debtors are concerned about the lack of knowledge of, and transparency into, the manner in which the JEC controlled management committee is operating the day-to-day business of the Operating Companies. The Debtors' concern is heightened by the issues discussed above concerning the manner in which JEC wrestled voting control of the Operating Companies from the Debtors.

45.    For these reasons, the Debtors also seek an order of this Court directing the Operating Companies to allow a representative of the Debtors (as the 100% owner of the Operating Companies) to have access to the books, records premises and management of the Operating Companies to monitor the operations of the Operating Companies. At this time, the Debtors are not seeking to regain control over the operations of the Operating Companies, or interfere in the operations of the Operating Companies or otherwise make decisions in connection with such operations. Rather, the Debtors are concerned about the Operating Companies engaging in any transactions outside of the ordinary course of business, especially if such transactions adversely affect the value of the equity in the Operating Companies, including

any effort by the JEC-controlled management committee to sell any of the assets of the Operating Companies or by JEC to conduct a foreclosure sale in respect of the assets of the Operating Companies during the pendency of these chapter 11 cases and prior to the sale process shortly to be proposed herein.

46.      As a result, the Debtors also request that this Court enter an order that requires the Operating Companies to provide written notice to the Debtors of any transaction that the Operating Companies propose to engage in that would be outside the ordinary course of business, including any notice provided by JEC of the exercise of any rights or remedies under the Credit Agreement or Prepetition Loan Documents in respect of the Operating Companies.  In connection therewith, the Debtors reserve their right to seek additional relief from this Court, including injunctive relief, in the event any such transactions are proposed by the Operating Companies and/or JEC.

47.      I believe that this Motion and the relief sought therein is critical to the Debtors' efforts to maximize the value of their assets because without it, the Debtors would be unable to provide potential bidders for these assets with guaranteed access to the information necessary for any of them to conduct the diligence required to be able to make, finalize and close on any offer to purchase.

**DEBTORS' EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS PURSUANT
TO 11 U.S.C. §§ 105, 361, 362, 363, 364 AND 507 (1) APPROVING POSTPETITION
FINANCING, (2) GRANTING LIENS AND PROVIDING SUPERPRIORITY
ADMINISTRATIVE EXPENSE STATUS, (3) MODIFYING AUTOMATIC STAY; AND (4)
SCHEDULING A FINAL HEARING**

48.    Prior to the Petition Date, the Debtors engaged in a fulsome prepetition marketing
and sale process to sell the Operating Companies and/or to locate refinancing or an investor to
restructure their obligations.  The Debtors were unable to consummate any such transaction.  As
a result, and given their current financial condition, financing arrangements, and capital
structure, the Debtors have been unable to obtain financing from sources other than the DIP
Lender on terms more favorable than the DIP Facility.  The Debtors have been unable to obtain
unsecured credit allowable under Bankruptcy Code section 503(b)(1) as an administrative
expense.  The Debtors have also been unable to obtain credit:  (a) solely having priority over that
of administrative expenses of the kind specified in sections 503(b), 507(a) and 507(b) of the
Bankruptcy Code; or (b) secured solely by a lien on property of the Debtors and their estates that
is not otherwise subject to a lien.  Financing on a postpetition basis is not otherwise available
without granting the DIP Lender, (1) perfected security interests in and liens on (each as
provided therein) all of the Debtors' existing and after-acquired assets with the priorities set forth
in paragraph 7 of the proposed Interim Order, (2) superpriority claims with the priorities set forth
in paragraph 8 of the proposed Interim Order, and (3) the other protections set forth in the
Interim Order.

