## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| DYNAVOX INC., *et al.*,[1] | Case No. 14-10791 (PJW) |
| Debtors. | Jointly Administered |
| | **Bidding Procedures Objection Deadline: April 30, 2014 at 4:00 p.m. (ET)**<br>**Bidding Procedures Hearing Date: May 5, 2014 at 3:00 p.m. (ET)** |
| | **[Proposed] Sale Objection Deadline: May 15, 2014 at 4:00 p.m. (ET)**<br>**[Proposed] Sale Hearing Date: May 22, 2014 at 11:00 a.m. (ET)** |

### MOTION OF THE DEBTORS FOR ENTRY OF ORDERS:  (A)(I) APPROVING BID PROCEDURES RELATING TO SALE OF THE DEBTORS' ASSETS; (II) SCHEDULING A HEARING TO CONSIDER THE SALE; (III) APPROVING THE FORM AND MANNER OF NOTICE OF SALE BY AUCTION; AND (IV) GRANTING RELATED RELIEF; AND (B)(I) AUTHORIZING THE SALE OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS; AND (II) GRANTING RELATED RELIEF

The above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**" or the "**Sellers**") hereby move the Court (the "**Motion**"), pursuant to sections 105(a) and 363 of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (collectively, the "**Bankruptcy Code**"), and Rules 2002, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), for entry of two orders:  (a) one, substantially in the form attached hereto as **Exhibit "A"** (the "**Bid Procedures Order**"), (i) approving the bid procedures (the "**Bid Procedures**") substantially in the form attached hereto as **Exhibit "B"**, with respect to the proposed sale (the "**Sale**") of the Debtors' assets (the "**Acquired Assets**") which are comprised primarily of the Systems Membership Units (defined below), (ii) scheduling a hearing (the "**Sale Hearing**") on

---

[1]  The Debtors in these cases, along with the last four digits of their federal tax identification numbers, are (i) DynaVox Intermediate LLC (****); (ii) DynaVox Inc. (7281); and (iii) DynaVox Systems Holdings LLC (8157).  The mailing address for the Debtors is 2100 Wharton Street, Suite 400, Pittsburgh, Pennsylvania 15203.

the Sale and setting objection and bidding deadlines with respect to the Sale, (iii) approving the form and manner of notice of an auction for the Acquired Assets (the "**Auction**"), and (iv) granting related relief; and (b) a second order, substantially in the form attached hereto as **Exhibit "C"** (the "**Sale Order**"), (i) authorizing the Sale free and clear of liens, claims, encumbrances, and interests, including the JEC Liens (as defined below) and the DIP Liens (as defined below), with such liens, claims, encumbrances, and interests to attach to the proceeds, if any, received by the Debtors from the Sale (the "**Sale Proceeds**"), provided however, that if the Special Advance Terms have not been fully funded as required by the JEC DIP Funding Agreement (as defined below) at such time, then the Sale Proceeds shall be used to fund the remainder of the Special Advance Terms approved by the Court as part of the JEC DIP Financing Agreement (defined below) in these Chapter 11 cases (the "**Cases**"), and (ii) granting related relief.  In support of this Motion, the Debtors respectfully represent as follows:

## I.    JURISDICTION

1.    The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper in this district pursuant to 28 U.S.C. § 1408.  This matter is core within the meaning of 28 U.S.C. § 157(b)(2).

2.    The statutory predicates for the relief sought herein are sections 105(a) and 363 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004 and 9014, and Local Rule 6004-1.

## II.    BACKGROUND

**A.    Overview of the Debtors and Their Operations**

3.    On April 6, 2014, DynaVox Intermediate LLC ("**Intermediate**") filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "**Court**").  On April 7, 2014, DynaVox Inc. ("**DynaVox Inc.**") and DynaVox Systems Holdings LLC ("**Systems Holdings**") each filed a voluntary

2

petition for relief under Chapter 11 of the Bankruptcy Code in the Court (collectively with April 6, 2014, the "**Petition Date**").

4.      The Debtors have continued in possession of their properties and are operating and managing their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.      No request has been made for the appointment of a trustee or examiner and no committees have been appointed in these Cases.

**B.      The Debtors' Corporate Structure**

6.      DynaVox Inc. is a publicly-traded Delaware corporation and the ultimate corporate parent of the DynaVox group of companies (collectively "**DynaVox**"). DynaVox Inc. is the holder and owner of 99.14% of the membership interests in Systems Holdings. In turn, Systems Holdings is the holder and owner of 100% of the membership interests in Intermediate. DynaVox Inc., Systems Holdings and Intermediate are holding companies that do not have separate employees or operations.

7.      Rather, Intermediate is the owner and holder of 100% of the membership interests in an operating company that is not a debtor in these Cases, namely DynaVox Systems LLC ("**Systems**"). Systems and its direct and indirect subsidiaries are the operating entities in the DynaVox group of companies (sometimes collectively referred to herein as the "**Operating Companies**"). A corporate organizational chart showing the relationship of the Debtors to each other and to the Operating Companies is attached to the Russell Declaration (defined below) as Exhibit A.

**C.      The Debtors' Business**

8.      DynaVox was founded in 1983 on research completed at Carnegie Mellon University on the use of symbolic language to assist people with serious speech impairments.

Nineteen years before the introduction of the iPad, DynaVox recognized the tremendous power of combining mobile computing with an intuitive user experience to unlock speech for a segment of the population that had been unable to communicate. DynaVox has become the industry standard in providing innovative communication and special education solutions to the Speech Language Pathologist (SLP) community, teaching professionals, and school district administrators. Through its product leadership and strong industry relationships, DynaVox established a 65% market share in Augmentative and Assistive Communication solutions and an 80% share in special education symbol-based software, resulting in over $84 million in annual revenue in 2012.

