# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| DYNAVOX INC., *et al.*,[1] | Case No. 14-10791 (PJW) |
| Debtors. | Jointly Administered |
| | **Ref. Nos. 41, 85 and 88** |

## DECLARATION OF ERIN L. RUSSELL IN SUPPORT OF SALE MOTION

I, Erin L. Russell, hereby declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury as follows:

1. I am the Authorized Representative of DynaVox Inc. ("**DynaVox Inc.**")[2], DynaVox Systems Holdings LLC ("**Systems Holdings**") and DynaVox Intermediate LLC ("**Intermediate**") (collectively, the "**Debtors**" or the "**Company**"). I have been a Director of DynaVox Inc. since its formation in December 2009 and have been a member of the Management Committee of DynaVox Systems Holdings LLC since October 2007. I am familiar with the Debtors' day-to-day operations, business affairs, and books and records.

2. This declaration (the "**Declaration**") is filed in support of the *Motion of the Debtors For Entry of Orders: (A)(I) Approving Bid Procedures Relating to Sale of the Debtors' Assets; (II) Scheduling a Hearing to Consider the Sale; (III) Approving the Form and Manner of Notice of Sale By Auction; and (IV) Granting Related Relief; and (B)(I) Authorizing the Sale of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests; and (II) Granting Related Relief* [Docket No. 41] (the "**Sale Motion**").

---

[1] The Debtors in these cases, along with the last four digits of their federal tax identification numbers, are (i) DynaVox Inc. (7281); (ii) DynaVox Intermediate LLC (****); and (iii) DynaVox Systems Holdings LLC (8157). The mailing address for the Debtors is 2100 Wharton Street, Suite 400, Pittsburgh, Pennsylvania 15203.

[2] Capitalized terms used but not defined herein shall have the same meaning ascribed in the Sale Motion.

3. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of the Debtors' senior management and board of directors, the Debtors' legal, investment banking professionals and other professionals, my review of relevant documents, or my opinion based upon my experience and knowledge of the Debtors' operations and financial condition. If I were called to testify, I would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of the Debtors.

a. **Pre-Petition Secured Credit Facility, Forbearance Agreement and Prepetition Marketing and Sale Process.**

4. On June 23, 2008, Intermediate, as guarantor, Dynavox Systems LLC ("**Systems**"), as the borrower, and the following direct and indirect subsidiaries of Systems: DynaVox Services Inc. ("**Services**"), Blink-Twice LLC ("**Blink-Twice**"), Mayer-Johnson LLC ("**Mayer-Johnson**"), DynaVox International Holdings Inc. ("**International**"), Eye Response Technologies, Inc. ("**ERT**") (Systems, Intermediate, Services, Blink-Twice, Mayer-Johnson, International and ERT are collectively referred to herein as the "**Borrower Parties**") entered into that certain Third Amended and Restated Credit Agreement, as amended (the "**Prepetition Credit Agreement**") with GE Business Financial Services Inc., as administrative agent and lender (the "**Agent**"), and those certain financial institutions as lenders under the Credit Agreement (collectively, the "**Prepetition Secured Lenders**"). Pursuant to the Prepetition Credit Agreement, the Prepetition Secured Lenders agreed, subject to the terms and conditions set forth in the Prepetition Credit Agreement, to make certain loans and other financial accommodations to the Borrower Parties.

5. Pursuant to the Prepetition Credit Agreement and the other loan documents entered into in connection therewith, as amended, and as modified by the Forbearance

Agreement (defined below) (the "**Prepetition Loan Documents**"), the Agent, on behalf of the Prepetition Secured Lenders, asserts a first priority lien and security interest in and to substantially all of the assets of the Borrower Parties. Neither DynaVox Inc. nor Systems Holdings nor the International Subsidiaries is a borrower or guarantor under the Prepetition Credit Agreement and the Agent does not have a lien on any of the assets of DynaVox Inc., Systems Holdings or the International Subsidiaries.