49.    The Debtors filed this Motion seeking approval, on an interim and final basis, of
the DIP Facility pursuant to the terms of the DIP Funding Agreement.  The Debtors' need to
obtain credit pursuant to the DIP Funding Agreement has been and continues to be immediate
and critical in order to enable the Debtors to prosecute these Cases and to administer and

preserve the value of their estates. The Debtors' ability to finance the prosecution of these Cases and to advance the sale of their assets (i.e., the System Membership Units) has required and continues to require the availability of working capital from the DIP Funding Agreement to fund the fees and expenses of professionals employed by the Debtors (as well as US Trustee fees), the absence of which would immediately and irreparably harm the Debtors, their estates, their creditors and equity holders, and the possibility for a successful reorganization. The Debtors do not have sufficient available sources of working capital and financing to operate in the ordinary course of business without the DIP Facility.

50.     The DIP Lender has indicated a willingness to provide financing to the Debtors subject to: (a) the entry of the proposed Interim Order no later than 5 days after the Petition Date; (b) entry of a Final Order no later than 45 days after the Petition Date; (c) approval of the terms and conditions of the DIP Facility and the DIP Documentation; and (d) entry of findings by this Court that such financing is essential to the Debtors' estates, that the DIP Lender is extending credit to the Debtors pursuant to the DIP Documentation in good faith, and that the DIP Lender's claims, superpriority claims, security interests, liens, rights, and other protections granted pursuant to the proposed Interim Order and the DIP Documentation will have the protections provided in section 364(e) of the Bankruptcy Code and will not be affected by any subsequent reversal, modification, vacatur, amendment, reargument or reconsideration of the proposed Interim Order, or any other order.

51.     I believe that the terms and conditions of the DIP Facility and the DIP Documentation are fair, reasonable, and the best available to the Debtors under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their

fiduciary duties, and are supported by reasonably equivalent value and consideration.  The DIP

Facility was negotiated in good faith and at arms' length among the Debtors and the DIP Lender.

52.    At the Final Hearing, the Debtors will seek final approval of the DIP Facility

pursuant to a proposed final order, which shall be in form and substance acceptable to the DIP

Lender, approving such postpetition financing arrangements, notice of which Final Hearing and

Final Order will be provided in accordance with the proposed Interim Order.


### SUMMARY OF SECOND DAY MOTIONS

53.    So as to enable the Debtors to smoothly transition into Chapter 11, they have

requested or will be requesting that the Court grant certain relief in the early stages of this case.

Specifically, the Debtors intend to seek: (i) authorization to employ and retain Genovese Joblove

& Battista, P.A. as their general bankruptcy counsel; (ii) authorization to employ and retain

Cousins Chipman & Brown, LLP as their local bankruptcy counsel; and (iii) to establish

procedures for interim compensation and reimbursement of professionals.

54.    With respect to the Debtors' request to employ and retain Genovese Joblove &

Battista, P.A. ("GJB") as its general bankruptcy counsel, and to employ and retain Cousins

Chipman & Brown, LLP ("CCB") as its local bankruptcy counsel, the Debtor seek to retain GJB

and CCB because of each firms general experience and knowledge in the field of debtor and

creditor rights and business reorganizations under chapter 11 of the Bankruptcy Code.  I believe

that GJB and CCB are especially well-suited for the type of representation required by the

Debtors.  In particular, GJB's attorneys and CCB's attorneys have been involved in many of the

largest and most complicated business reorganizations in jurisdictions across the country. I also

believe, based on the representations of GJB and CCB, that each of these firms neither holds nor

represents any interest adverse to the Debtors, and are disinterested persons as such term is defined in the Bankruptcy Code.

55.     With respect to the Debtors' request for the establishment of procedures for interim compensation and reimbursement of expenses of professionals, the Debtors believe that the requested relief will enable professionals to be paid partial amounts owed to them while ensuring appropriate oversight, while otherwise not unduly burdening the Court, the United States Trustee and the professionals.  Such relief has been established in other Chapter 11 cases in this and other districts, and I believe that the requested relief is in the best interests of the Debtors, their estates and their creditors.

## CONCLUSION

56.     For all of these reasons, I respectfully request that this Court grant the relief requested in each of the First Day Motions filed concurrently herewith.

57.     This concludes my declaration.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on _April 7_, 2014

_____
Erin L. Russell