9.      A more detailed overview of the Debtors and the reasons for the commencement of these Chapter 11 cases is set forth in the *Declaration of Erin L. Russell in Support of Chapter 11 Petitions and First Day* [Docket No. 4] (the "**Russell Declaration**") filed on the Petition Date and incorporated herein by reference.

**D.     Pre-Petition Secured Credit Facility, Forbearance Agreement and Prepetition Marketing and Sale Process.**

10.     On June 23, 2008, Intermediate, as guarantor, Systems, as the borrower, and the following direct and indirect subsidiaries of Systems: DynaVox Services Inc. ("**Services**"), Blink-Twice LLC ("**Blink-Twice**"), Mayer-Johnson LLC ("**Mayer-Johnson**"), DynaVox International Holdings Inc. ("**International**"), Eye Response Technologies, Inc. ("**ERT**") (Systems, Intermediate, Services, Blink-Twice, Mayer-Johnson, International and ERT are collectively referred to herein as the "**Borrower Parties**") entered into that certain Third Amended and Restated Credit Agreement, as amended (the "**Prepetition Credit Agreement**") with GE Business Financial Services Inc., as administrative agent and lender (the "**Agent**"), and those certain financial institutions as lenders under the Credit Agreement (collectively, the "**Prepetition Secured Lenders**"). Pursuant to the Prepetition Credit Agreement, the Prepetition

Secured Lenders agreed, subject to the terms and conditions set forth in the Prepetition Credit Agreement, to make certain loans and other financial accommodations to the Borrower Parties.

11.     Pursuant to the Prepetition Credit Agreement and the other loan documents entered into in connection therewith, as amended, and as modified by the Forbearance Agreement (defined below) (the "**Prepetition Loan Documents**"), the Agent, on behalf of the Prepetition Secured Lenders, asserts a first priority lien and security interest in and to substantially all of the assets of the Borrower Parties.   Neither DynaVox Inc. nor Systems Holdings nor the International Subsidiaries is a borrower or guarantor under the Prepetition Credit Agreement and the Agent does not have a lien on any of the assets of DynaVox Inc., Systems Holdings or the International Subsidiaries.

12.     However, on April 27, 2010, as part of the Prepetition Loan Documents, Intermediate and Agent entered into that certain Amended and Restated Pledge Agreement wherein Intermediate pledged its membership interests in Systems to Agent for the benefit of the Prepetition Secured Lenders as collateral security for the obligations owed under the Prepetition Credit Agreement (the "**Intermediate Pledge Agreement**").  As a result, the Agent, on behalf of the Prepetition Secured Lenders, asserted a lien on 100% of the membership interests owned by Intermediate in Systems (the "**Systems Membership Units**") and indirectly in the Operating Companies.   The Systems Membership Units comprise substantially all of the assets of Intermediate.

13.     By letter to Systems, dated April 4, 2013, the Agent notified Systems that the Agent was reserving all of its rights and remedies as a result of the existence of an event of default in respect of a financial covenant under the Prepetition Credit Agreement for the failure of Systems to maintain the Fixed Charge Coverage Ratio required under the Prepetition Credit Agreement for the quarter ended March 29, 2013 (the "**Reservation Letter**").  The Agent did

not accelerate the obligations under the Prepetition Credit Agreement in the Reservation Letter, but instead notified Systems that it would monitor the situation on a "day to day" basis. The Agent also reserved its rights, among other things, to terminate the commitment to make loans under the Prepetition Credit Agreement, to accelerate the obligations under the Prepetition Credit Agreement and to foreclose on or otherwise realize on its collateral in accordance with the Prepetition Loan Documents.

14.    On June 28, 2013, in response to the demand from the Agent, the Borrower Parties were required to prepay a portion of the principal due and owing under the Prepetition Credit Agreement by an amount equal to $10,000,000. As of July 29, 2013, the Agent asserted that the outstanding principal balance of the obligations due under the Prepetition Credit Agreement, after application of such principal prepayment, was at least $15,200,000 exclusive of interest, fees and expenses.

15.    On or about July 29, 2013, the Borrower Parties, the Agent and the Prepetition Secured Lenders entered into a Forbearance Agreement and Fifth Amendment to Prepetition Credit Agreement (the "**Forbearance Agreement**"), which Forbearance Agreement provided, in addition to the forbearance of principal payments and other accommodations to the Borrower Parties, for, among other things, the Borrower Parties to engage the services of an investment banking firm to assist the Borrower Parties in developing and conducting a marketing and sale process for the Borrower Parties or substantially all of their assets, and to negotiate, document and consummate a sale acceptable to the Prepetition Secured Lenders of the Borrower Parties or their assets. The Forbearance Agreement provided that the Prepetition Secured Lenders would forbear from accelerating the obligations under the Prepetition Credit Agreement and exercising any default related rights or remedies thereunder if the Borrower Parties complied with the sale milestones set forth in the Forbearance Agreement in connection with such sale. The

Forbearance Agreement also provided that the Borrower Parties were required to consummate an acceptable sale prior to October 31, 2013.

16.     From July 2013 through the end of October, 2013, the Borrower Parties, with the assistance of its investment banker, Bulger Partners, LLC, engaged in a fulsome marketing and sale process to sell the businesses of the Borrower Parties as a going concern in an effort to maximize the value of their assets for all stakeholders in the DynaVox group of companies (the **"Pre-Petition Marketing Process"**).  During the Pre-Petition Marketing Process, the Borrower Parties, through their investment banker, contacted and engaged with 105 potential buyers, including 60 financial buyers and 45 strategic buyers (the **"Pre-Petition Potential Purchasers"**), to determine whether any such parties had an interest in pursuing a transaction with the Borrower Parties.