6. However, on April 27, 2010, as part of the Prepetition Loan Documents, Intermediate and Agent entered into that certain Amended and Restated Pledge Agreement wherein Intermediate pledged its membership interests in Systems to Agent for the benefit of the Prepetition Secured Lenders as collateral security for the obligations owed under the Prepetition Credit Agreement (the "**Intermediate Pledge Agreement**"). As a result, the Agent, on behalf of the Prepetition Secured Lenders, asserted a lien on 100% of the membership interests owned by Intermediate in Systems (the "**Systems Membership Units**") and indirectly in the Operating Companies. The Systems Membership Units comprise substantially all of the assets of Intermediate.

7. By letter to Systems, dated April 4, 2013, the Agent notified Systems that the Agent was reserving all of its rights and remedies as a result of the existence of an event of default in respect of a financial covenant under the Prepetition Credit Agreement for the failure of Systems to maintain the Fixed Charge Coverage Ratio required under the Prepetition Credit Agreement for the quarter ended March 29, 2013 (the "**Reservation Letter**"). The Agent did not accelerate the obligations under the Prepetition Credit Agreement in the Reservation Letter, but instead notified Systems that it would monitor the situation on a "day to day" basis. The Agent also reserved its rights, among other things, to terminate the commitment to make loans

under the Prepetition Credit Agreement, to accelerate the obligations under the Prepetition Credit Agreement and to foreclose on or otherwise realize on its collateral in accordance with the Prepetition Loan Documents.

8. On June 28, 2013, in response to the demand from the Agent, the Borrower Parties were required to prepay a portion of the principal due and owing under the Prepetition Credit Agreement by an amount equal to $10,000,000. As of July 29, 2013, the Agent asserted that the outstanding principal balance of the obligations due under the Prepetition Credit Agreement, after application of such principal prepayment, was at least $15,200,000 exclusive of interest, fees and expenses.

9. On or about July 29, 2013, the Borrower Parties, the Agent and the Prepetition Secured Lenders entered into a Forbearance Agreement and Fifth Amendment to Prepetition Credit Agreement (the "**Forbearance Agreement**"), which Forbearance Agreement provided, in addition to the forbearance of principal payments and other accommodations to the Borrower Parties, for, among other things, the Borrower Parties to engage the services of an investment banking firm to assist the Borrower Parties in developing and conducting a marketing and sale process for the Borrower Parties or substantially all of their assets, and to negotiate, document and consummate a sale acceptable to the Prepetition Secured Lenders of the Borrower Parties or their assets. The Forbearance Agreement provided that the Prepetition Secured Lenders would forbear from accelerating the obligations under the Prepetition Credit Agreement and exercising any default related rights or remedies thereunder if the Borrower Parties complied with the sale milestones set forth in the Forbearance Agreement in connection with such sale. The Forbearance Agreement also provided that the Borrower Parties were required to consummate an acceptable sale prior to October 31, 2013.

10. From July 2013 through the end of October, 2013, the Borrower Parties, with the assistance of its investment banker, Bulger Partners, LLC, engaged in a fulsome and public marketing and sale process to sell the businesses of the Borrower Parties as a going concern in an effort to maximize the value of their assets for all stakeholders in the DynaVox group of companies (the "**Pre-Petition Marketing Process**"). During the Pre-Petition Marketing Process, the Borrower Parties, through their investment banker, contacted and engaged with 105 potential buyers, including 60 financial buyers and 45 strategic buyers (the "**Pre-Petition Potential Purchasers**"), to determine whether any such parties had an interest in pursuing a transaction with the Borrower Parties.

11. By the end of October 2013, several interested parties had performed a substantial amount of due diligence on the businesses and assets of the Borrower Parties and had presented various written indications of interest to pursue a transaction. Certain of the proposed transactions (subject to the terms thereof) provided for consideration in excess of the obligations owing under the Prepetition Credit Agreement. Notwithstanding the positive progress made by the Borrower Parties as of the end of October 2013, the Borrower Parties were unable to meet the deadline of October 31, 2013 to consummate an acceptable sale transaction pursuant to the terms of the Forbearance Agreement.

12. As a result, on October 21, 2013, the Agent and the Borrower Parties entered into a certain Consent and Amendments Under Forbearance Agreement (the "**Consent**"). Pursuant to the terms of the Consent, the Agent agreed to extend certain sale milestone deadlines under the Credit Agreement, including extending the outside date to consummate an acceptable sale to December 6, 2013.