17.     By the end of October 2013, several interested parties had performed a substantial amount of due diligence on the businesses and assets of the Borrower Parties and had presented various written indications of interest to pursue a transaction.   Certain of the proposed transactions (subject to the terms thereof) provided for consideration in excess of the obligations owing under the Prepetition Credit Agreement.  Notwithstanding the positive progress made by the Borrower Parties as of the end of October 2013, the Borrower Parties were unable to meet the deadline of October 31, 2013 to consummate an acceptable sale transaction pursuant to the terms of the Forbearance Agreement.

18.     As a result, on October 21, 2013, the Agent and the Borrower Parties entered into a certain Consent and Amendments Under Forbearance Agreement (the **"Consent"**).  Pursuant to the terms of the Consent, the Agent agreed to extend certain sale milestone deadlines under the Credit Agreement, including extending the outside date to consummate an acceptable sale to December 6, 2013.

19.     Thereafter, through the end of 2013 and into the early part of 2014, the Borrower Parties continued to work with those potential purchasers who had made proposals to enter into a transaction in an attempt to finalize, document and consummate a transaction.  Despite all best efforts on the part of the Borrower Parties to do so, the Borrower Parties were not able to finalize a transaction with any such potential purchasers that was acceptable to the Borrower Parties and the Agent. As a result, the Forbearance Agreement expired on its own terms and was not extended.

20.     Thereafter, on or about February 2014, the Agent and Prepetition Secured Lenders elected to market and sell the debt obligations under the Prepetition Credit Agreement (as defined in the Credit Agreement, the "**Obligations**").  On February 21, 2014, the Agent and Prepetition Secured Lenders in fact sold, assigned and transferred to an entity named JEC-BR Partners, LLC, a Delaware limited liability company ("**JEC**"), all of their right, title and interest in and to the Obligations (as defined in the Prepetition Credit Agreement) and any and all other rights and remedies held by the Agent and the Prepetition Secured Lenders under the Prepetition Credit Agreement and the Prepetition Loan Documents (all liens and security interests granted in connection therewith are herein referred to as the "**JEC Liens**").  As a result of such loan sale, JEC became and is the sole owner and holder of the Obligations under the Prepetition Credit Agreement as well as the rights and remedies therein and under the Prepetition Loan Documents.

21.     On March 18, 2014, JEC, as successor to Prepetition Secured Lenders and Agent, delivered copies of executed corporate resolutions to the Borrower Parties wherein JEC purported to exercise its rights under the Intermediate Pledge Agreement (and the accompanying Irrevocable Proxy Coupled With Interest dated April 30, 2012) (the "**Resolutions**").  Pursuant to the Resolutions, JEC removed the existing members of the management committee of Systems and also reconstituted the management committee of Systems with three of its own employees.

JEC also executed similar resolutions taking control of the direct and indirect subsidiaries of Systems. Since then, JEC, through the reconstituted management committee, has been in control of the Operating Companies, including Systems and each of its direct and indirect subsidiaries.

22.    On March 21, 2014, JEC issued notice to the Debtors that JEC had scheduled a sale, at public auction, of 100% of the Systems Membership Units for March 31, 2014 (the "**Public Sale**"). Thereafter, on March 27, 2014, JEC issued notice to the Debtors that JEC had extended the date for the Public Sale from March 31, 2014 to April 7, 2014 at 10:00 a.m.

E.    **Tobii Letter of Intent and Funding Agreement**

23.    On April 4, 2014, the Debtors received an acquisition proposal dated April 3, 2014 (the "**Proposal**") from Tobii Technology AB, a Swedish corporation ("**Tobii**"), offering cash in excess of the amounts necessary to satisfy the Obligations owed to JEC and relieve the lien on the Systems Membership Units, subject to the performance by Tobii of due diligence and other conditions, such as agreement on mutually agreeable deal documentation. Tobii is a high-technology company that develops and sells products for eye control and eye tracking.

24.    To permit diligence while also protecting the interests of DynaVox (including the Operating Companies) in its confidential information, on April 4, 2014, Tobii and DynaVox Inc., on behalf of itself and its direct and indirect subsidiaries, entered into that certain Confidentiality and Nondisclosure Agreement ("**NDA**") wherein DynaVox Inc. agreed to disclose, and to use its best efforts to cause its direct and indirect subsidiaries (*i.e.*, the Operating Companies) to disclose, certain confidential financial, technical and other business information to Tobii, which information is subject to, and required to be kept strictly confidential in accordance with, the terms of the NDA. In addition, and in order to facilitate the due diligence and a competitive sale process, as well as to evidence its commitment to the Proposal, on April 4, 2014, the Debtors and Tobii entered into a funding arrangement pursuant to a Secured Funding Agreement for Post-

Petition Debtor-in-Possession Financing Facility (the "**Tobii DIP Funding Agreement**") for which the Debtors sought Court approval as one of their "first day" motions. Among the conditions for the postpetition availability of credit under the Tobii DIP Funding Agreement was entry of an order granting Tobii access to the books, records, management and personnel of the Operating Companies so as to enable Tobii to conduct due diligence in connection with its contemplated purchase of the Systems Membership Units. Consistent with that requirement, the Debtors filed their *Emergency Motion for an Order (i) Directing DynaVox Systems, LLC, the Debtors' Operating Subsidiary, to Grant the Debtors Access to Books, Records and Management of DynaVox Systems LLC and its Subsidiaries for the Purpose of Conducting Due Diligence and (ii) Granting Related Relief* [Dkt. No. 6] (the "**Due Diligence Motion**"), seeking such access to information for all potential bidders. Ultimately, the Tobii DIP Funding Agreement was not approved because, as described below, it was replaced by alternative funding offered by JEC. In connection with the replacement of the Tobii DIP Funding Agreement, in addition to the other matters discussed below, the Debtors (and JEC) agreed that Tobii shall be pre-qualified as a bidder under any bidding procedures established for the sale of the Systems Membership Units.