13. Thereafter, through the end of 2013 and into the early part of 2014, the Borrower Parties continued to work with those potential purchasers who had made proposals to enter into a transaction in an attempt to finalize, document and consummate a transaction. Despite all best efforts on the part of the Borrower Parties to do so, the Borrower Parties were not able to finalize a transaction with any such potential purchasers that was acceptable to the Borrower Parties and the Agent. As a result, the Forbearance Agreement expired on its own terms and was not extended.

14. Thereafter, on or about February 2014, the Agent and Prepetition Secured Lenders elected to market and sell the debt obligations under the Prepetition Credit Agreement (as defined in the Credit Agreement, the "**Obligations**"). On February 21, 2014, the Agent and Prepetition Secured Lenders in fact sold, assigned and transferred to an entity named JEC-BR Partners, LLC, a Delaware limited liability company ("**JEC**"), all of their right, title and interest in and to the Obligations (as defined in the Prepetition Credit Agreement) and any and all other rights and remedies held by the Agent and the Prepetition Secured Lenders under the Prepetition Credit Agreement and the Prepetition Loan Documents (all liens and security interests granted in connection therewith are herein referred to as the "**JEC Liens**"). As a result of such loan sale, JEC became and is the sole owner and holder of the Obligations under the Prepetition Credit Agreement as well as the rights and remedies therein and under the Prepetition Loan Documents.

**b.    Tobii Letter of Intent and Funding Agreement**

15. On April 4, 2014, the Debtors received an acquisition proposal dated April 3, 2014 (the "**Proposal**") from Tobii Technology AB, a Swedish corporation ("**Tobii**"), offering cash in excess of the amounts necessary to satisfy the Obligations owed to JEC and relieve the lien on the Systems Membership Units, subject to the performance by Tobii of due diligence and

other conditions, such as agreement on mutually agreeable deal documentation. Tobii is a high-technology company that develops and sells products for eye control and eye tracking.

16. To permit diligence while also protecting the interests of DynaVox (including the Operating Companies) in its confidential information, on April 4, 2014, Tobii and DynaVox Inc., on behalf of itself and its direct and indirect subsidiaries, entered into that certain Confidentiality and Nondisclosure Agreement ("**NDA**") wherein DynaVox Inc. agreed to disclose, and to use its best efforts to cause its direct and indirect subsidiaries (*i.e.*, the Operating Companies) to disclose, certain confidential financial, technical and other business information to Tobii, which information is subject to, and required to be kept strictly confidential in accordance with, the terms of the NDA. In addition, and in order to facilitate the due diligence and a competitive sale process, as well as to evidence its commitment to the Proposal, on April 4, 2014, the Debtors and Tobii entered into a funding arrangement pursuant to a Secured Funding Agreement for Post-Petition Debtor-in-Possession Financing Facility (the "**Tobii DIP Funding Agreement**") for which the Debtors sought Court approval as one of their "first day" motions. Among the conditions for the postpetition availability of credit under the Tobii DIP Funding Agreement was entry of an order granting Tobii access to the books, records, management and personnel of the Operating Companies so as to enable Tobii to conduct due diligence in connection with its contemplated purchase of the Systems Membership Units. Consistent with that requirement, the Debtors filed their *Emergency Motion for an Order (i) Directing DynaVox Systems, LLC, the Debtors' Operating Subsidiary, to Grant the Debtors Access to Books, Records and Management of DynaVox Systems LLC and its Subsidiaries for the Purpose of Conducting Due Diligence and (ii) Granting Related Relief* [Dkt. No. 6] (the "**Due Diligence Motion**"), seeking such access to information for all potential bidders.

17. Ultimately, the Tobii DIP Funding Agreement was not approved because, as described below, it was replaced by alternative funding offered by JEC. In connection with the replacement of the Tobii DIP Funding Agreement, in addition to the other matters discussed below, the Debtors (and JEC) agreed that Tobii shall be pre-qualified as a bidder under any bidding procedures established for the sale of the Systems Membership Units.

c. **The JEC Replacement Funding Agreement**

18. On April 9, 2014, the Debtors, Tobii and JEC negotiated the terms of a replacement funding agreement (the "**JEC DIP Funding Agreement**"). The JEC DIP Funding Agreement contained substantially similar terms as the Tobii DIP Funding Agreement, however, it provided other terms and conditions for the Debtors estates, including certain Interim Availability Conditions (as defined therein) requiring the filing of the Sale Motion.