**F.     The JEC Replacement Funding Agreement**

25.     On April 9, 2014, the Debtors, Tobii and JEC negotiated the terms of a replacement funding agreement (the "**JEC DIP Funding Agreement**"). The JEC DIP Funding Agreement contained substantially similar terms as the Tobii DIP Funding Agreement, however, it provided other terms and conditions for the Debtors estates, including certain Interim Availability Conditions (as defined therein) requiring the filing of this Motion.

26.     A copy of the JEC DIP Funding Agreement is attached as Exhibit A to the *Interim Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507 (1) Approving Postpetition Financing, (2) Granting Liens and Providing Superpriority Administrative Expense Status, (3)*

*Modifying Automatic Stay; and (4) Scheduling a Final Hearing* [Docket No. 40] (the "**Interim DIP Order**"), approved by the Bankruptcy Court on April 14, 2014.

27.    As set forth more fully on the record at the April 9, 2014 hearing before the Court, pursuant to the JEC DIP Funding Agreement, JEC has committed to fund an amount up to $400,000 (the "**DIP Loan**") subject to the terms and conditions contained in the JEC DIP Funding Agreement, including the liens and security interests granted therein to JEC (the "**DIP Liens**") to be used solely: (i) to pay professional fees, costs and expenses of the Debtors incurred in connection with prosecuting the Debtors' bankruptcy cases and a sales process involving the Systems Membership Interests or assets of the Systems and the Operating Companies (the "**Target**"); and (ii) any fees required to be paid under 28 U.S.C. §1930.

28.    The JEC DIP Funding Agreement is also subject to certain Interim Availability Conditions (as defined therein), including: (a) the filing by the Debtors of this Motion, on or before April 14, 2014, seeking the approval of a sale of the Systems Membership Units pursuant to section 363 of the Bankruptcy Code; (ii) a request for the approval of bid procedures in connection therewith; (iii) a request that the Court hold a hearing on the approval of such bid procedures on or before May 5, 2014; and (iv) a request that a hearing on the sale of the Systems Membership Units be held on or before May 22, 2014.

29.    The JEC DIP Funding Agreement terminates should the Court fail to enter an order: (i) approving the Bid Procedures on or before May 7, 2014, or (ii) approving the Sale of the Systems Membership Units on or before May 23, 2014.

30.    In accordance with the JEC DIP Funding Agreement, JEC is permitted to credit bid any amount not exceeding the accrued DIP Obligations (as defined therein). In addition, JEC has reserved any and all rights to credit bid under Section 363(k) of the Bankruptcy Code the total amount due and owing under the Prepetition Loan Documents, which amount is estimated

to be $14,500,000.00, (the "**JEC Prepetition Debt**") (the DIP Obligations plus the JEC Prepetition Debt shall be referred to herein collectively as the "**JEC Debt**").

31.      Prior to the filing of these Cases, the Debtors investigated the claims, liens and security interests under the Prepetition Loan Documents and do not believe there are any legitimate bases to object to such claims, liens and security interests.  Moreover, the Debtors acknowledged such claims, liens and security interests under the Forbearance Agreement.  As a result, the Debtors do not intend to object to JEC asserting a credit bid for the JEC Debt in connection with the proposed sale of the Systems Membership Interests.  The Debtors intentions in respect of JEC asserting a credit bid does not and is not intended to bind any other party in interest in these Cases.

32.      Notwithstanding the foregoing, the Debtors hereby reserve any and all rights, claims and causes of action against JEC related to any act or omission of JEC, and is not and does not release JEC from any such claims or causes of action in connection herewith.

### III.      THE PROPOSED SALE AND RELATED PROCEDURES

**A.      The Proposed Sale.**

33.      After substantial analysis, the Debtors believe that it is in the best interests of the Debtors and their estates to sell the Acquired Assets, consisting primarily of the Systems Membership Units, subject to higher and better offers, on an as-is, where-is basis.

34.      As set forth above in connection with the Prepetition Marketing Process, the Debtors extensively marketed the Acquired Assets for months prior to the Petition Date.  In order to ensure the Acquired Assets are fully and adequately marketed in this Sale process, the Debtors have, prior to the approval of the Bid Procedures, resumed  their Pre-Petition Marketing Process by re-contacting all of the Pre-Petition Potential Purchasers, including JEC and Tobii, to inform them of this proposed Sale and to notify them of the proposed Bidding Procedures.

35.     Finally, pursuant to the *Order Granting Emergency Motion of the Debtors for an Order (i) Directing Dynavox Systems, LLC, the Debtors' Operating Subsidiary, to Grant the Debtors Access to the Books, Records and Management of Dynavox Systems LLC and its Subsidiaries for the Purpose of Conducting Due Diligence, and (ii) Granting Related Relief* [Docket No. 39](the **"Due Diligence Order"**), approved by the Bankruptcy Court on April 14, 2014, the electronic data room utilized by the Operating Companies in the Pre-Petition Marketing Process was made operational again and updated with current information (the **"Data Room"**), and was opened on April 11, 2014, and will enable all potential bidders to conduct due diligence on the Operating Companies pursuant to the terms of the Due Diligence Order.