19. A copy of the JEC DIP Funding Agreement is attached as Exhibit A to the *Interim Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507 (1) Approving Postpetition Financing, (2) Granting Liens and Providing Superpriority Administrative Expense Status, (3) Modifying Automatic Stay; and (4) Scheduling a Final Hearing* [Docket No. 40] (the "**Interim DIP Order**"), approved by the Bankruptcy Court on April 14, 2014.

20. As set forth more fully on the record at the April 9, 2014 hearing before the Court, pursuant to the JEC DIP Funding Agreement, JEC committed to fund an amount up to $400,000 (the "**DIP Loan**") subject to the terms and conditions contained in the JEC DIP Funding Agreement, including the liens and security interests granted therein to JEC (the "**DIP Liens**") to be used solely: (i) to pay professional fees, costs and expenses of the Debtors incurred in connection with prosecuting the Debtors' bankruptcy cases and a sales process involving the

Systems Membership Interests or assets of the Systems and the Operating Companies (the "**Target**"); and (ii) any fees required to be paid under 28 U.S.C. §1930.

21. The JEC DIP Funding Agreement was also subject to certain Interim Availability Conditions (as defined therein), including: (i) the filing by the Debtors of a motion, on or before April 14, 2014, seeking the approval of a sale of the Systems Membership Units pursuant to section 363 of the Bankruptcy Code; (ii) a request for the approval of bid procedures in connection therewith; (iii) a request that the Court hold a hearing on the approval of such bid procedures on or before May 5, 2014; and (iv) a request that a hearing on the sale of the Systems Membership Units be held on or before May 22, 2014.

22. The JEC DIP Funding Agreement terminates should the Court fail to enter an order: (a) approving the Bid Procedures on or before May 7, 2014, or (b) approving the Sale of the Systems Membership Units on or before May 23, 2014.

23. In accordance with the JEC DIP Funding Agreement, JEC was permitted to credit bid any amount not exceeding the accrued DIP Obligations (as defined therein). In addition, JEC has reserved any and all rights to credit bid under section 363(k) of the Bankruptcy Code the total amount due and owing under the Prepetition Loan Documents, which amount is agreed to be $13,850,000 (the "**JEC Prepetition Debt**") (the DIP Obligations plus the JEC Prepetition Debt shall be referred to herein collectively as the "**JEC Debt**").

24. On May 5, 2014, the Court entered the *Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507 (1) Approving Postpetition Financing, (2) Granting Liens and Providing Superpriority Administrative Expense Status, and (3) Modifying Automatic Stay* (the "**Final DIP Order**") [Docket No. 86], pursuant to which the Debtors' entry into the JEC DIP Funding Agreement was authorized and approved.

d.  **The Debtors' Sale Motion and Post-Petition Sale and Marketing Process**

25. On April 14, 2014, in accordance with the Interim Availability Conditions, the Debtors filed the Sale Motion. In addition to requesting approval of the sale of substantially all of the Debtors' assets (the "**Sale**"), the Sale Motion requested approval of certain bidding procedures. [*See* Docket No. 41].

26. On May 5, 2014, the Court entered an Order approving those procedures (the "**Bidding Procedures Order**") [Docket No. 85]. Pursuant to the Bidding Procedures Order, the Court, *inter alia*, established (i) May 15, 2014, at 4:00 p.m. as the Objection Deadline to the proposed Sale (the "**Objection Deadline**"); (ii) May 20, 2014 at 12:00 p.m. as the deadline for interested parties to submit a Qualified Bid (the "**Bid Deadline**"); (iii) May 21, 2014 as the date for the Debtors to conduct an Auction in the event the Debtors receive two (2) or more Qualified Bids on or before the Bid Deadline (the "**Auction**"); and (iv) May 22, 2014, at 11:00 a.m. as the date and time for the sale hearing (the "**Sale Hearing**").