**B.      Proposed Bid Procedures.**

36.     The Debtors believe that it is imperative that they promptly move forward with the Auction and the Sale in order to generate and retain any potential purchasers' interest in the Acquired Assets and to maximize their value for the benefit of their estates.  Given the limited funding available to the Debtors, including under the JEC DIP Funding Agreement, the Debtors have no choice but to attempt to market their assets in an expedited manner to preserve and maximize the value of the Systems Membership Units.  Moreover, the Debtors do not have a "stalking horse" buyer to advance in connection with such sale process.  Accordingly, the Bid Procedures (as summarized below) were developed consistent with the Debtors' need to expedite the Sale process without a "stalking horse," but with the objective of promoting active bidding that will result in the highest or best offer for the Acquired Assets.  Moreover, the Bid Procedures reflect the Debtors' objective of conducting the Auction in a controlled, but fair and open manner that promotes interest in the Acquired Assets by financially-capable, motivated bidders who are likely to close a transaction.

37.     The Debtors seek to conduct an open and fair Sale process pursuant to which the winning bidder will receive an executed Bill of Sale (the "**Bill of Sale**"), substantially in the form attached hereto as **Exhibit "D"**, for the purchase of the Systems Membership Units, together with an endorsed copy of the certificate evidencing the Systems Membership Units, on an as-is, where-is basis, free and clear of any liens, claims and encumbrances, with such liens, claims and encumbrances to attach to the Sale Proceeds, if any.

38.     Attached to this Motion as **Exhibit "B"** are the proposed Bid Procedures. Pursuant to Local Rule 6004-1:  (a) each bidder participating at the Auction will be required to confirm that it has not engaged in any collusion with respect to the bidding or the Sale; (b) the Auction will be conducted openly, but only the Debtors, JEC, Tobii (if they submit a Qualified Bid), any representative of any Official Committee appointed in the Cases (the "**Committee**"), and any Qualified Bidder who has timely submitted a Qualified Bid, together with professional advisors to each of the foregoing, may attend the Auction, and (c) bidding at the Auction will be transcribed.  The Bid Procedures are typical for asset sales of this size and nature, require a deposit (except with regard to JEC or its designee), include provisions for consultation with any Committee, and require that a bidder be a "**Qualified Bidder**" as defined in the Bid Procedures.

39.     The following paragraphs in this section summarize key provisions of the Bid Procedures, but are qualified in their entirety by reference to the actual Bid Procedures:[2]

    a.    <u>Participation Requirements</u>.

        i.    <u>Confidentiality Agreement</u>.  An executed confidentiality agreement in form and substance reasonably acceptable to the Debtors (each a "**Confidentiality Agreement**");

        ii.    <u>Identification of Potential Bidder</u>.  Identification of the Potential Bidder and any principals and representatives thereof who are authorized to appear and act on their behalf for all purposes

---

[2]    Capitalized terms not defined in the below sub-paragraphs shall have the meanings ascribed to them in the Bid Procedures attached hereto as **Exhibit "B"**.

regarding the contemplated Sale of the Systems Membership Units (the **"Transaction"**);

    iii.    <u>Proof of Financial Ability to Perform</u>. The most current audited and latest unaudited financial statements (collectively, the **"Financials"**) of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of the Proposed Sale, Financials of the equity holder(s) of the Potential Bidder or such other form of financial disclosure evidencing the Potential Bidder's ability to close the Transaction, the sufficiency of which shall be determined by the Debtors in their reasonable discretion after consultation with any Committee; and

  b.    <u>Qualified Bid</u>.[3]

    i.    <u>Modified Bill of Sale and Sale Order</u>. A Bid must include fully executed transaction documents pursuant to which the Qualified Bidder proposes to effectuate the contemplated Transaction. A Bid shall include a blacklined copy of the Bill of Sale and the Sale Order (the **"Modified Agreement"**) to show all changes requested by the Bidder.

    ii.    <u>Acquired Assets</u>. Each Bid must be for all of the Acquired Assets.

    iii.    <u>Contingencies</u>. A Bid may not be conditioned on obtaining internal approval, obtaining financing or on the outcome or review of due diligence after the Auction.

    iv.    <u>Authorization to Bid</u>. Each Bid must include evidence of authorization and approval from such Qualified Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Modified Agreement.

    v.    <u>Good Faith Deposit</u>. Each Bid must be accompanied by a cash deposit in an amount equal to ten percent (10%) of the highest proposed purchase price offered by the Qualified Bidder in its Qualified Bid (the **"Good Faith Deposit"**).

    vi.    <u>No Fees Payable to Qualified Bidder</u>. A Bid shall not request or entitle the Qualified Bidder to any termination fee, expense reimbursement or similar type of payment.

    vii.    <u>Financing Sources</u>. A Bid must contain evidence of the ability to consummate the Transaction satisfactory to the Debtors with appropriate contact information for all such financing sources.

---

[3]    JEC and Tobii shall be deemed a Qualified Bidder. Pursuant to the JEC DIP Financing Agreement, JEC's credit bid is a Qualified Bid.

viii. <u>Minimum Initial Bid Requirement</u>.  There is no minimum initial overbid being required by the Debtors in connection with a Qualified Bid.  Notwithstanding, the Debtors represent that they shall proceed with the Auction (assuming more than one Qualified Bid is received) and the Sale if the Debtors receive the following initial minimum bid requirement: (a) a purchase price equal to the JEC Debt plus an amount equal to $250,000, and (b) contain a waiver of any intercompany obligations owed by the Operating Companies to the Debtors (the "**Minimum Initial Bid**").  If the Minimum Initial Bid is not received by the Bid Deadline, then the Debtors reserve the right to cancel the Auction and the Sale Hearing in the exercise of their business judgment.

ix. <u>Subsequent Overbids</u>.  Each subsequent Overbid must be in increments of at least Two Hundred Thousand Dollars ($200,000) in cash or cash equivalents, or additional credit bid if made by JEC.