27. Although the Debtors had previously engaged in a wholesale prepetition marketing and sale process spanning not less than six (6) months, on April 28, 2014, the Debtors retained Cassel Salpeter & Co., LLC ("**Cassel Salpeter**") as their financial advisor and investment banker for purposes of marketing the Debtors' assets in preparation of the contemplated Auction, so as to ensure the highest possible sale price for the Systems Membership Units.

28. On April 30, 2014, the Debtors filed their *Application for (i) Authority to Employ Cassel Salpeter & Co., LLC as Financial Advisor and Investment Banker for the Debtors Nunc Pro Tunc to April 28, 2014, and (ii) Waiver of Certain Information Requirements of Local Rule 2016-2* [Docket No. 75].

29. Beginning on April 28, 2014, and continuing through May 21, 2014, Cassel Salpeter oversaw the entire Sale process to ensure its fairness, openness and transparency. As part of its oversight process, Cassel Salpeter (a) contacted potential buyers in connection with the Sale; (b) assisted in the facilitation of available information with potential purchasers; (c) attended meetings and conference calls between the Debtors and potential buyers; (d) assisted in the facilitation of the Auction; and (e) advised the Debtors in connection with negotiations, and aided in consummation of the potential Sale.

30. Additionally, and as part of its marketing efforts, and in accordance with the Bid Procedures Order, the Debtors caused copies of the Sale Notice (as approved in the Bidding Procedures Order) to be served on: (i) the Office of the United States Trustee for the District of Delaware, Attn: Tiiara N.A. Patton, Esq.; (ii) counsel to any Committee; (iii) all taxing authorities having jurisdiction over any of the Acquired Assets subject to the sale, including the Internal Revenue Service; (iv) the state/local environmental agencies in the jurisdictions where the Debtors own or lease real property; (v) all parties that have requested special notice pursuant to Bankruptcy Rule 2002 as of the date prior to the date of entry of this Order, including counsel to the Ad Hoc Equity Committee; (vi) all persons or entities known to the Debtors that have or have asserted a lien on, or security interest in, all or any portion of the Acquired Assets; (vii) all Attorneys General for the states in which the Debtors conduct business; (viii) the Securities and Exchange Commission; and (ix) all potential bidders previously identified or otherwise known to the Debtors [Docket No. 90, 91].

31. I submit that the decision to proceed with the Sale is based upon the Debtors' sound business judgment and should be approved.

32. The Debtors proposed the Sale of the Acquired Assets after a thorough consideration of all viable alternatives and concluded that several sound business justifications supported its decision to pursue the Sale. Most importantly, it is my belief that the Debtors cannot sustain a stand-alone operational reorganization based upon, among other things, the level of its secured debt (in excess of $14 million) and a lack of long term financing, among other factors. Absent the Sale of the Acquired Assets, the Debtors will lack sufficient cash resources to continue to pay their debts as they become due, and the value of the Acquired Assets will continue to decline. Thus, the relief sought in the Sale Motion is not only reasonable, but necessary to maximize the value of the Debtors' assets for the benefit of all stakeholders.

33. Based upon this reality, the Debtors have determined that the Sale of their assets provides the best and most efficient means for the Debtors to maximize the value of their estates. Accordingly, the Debtors believe that the Court-approved Sale process in this case has provided the highest and best value that can be obtained for the Acquired Assets. The proposed Sale thus represents an exercise of the Debtors' sound business judgment and should be approved.

34. It is my belief that the Debtors' Court-approved marketing process, implemented by both the Debtors and Cassel Salpeter, establishes that the Successful Bid submitted by Tobii Technology AB or its designated subsidiary, in the amount of $18,000,000, and the Back-Up Bid submitted by Systems Acquisition Corporation, in the amount of $17,800,000, represents the highest and best price for the Debtors' assets.

35. As a result of the Debtors' marketing efforts, the Debtors believe that the sale price has been fully tested by the market and constitutes fair and reasonable consideration for the Acquired Assets, and is higher in amount than any offers previously received for the Acquired Assets.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on May ___, 2014

_____
Erin L. Russell