x. <u>Other Evidence</u>.  Each Bid must contain evidence satisfactory to the Debtors (based on availability of financing, experience, and other considerations) that the bidder will be able to timely consummate the Transaction if selected as the Successful Bidder.

c. <u>Bid Deadline</u>.  The deadline for submitting bids by a Qualified Bidder shall be May 20, 2014, at 12:00 p.m. (Prevailing Eastern Time) (the "**Bid Deadline**").  A Bid received after the Bid Deadline shall not constitute a Qualified Bid.

d. <u>Auction</u>.  Subject to the Debtors' reservations of rights above in respect of Minimum Initial Bids, only in the event that the Debtors receive at least two (2) Qualified Bids by the Bid Deadline, the Debtors shall conduct the Auction of the Acquired Assets to determine the highest and otherwise best bid with respect to the Acquired Assets (the "**Baseline Bid**").  No later than May 20, 2014, at 5:00 p.m. (Prevailing Eastern Time), the Debtors will notify all Qualified Bidders of (i) whether the Debtors intend to proceed with an Auction, and (ii) if so, then the Baseline Bid.  The Auction shall commence at 10:00 a.m. (Prevailing Eastern time) on May 21, 2014, at the offices of Cousins Chipman & Brown, LLP, 1007 North Orange Street, Suite 1110, Wilmington, Delaware, 19801.

e. <u>Sale Hearing</u>.  The Sale Hearing shall be conducted by the Bankruptcy Court on May 22, 2014 at 11 a.m.

f. <u>Modifications</u>.  The Bid Procedures may not be materially modified except upon order of the Bankruptcy Court or with the express written consent of the Debtors (after consultation with the Committee, if any, and JEC).  The Debtors further reserve the right to seek an extension of the Sale Hearing in the event of non-compliance with the Due Diligence

Order in respect of providing reasonable access to potential bidders to conduct due diligence of the Operating Companies.

40.     The Debtors, in consultation with JEC and any Committee, expressly reserve the right to modify the relief requested herein.  Moreover, the Debtors, in consultation with JEC and any Committee, reserve the right, upon notice to all Notice Parties (as defined below) and those parties that have demonstrated an interest in bidding on the Acquired Assets, to: (a) waive terms and conditions set forth herein with respect to any or all potential bidders; (b) impose additional terms and conditions with respect to any or all potential bidders; (c) extend the deadlines set forth herein; (d) cancel or extend the sale of the Acquired Assets and/or Sale Hearing in open court without further notice; and (e) amend the Bid Procedures as they may determine to be in the best interests of their estates or to withdraw the Motion at any time with or without prejudice. Notwithstanding anything herein to the contrary, in the event JEC (or its designee) submits a Qualified Bid, then JEC shall not be entitled to its consultation rights hereunder.

41.     JEC and Tobii are each deemed to be a Qualified Bidder.  For avoidance of doubt, JEC and Tobii shall be required to submit a Qualified Bid by the Bid Deadline and meet all of the requirements of a Qualified Bid set forth above in order to participate in the Auction or be considered at the Sale Hearing, provided however, that JEC shall not be required to submit a Good Faith Deposit.

**C.    Notice of Auction.**

42.     The Debtors seek to have the Auction scheduled for a date no later than May 21, 2014.  The value of the Acquired Assets may decline substantially if the Sale process is not completed on an expedited basis.  Further, potential bidders may lose confidence in the certainty of the Sale process and decide to stop pursuing the purchase of the Acquired Assets.  As such, it is imperative to move forward with the Auction and the Sale promptly.

43.     Not later than three business days after the entry of the Bid Procedures Order, the Debtors will serve copies of the Sale Notice, substantially in the form attached hereto as **Exhibit "E"** (the "**Sale Notice**"), the Bid Procedures, and the Bid Procedures Order by mail, postage prepaid to:  (a) all entities known to have expressed a *bona fide* interest in acquiring the Acquired Assets (by overnight mail); (b) counsel to JEC; (c) counsel to Tobii; (d) the Office of the United States Trustee for the District of Delaware; (e) known entities holding or asserting a security interest in or lien against any of the Acquired Assets; (f) taxing authorities whose rights may be affected by a sale of the Acquired Assets; (g) counsel to the Committee; (h) all Attorneys General for the states in which the Debtors conduct business; (i) the Securities and Exchange Commission; and (j) all parties that have requested notice pursuant to Bankruptcy Rule 2002 as of the date prior to the date of entry of the Bid Procedures Order.

44.     The Debtors further request, pursuant to Bankruptcy Rule 9014, that objections, if any, to the proposed Sale: (a) be in writing; (b) comply with the Bankruptcy Rules and the Local Rules; (c) be filed with the Clerk of the United States Bankruptcy Court for the District of Delaware, 824 Market Street, 3rd Floor, Wilmington, Delaware, 19801; and (d) be served so as to be received by:  (i) the Debtors; (ii) counsel to the Debtors; (iii) counsel to JEC; (iv) counsel to Tobii; (v) the Office of the United States Trustee; and (vi) all parties entitled to notice pursuant to Bankruptcy Rule 2002, in accordance with Local Bankruptcy Rule 2002-1(b) (collectively, the "**Notice Parties**").

## IV.     RELIEF REQUESTED

45.     By this Motion, the Debtors seek the entry of two orders of this Court:  (a) the Bid Procedures Order (i) approving the Bid Procedures with respect to the Sale of the Acquired Assets, (ii) scheduling the Sale Hearing and setting objection and bidding deadlines with respect to the Sale, (iii) approving the form and manner of notice of the Auction, and (iv) granting

related relief; and (b) the Sale Order (i) authorizing the Sale free and clear of liens, claims, encumbrances and interests, with such liens, claims, encumbrances and interests to attach to the Sale Proceeds, if any, and (ii) granting related relief.

46.     As described above, the Debtors, after extensive prepetition efforts to maximize value, ultimately determined in the exercise of their reasonable business judgment that the most effective way to maximize the value of the Debtors' estates for the benefit of their constituents would be to sell substantially all of their assets.  The Debtors believe that the proposed Sale will maximize the value of the Debtors' assets for all stakeholders.

## V.     **BASIS FOR RELIEF REQUESTED**

**A.     The Sale is Within the Sound Business Judgment
of the Debtors and Should Be Approved.**

47.     Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a debtor-in-possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."   11 U.S.C.  §  363(b)(1).   Section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of a debtor's assets prior to confirmation of a plan.  However, courts in this Circuit and others have required that the decision to sell assets outside the ordinary course of business be based upon the sound business judgment of the debtors.  *See In re Abbotts Dairies of Pennsylvania, Inc.,* 788 F.2d 143 (3d Cir. 1986); *see also Myers v. Martin (In re Martin),* 91 F.3d 389, 395 (3d Cir. 1996); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.),* 722 F.2d 1063, 1071 (2d Cir. 1983); *Dai-Ichi Kangyo Bank, Ltd v. Montgomery Ward Holding Corp., (In re Montgomery Ward Holding Corp.),* 242 B.R. 147, 153 (D. Del. 1999); *In re Delaware & Hudson Ry. Co.,* 124 B.R. 169, 176 (D.D.C. 1991).

48.     The "sound business judgment" test requires a debtor to establish four elements in order to justify the sale or lease of property outside the ordinary course of business, namely,

(a) that a "sound business purpose" justifies the sale of assets outside the ordinary course of business, (b) that adequate and reasonable notice has been provided to interested persons, (c) that the debtors have obtained a fair and reasonable price, and (d) good faith. *Abbotts Dairies,* 788 F.2d 143; *Titusville Country Club v. Pennbank (In re Titusville Country Club),* 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); *In re Sovereign Estates, Ltd,* 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989). The Debtors submit that the decision to proceed with the Sale and the Bid Procedures related thereto is based upon their sound business judgment and should be approved. A debtor's showing of a sound business purpose need not be unduly exhaustive but, rather, a debtor is "simply required to justify the proposed disposition with sound business reasons." *In re Baldwin United Corp.,* 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984). Whether or not there are sufficient business reasons to justify a transaction depends upon the facts and circumstances of each case. *Lionel,* 722 F.2d at 1071; *Montgomery Ward,* 242 B.R. at 155 (approving funding of employee incentive and severance program; business purpose requirement fulfilled because stabilizing turnover rate and increasing morale were necessary to successful reorganization).

49.    Additionally, Section 105(a) of the Bankruptcy Code provides a bankruptcy court with broad powers in the administration of a case under the Bankruptcy Code. Section 105(a) provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). Provided that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated by the Bankruptcy Code, the exercise of its Section 105(a) power is proper. *In re Fesco Plastics Corp.,* 996 F.2d 152, 154 (7th Cir. 1993); *Pincus v. Graduate Loan Ctr. (In re Pincus),* 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002). Pursuant to Section 105(a), a court may fashion an order or decree that helps preserve or protect the value of a debtor's assets. *See, e.g., Chinichian v. Campolongo (In re Chinichian),* 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section

105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); *In re Cooper Props. Liquidating Trust, Inc.,* 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (noting that bankruptcy court is "one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws.").

50.     The Debtors submit that sound business justification exists to sell the Acquired Assets to the Successful Bidder pursuant to the Bid Procedures.  Absent a sale of their assets, the Debtors lack sufficient cash resources to pay their debts as they are due, and the value of the Acquired Assets will continue to decline absent a prompt sale.  Thus, the relief sought herein is not only reasonable, but necessary, to maximize the value of the Debtors' estates for the benefit of their stakeholders.

51.     The notice of Auction is designed to provide adequate notice to all potentially interested parties, including those who have previously expressed an interest in purchasing the Acquired Assets.  Indeed, the Debtors have and, upon approval of the Bid Procedures, will continue to market the Acquired Assets and will solicit the most likely interested competing bidders.  Accordingly, the proposed Sale satisfies the second prong of the *Abbotts Dairies* standard.

52.     Moreover, the Bid Procedures are designed to maximize the value received for the Acquired Assets.  The process set forth in the Bid Procedures allows for a timely and efficient auction process given the circumstances facing the Debtors, while providing bidders with ample time and information to submit a timely bid and perform diligence.  The Bid Procedures are designed to ensure that the Acquired Assets will be sold for the highest or otherwise best possible purchase price.  The Debtors are subjecting the Acquired Assets to market testing and permitting all prospective purchasers to bid on the Acquired Assets.  The proposed Sale will be

subject to a market check through the solicitation of competing bids in a court-supervised Auction process as set forth in the Bid Procedures. Accordingly, the Debtors and all parties-in-interest can be assured that the consideration received for the Acquired Assets will be fair and reasonable, and, thereby satisfying the third prong of the *Abbotts Dairies* standard. The "good faith" prong of the *Abbotts Dairies* standard is also satisfied as discussed further below.

**B.      The Sale is Proposed in "Good Faith".**

53.     The Debtors request that the Court find that the Successful Bidder is entitled to the benefits and protections provided by Section 363(m) of the Bankruptcy Code in connection with the Sale.

54.     Section 363(m) of the Bankruptcy Code provides, in pertinent part:

> The reversal or modification on appeal of an authorization under subsection (b) . . . of this section of a sale . . . of property does not affect the validity of a sale . . . under such authorization to an entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m).

55.     Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets sold pursuant to Section 363 of the Bankruptcy Code from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal. By its terms, Section 363(m) of the Bankruptcy Code applies to sales of interests in tangible assets, such as the Acquired Assets.

56.     The Debtors submit, and will present evidence at the Sale Hearing, if necessary, that as set forth above, the Sale was an arm's-length transaction, in which the Successful Bidder acted in good faith. The Auction is an open and fair sale process, and the Debtors will have their own separate legal counsel to negotiate on their behalf throughout the Auction and the Sale. Accordingly, the Debtors request that the Court make the finding at the Sale Hearing that the

Successful Bidder has purchased the Acquired Assets in good faith within the meaning of section 363(m) of the Bankruptcy Code.

**C.    The Sale Satisfies the Requirements of Section 363(f) of the Bankruptcy Code.**

57.    Under Section 363(f) of the Bankruptcy Code, a debtor-in-possession may sell all or any part of its property free and clear of any and all liens, claims, or interests in such property if:  (a) such a sale is permitted under applicable non-bankruptcy law; (b) the party asserting such a lien, claim, or interest consents to such sale; (c) the interest is a lien and the purchase price for the property is greater than the aggregate amount of all liens on the property; (d) the interest is the subject of a bona fide dispute; or (e) the party asserting the lien, claim, or interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction for such interest. 11 U.S.C. § 363(f); *Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot),* 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that Section 363(f) of the Bankruptcy Code is written in the disjunctive; therefore, a court may approve a sale "free and clear" provided at least one of the subsections is met).

58.    JEC, as the Debtors' pre-petition secured lender, has consented to the form of the Bid Procedures and the Bill of Sale in substantially the forms attached hereto.    As a result, the Debtors have satisfied, at minimum, the second requirement of Section 363(f) of the Bankruptcy Code, if not others as well.  Therefore, approving the sale of the Acquired Assets free and clear of all adverse interests is warranted.  Furthermore, courts have held that they have the equitable power to authorize sales free and clear of interests that are not specifically covered by Section 363(f).  *See, e.g., In re Trans World Airlines, Inc.,* 2001 WL 1820325 at *3, 6 (Bankr. D. Del. March 27, 2001); *Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.),* 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987).  As a result, the Acquired Assets may be sold free and clear of JEC's prepetition liens.

**D.    Relief from the Fourteen Day Waiting Period
Under Bankruptcy Rule 6004(h) is Appropriate.**

59.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  The Debtors request that the Sale Order be effective immediately by providing that the fourteen-day stay under Bankruptcy Rule 6004(h) is waived.

60.    The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before an order can be implemented.  *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h).  Although Bankruptcy Rules 6004(h) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen-day stay period, Collier on Bankruptcy suggests that the fourteen-day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure."  10 Collier on Bankruptcy 15th Ed. Rev., ¶6064.09 (L. King, 15th rev. ed. 1988).  Furthermore, Collier's provides that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal.  *Id.*

61.    As described above, time is clearly of the essence, given the time constraints imposed by the JEC DIP Financing Agreement, and the continuing over-all market uncertainty and volatility are causing a decline of the value of the Debtors' estates.  Since a prompt closing of the Sale is of critical importance, the Debtors hereby request that the Court waive the fourteen-day stay period under Bankruptcy Rule 6004(h).

## VI.    NO PRIOR REQUEST

62.    No prior Motion for the relief requested herein has been made to this or any other court.

## VII.    <u>NOTICE</u>

63.    Notice of this Motion has been given to the following parties or, in lieu thereof, to their counsel, if known: (a) the Office of the United States Trustee for the District of Delaware; (b) the Debtors' twenty (20) largest unsecured creditors as identified in their Chapter 11 petitions; (c) counsel to JEC; (d) counsel to Tobii; (e) all taxing authorities having jurisdiction over any of the Acquired Assets subject to the sale, including the Internal Revenue Service; (f) the state/local environmental agencies in the jurisdictions where the Debtors own or lease real property; (g) all parties that have requested special notice pursuant to Bankruptcy Rule 2002 as of the date prior to the date of the filing of this Motion; (h) all persons or entities known to the Debtors that have or have asserted a lien on, or security interest in, all or any portion of the Acquired Assets; (i) the Securities and Exchange Commission; (j) all Attorneys General for the states in which the Debtors conduct business; and (k) all potential bidders previously identified or otherwise known to the Debtors.  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

WHEREFORE, the Debtors respectfully request (i) entry of the proposed Bid Procedures Order, substantially in the form attached hereto as **Exhibit "A"**; (ii) entry of the proposed Sale Order, substantially in the form attached hereto as **Exhibit "C"**; and (iii) such other and further relief as the Court deems just and proper.

Dated: April 14, 2014
      Wilmington, Delaware

**COUSINS CHIPMAN & BROWN, LLP**

William E. Chipman, Jr. (No. 3818)
Mark D. Olivere (No. 4291)
1007 North Orange Street, Suite 1110
Wilmington, Delaware  19801
Telephone:    (302) 295-0191
Facsimile:    (302) 295-0199
Email:         chipman@cbllp.com
         olivere@ccbllp.com

-AND-

**GENOVESE JOBLOVE & BATTISTA, P.A.**
Paul J. Battista (Fla. Bar No. 884126)
Heather L. Harmon (Fla. Bar No. 013192)
100 SE 2nd Street, Suite 4400
Miami, Florida 33131
Telephone:     (305) 349-2300
Facsimile:     (305) 349-2310)
Email:         pbattista@gjb-law.com
               hharmon@gjb-law.com

*Proposed Counsel to Debtors and*
*Debtors-In-Possession*