## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| DYNAVOX INC., *et al.*, | Case No. 14-10791 (PJW) |
| Debtors. | Jointly Administered |

## DISCLOSURE STATEMENT FOR JOINT PLAN OF LIQUIDATION OF DYNAVOX INC., DYNAVOX SYSTEMS HOLDINGS LLC AND DYNAVOX INTERMEDIATE LLCUNDER CHAPTER 11 OF THE BANKRUPTCY CODE

### DATED: October 3, 2014

**GENOVESE JOBLOVE & BATTISTA, P.A.**

Paul J. Battista (Fla. Bar No. 884126)
Heather L. Harmon (Fla. Bar No. 013192)
100 SE 2nd Street, Suite 4400
Miami, Florida 33131
Telephone:    (305) 349-2300
Facsimile:    (305) 349-2310)
Email:    pbattista@gjb-law.com
    hharmon@gjb-law.com

*Co-Counsel to Debtors and*
*Debtors-In-Possession*

**CHIPMAN BROWN CICERO & COLE, LLP**

William E. Chipman, Jr. (No. 3818)
Mark D. Olivere (No. 4291)
1007 North Orange Street, Suite 1110
Wilmington, Delaware  19801
Telephone:    (302) 295-0191
Facsimile:    (302) 295-0199
Email:    chipman@chipmanbrown.com
    olivere@chipmanbrown.com

*Co-Counsel to Debtors and*
*Debtors-In-Possession*

**[THIS DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT AND MAY NOT BE USED TO SOLICIT ACCEPTANCES OR REJECTIONS OF THE PLAN]**

## SUMMARY INFORMATION

**Debtors**: DynaVox Inc., DynaVox Systems Holdings LLC and DynaVox Intermediate LLC (collectively, the "Debtors")

**Vote Required to Accept the Plan:** All Classes of Claims and Equity Interests are Unimpaired under the Plan and therefore deemed to have accepted the Plan under Section 1126(f) of the Bankruptcy Code.

**Voting Information:** Unless the Bankruptcy Court orders otherwise, no votes will be solicited on the Plan and no Ballots shall be provided as all Classes of Claims and Equity Interests are Unimpaired and therefore deemed to have accepted the Plan. However, if the Bankruptcy Court requires solicitation and voting of any Class, then the Ballot Tabulator under the Plan is:

UpShot Services LLC
7808 Cherry Creek South Drive
Suite 112
Denver, CO 80231
(720) 457-3304
www.upshotservices.com

If solicitation and voting is required of any Class, then for your ballot to be counted, UpShot Services LLC must receive it no later than 5:00 p.m. Eastern Time on [_____].

**Confirmation Hearing**: The Confirmation Hearing will be held on [_____] at _____ pm (Eastern Time) at the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, 6th Floor, Courtroom #2, Wilmington, Delaware 19801. The Confirmation Hearing may be continued from time to time without further notice.

**Treatment of Claims and Interests**: The treatment that creditors and shareholders will receive if the Bankruptcy Court confirms the Plan is set forth in Section II of the Plan and summarized in Section IX of this Disclosure Statement. If the Plan is confirmed and becomes effective, then the terms of the Plan will be controlling on all creditors, shareholders and interested parties. You therefore are urged to read the Plan in its entirety. All discussion and summary of the terms and conditions of the Plan in this Disclosure Statement are qualified in their entirety by the Plan, which should be reviewed in its entirety by creditors, shareholders and interested parties.

**The Effective Date:** The Effective Date under the Plan will be the first Business Day following the Confirmation Date, on which the conditions set forth in Section VI.A of the Plan are satisfied.

**Questions**: All inquiries about the Plan and Disclosure Statement should be sent in writing to:

CHIPMAN BROWN CICERO & COLE, LLP
Attn:  William E. Chipman, Jr.
1007 North Orange Street, Suite 1110
Wilmington, Delaware  19801
Facsimile:  (302) 295-0199
E-Mail:    chipman@chipmanbrown.com

**IMPORTANT NOTICE:** **THE PLAN AND DISCLOSURE STATEMENT CONTAIN IMPORTANT INFORMATION THAT IS NOT INCLUDED IN THIS SUMMARY. THAT INFORMATION COULD MATERIALLY AFFECT YOUR RIGHTS. YOU SHOULD THEREFORE READ THE PLAN AND DISCLOSURE STATEMENT IN THEIR ENTIRETY. IF APPLICABLE, YOU SHOULD ALSO CONSULT WITH YOUR LEGAL AND FINANCIAL ADVISORS BEFORE VOTING ON THE PLAN.**

1

# I.

## INTRODUCTION

On April 6, 2014, DynaVox Intermediate, LLC ("Intermediate") filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Court"). On April 7, 2014, DynaVox Inc. ("DynaVox Inc.") and DynaVox Systems Holdings LLC ("Systems Holdings") filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the Court (each a "Petition Date"), thereby commencing these Cases. The jointly administered Cases are pending before the United States Bankruptcy Court for the District of Delaware before the Honorable Peter J. Walsh (the "Bankruptcy Court" or "Court") under Case No. 14-10791-PJW. Since the Petition Date, the Debtors have managed their affairs as debtors and debtors in possession pursuant to Bankruptcy Code sections 1107 and 1108.

The Debtors are proponents of the Joint Plan of Liquidation of DynaVox Inc., DynaVox Intermediate LLC and DynaVox Systems Holdings LLC Under Chapter 11 of the Bankruptcy Code (Dated: October 3, 2014) (the "**Plan**")[1] that is attached to this Disclosure Statement as Exhibit 1. **THE DOCUMENT THAT YOU ARE READING IS THE DISCLOSURE STATEMENT FOR THE ATTACHED PLAN.** The Plan sets forth the manner in which the Claims against and Equity Interests in the Debtors will be treated following the Debtors' liquidation under chapter 11. This Disclosure Statement describes the Debtors' past business operations, the sale of substantially all of their assets during the Cases, and the principal terms of the Plan, pursuant to which a Liquidating Trustee will liquidate the remaining assets of the Debtors' bankruptcy Estates, and distribute the proceeds thereof to the holders of Allowed General Unsecured Claims and Allowed Equity Interests.

FOR A COMPLETE UNDERSTANDING OF THE PLAN, YOU SHOULD READ THIS DISCLOSURE STATEMENT, THE PLAN, AND THE EXHIBITS TO THESE DOCUMENTS IN THEIR ENTIRETY.

This Disclosure Statement sets forth the assumptions underlying the Plan, describes the process that the Court will follow in determining whether to confirm the Plan, and describes how the Plan will be implemented if it is confirmed by the Bankruptcy Court. Bankruptcy Code section 1125 requires that a disclosure statement contain "adequate information" concerning a plan of reorganization. 11 U.S.C. §1125(a). The Court has **[NOT YET]** approved the form of this document as containing adequate information to enable entities affected by the Plan to make an informed judgment on deciding whether to vote to accept or to reject the Plan. Court approval of the adequacy of this Disclosure Statement, however, does not constitute a determination by the Court with respect to the fairness or the merits of the Plan or the accuracy or completeness of the information contained in the Plan or Disclosure Statement. **THE COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT. THEREFORE, THE TERMS OF THE PLAN ARE NOT YET BINDING ON ANYONE. IF THE COURT LATER CONFIRMS THE PLAN, AND THE EFFECTIVE DATE**

---

[1] All capitalized terms contained herein and not otherwise defined shall have the meaning set forth in the Plan.

**OCCURS, THEN THE PLAN WILL BE BINDING ON THE DEBTORS AND ON ALL CREDITORS AND EQUITY INTEREST HOLDERS IN THESE CASES.**

The Debtors believe that the Plan provides for the greatest and earliest possible recoveries to Holders of Allowed Claims and Allowed Equity Interests, that acceptance of the Plan is in the best interests of all parties in interest, and that any alternative would result in unnecessary delay, uncertainty, and expense to the Estates. The Debtors therefore strongly recommend that all eligible creditors and equity interest holders support the Plan, and if applicable, vote to accept the Plan.

## II.

## GENERAL DISCLAIMERS AND INFORMATION

Please carefully read this document and the Exhibits to this document. These documents explain who may object to confirmation of the Plan, who is entitled to vote to accept or reject the Plan, and the treatment that creditors and shareholders can expect to receive if the Court confirms the Plan. The Disclosure Statement also describes the Debtors' history, the events precipitating the Cases, other events in the Cases, the effect of Plan confirmation, and some of the things the Court may consider in deciding whether to confirm the Plan. The statements and information contained in the Plan and Disclosure Statement, however, do not constitute financial or legal advice. You therefore should consult your own advisors if you have questions about the impact of the Plan on your Claims or Equity Interests.

The financial information used to prepare the Plan and Disclosure Statement was prepared by the Debtors (and their professionals) from information in their books and records and is the sole responsibility of the Debtors. The Debtors' professionals prepared the Plan and Disclosure Statement at the direction of, and with the review, input, and assistance of, the Debtors' authorized representative and board of directors. The Debtors' professionals have not independently verified this information.

The statements and information that concern the Debtors and that are set forth in this document constitute the only statements and information that the Bankruptcy Court has approved for the purpose of soliciting votes to accept or reject the Plan. Therefore, no statements or information that are inconsistent with anything contained in this Disclosure Statement are authorized unless otherwise ordered by the Bankruptcy Court.

You may not rely on the Plan and Disclosure Statement for any purpose other than to determine whether to support or object to confirmation of the Plan, and if applicable, to vote to accept or reject the Plan. Nothing contained in the Plan or Disclosure Statement constitutes an admission of any fact or liability by any party or may be deemed to constitute evidence of the tax or other legal effects that the Debtors' liquidation may have on entities holding Claims or Equity Interests.

Unless another time is expressly specified in this Disclosure Statement, all statements contained in this document are made as of October 3, 2014. Under no circumstances will the delivery of this Disclosure Statement or the exchange of any rights made in connection with the

Plan create an implication or representation that there has been no subsequent change in the information included in this document. The Debtors assume no duty to update or supplement any of the information contained in this document, and they presently do not intend to undertake any such updates or supplements.

CAUTIONARY STATEMENT: Some statements in this document may constitute forward-looking statements within the meaning of the Securities Act of 1933 and the Securities Exchange Act of 1934 and any amendments to those acts. Such statements are based upon information available when the statements were made and are subject to risks and uncertainties that could cause actual results materially to differ from those expressed in the statements. Neither the Securities and Exchange Commission ("SEC") nor any state securities commission has approved or disapproved the Disclosure Statement, the Plan, or any exhibits to either document.

The following is a list of Exhibits attached hereto and incorporated herein:

| EXHIBIT NO. | DESCRIPTION |
|---|---|
| 1 | Debtors' Joint Plan of Liquidation (Dated: October 3, 2014) |
| 2 | Professional Biography of Soneet R. Kapila, Proposed Liquidating Trustee |
| 3 | Debtors' Corporate Organizational Chart |
| 4 | Timeline of Debtors' Corporate History |

## III.

## WHO MAY VOTE TO ACCEPT OR REJECT THE PLAN

What follows in this Section III is a general discussion of the rules governing the treatment and satisfaction of claims and equity interests under a plan of liquidation proposed under the Bankruptcy Code. Where a particular word (such as "Debtors") or term (such as "Allowed Claim" or "Allowed Equity Interest") is capitalized in this Disclosure Statement, and not otherwise defined herein, that word or phrase has the meaning provided in Section I (Definitions) of the Plan. Where, however, a particular word (such as "debtor") or phrase (such as "allowed claim" or "allowed interest") is not capitalized in this Disclosure Statement, that word or phrase is not intended to refer to the definitions provided in Section I of the Plan, but rather, the word or phrase is intended to have the general meaning ascribed to it in common bankruptcy practice parlance. To vote to accept or reject the Plan, your Equity Interest(s) must be impaired and not a Disputed Equity Interest, and the Plan must provide for you to receive or retain some value. (Holders of Unimpaired Claims or Unimpaired Equity Interests are deemed to have accepted the Plan and do not vote, though they may object to confirmation of the Plan to the extent they otherwise have standing to do so). As defined by the Bankruptcy Code, a claim

generally includes all rights to payment from a debtor, while an equity interest generally represents an ownership stake in the debtor.

## A.    Allowed Claims and Equity Interests.

With the exceptions explained below, under the Bankruptcy Code, a claim or interest is generally allowed only if a proof of the claim or equity interest is properly filed before the Bar Date for doing so and either no party in interest has objected or the court has entered an order allowing the claim or interest.  Under certain circumstances as provided in the Bankruptcy Code, a creditor may have an allowed claim even if a proof of claim was not filed and the Bar Date for filing a proof of claim has passed.  For example, a claim may be deemed allowed if the claim is listed on the debtor's schedules of liabilities filed with the court, and is not scheduled as disputed, contingent, or unliquidated.  Further, an equity interest may be allowed if the equity interest holder was a shareholder of record as of the Petition Date.

## B.    Impaired Claims and Equity Interests.

Generally speaking, under the Bankruptcy Code, a class of claims or equity interests is impaired if the plan alters the legal, equitable, or contractual rights of the members of the class, even if the alteration is beneficial to the creditors or interest holders.  ALL CLASSES OF CLAIMS AND EQUITY INTERESTS ARE UNIMPAIRED UNDER THE DEBTORS' PLAN AND THEREFORE SUCH CLASSES ARE DEEMED TO HAVE ACCEPTED THE PLAN UNDER SECTION 1126(F) OF THE BANKRUPTCY CODE.

## IV.

## VOTES NECESSARY TO CONFIRM THE PLAN

Under the Bankruptcy Code, impaired claims or equity interests are placed in classes under a plan, and it is the class that must accept that plan.  Section II.A of the Plan and Section IX.B of this Disclosure Statement summarize the classification of all Claims and Equity Interests under the Plan.  There also are some types of claims that are unclassified because the Bankruptcy Code requires that they be treated a certain way.  These claims are considered unimpaired, and their holders cannot vote.  Section II.B of the Plan and Section IX.C of this Disclosure Statement describe these Claims in detail.

Under the Bankruptcy Code, a bankruptcy court may confirm a plan if at least one class of impaired claims or equity interests has voted to accept that plan (without counting the votes of any insiders whose claims or equity interests are classified within that class) and if certain statutory requirements are met both as to non-consenting members within a consenting class and as to rejecting classes.  A class of claims has accepted the plan only when at least a majority in number and at least two-thirds in amount of the allowed claims actually voting in that class vote to accept the plan.  A class of equity interests has accepted the plan only when at least two-thirds in amount of the allowed equity interests actually voting in that class vote to accept the plan.

Even if the Debtors receive the requisite number of votes to confirm the proposed Plan, the Plan will not become binding unless and until, among other things, the Bankruptcy Court

makes an independent determination that confirmation is appropriate. This determination will be the subject of the Confirmation Hearing.

TO BE CLEAR, ALL CLASSES OF CLAIMS AND EQUITY INTERESTS UNDER THE DEBTORS' PLAN ARE UNIMPAIRED UNDER THE PLAN, AND THEREFORE ALL SUCH CLASSES ARE DEEMED TO HAVE ACCEPTED THE PLAN UNDER SECTION 1126(F) OF THE BANKRUPTCY CODE. AS A RESULT, UNLESS THE COURT ORDERS OTHERWISE, THE DEBTORS WILL NOT BE SOLICITING VOTES UNDER THE PLAN OR ISSUING BALLOTS TO HOLDERS OF CLAIMS OR EQUITY INTERESTS.

## V.

## INFORMATION REGARDING VOTING IN THESE CASE

### A.    Voting Instructions.

The Debtors believe that all Classes of Claims and Equity Interests are Unimpaired under the Plan. As such, the holders of Claims and Equity Interests in these Classes are not entitled to vote and each of these Classes is deemed to accept the Plan. Similarly, Administrative Claims and Priority Tax Claims are not classified under the Plan and the holders thereof are not entitled to vote.

Any party that disputes the Debtors' characterization of its Claim or Equity Interest as being unimpaired may request a finding of impairment from the Bankruptcy Court in order to obtain the right to vote on the Plan, provided however that such party should file and serve a motion requesting such a determination and arrange for such motion to be heard by the Court *prior* to the hearing on confirmation of the Plan.

If the Court orders the Debtors to solicit votes on the Plan, then in voting to accept or reject the Plan, please use only the ballot (if any) sent to you with this Disclosure Statement, and please carefully read the voting instructions on the ballot for an explanation of the applicable voting procedures and deadlines. If you have received this Disclosure Statement without a ballot, then the Debtors believe that you are: (i) a creditor or equity interest holder whose claim is unimpaired by the Plan and that you, therefore, are not entitled to vote on the Plan, (ii) a holder of a Claim that will not retain or receive value under the Plan and that you, therefore, are deemed to reject the Plan, or (iii) otherwise not the holder of Claim that is entitled to vote to accept or reject the Plan. As set forth above, the Debtors believe that all Classes are Unimpaired and therefore all such Classes are deemed to have accepted the Plan.

If you nevertheless believe that you are entitled to vote on the Plan, you must file and serve a motion requesting a determination that you are entitled to vote on the Plan and arrange for such motion to be heard by the Court *prior* to the hearing on confirmation of the Plan.

If the Court authorizes you to vote to accept or reject the Plan, then your ballot must be received by the Ballot Tabulator, at the address or facsimile number listed above, no later than 5:00 p.m. Eastern Time, on [_____]. If your ballot is not timely received by the Ballot Tabulator, it will not be counted. Ballots must be provided to the Ballot Tabulator by mail,

overnight delivery, messenger, or facsimile. Ballots sent by e-mail will <u>not</u> be accepted by the Ballot Tabulator and will <u>not</u> be counted in tabulating votes accepting or rejecting the Plan.

A free copy of all pleadings and other papers filed in this Case are available at http://www.upshotservices.com/dynavox. Any interested party desiring further information with respect to the Plan, or seeking additional copies of this document, should contact in writing the Debtors' Co-Counsel, CHIPMAN BROWN CICERO & COLE, LLP, Attn: William E. Chipman, Jr., Esquire, at the address noted on the cover page of this Disclosure Statement. In addition, pleadings and other papers filed in this Case may be inspected regular court hours at the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, 3rd Floor, Wilmington, Delaware 19801.

## VI.

## CRAMDOWN: TREATMENT OF NON-CONSENTING CLASSES

Generally, even if all classes do not consent to the proposed treatment of their claims or interests under a plan, a plan nonetheless may be confirmed if the dissenting classes are treated in the manner prescribed by the Bankruptcy Code. The process by which a plan is confirmed, notwithstanding the existence of a dissenting class, is commonly referred to as "cramdown." The Bankruptcy Code allows dissenting classes to be crammed down if the plan does not "discriminate unfairly" and is "fair and equitable." The Bankruptcy Code does not define unfair discrimination, but it does set forth certain minimum requirements for "fair and equitable" treatment. For a class of secured claims, "fair and equitable" can mean that the secured claimants retain their liens and receive deferred cash payments, the present value of which equals the value of the secured claimant's interest in collateral. For a class of unsecured claims, a plan is fair and equitable if the claims in that class receive value equal to the allowed amount of the claims, or, if the unsecured claims are not fully satisfied, no claim or interest that is junior to such claims receives or retains anything under the plan. Accordingly, if a class of unsecured claims rejects a plan under which a junior class (e.g., a class of interest holders) will receive or retain any property under the plan, the plan cannot be confirmed (with certain possible exceptions not relevant to the Plan) unless the plan provides that the class of unsecured creditors receives value equal to the allowed amount of the claims in that class.

ALL CLASSES OF CLAIMS AND EQUITY INTERESTS ARE UNIMPAIRED UNDER THE PLAN AND THEREFORE ALL SUCH CLASSES ARE DEEMED TO HAVE ACCEPTED THE PLAN UNDER SECTION 1126(F) OF THE BANKRUPTCY CODE.

## VII.

## WHO MAY OBJECT TO PLAN CONFIRMATION

A Confirmation hearing has been scheduled for [_____] Eastern Time, in the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, 6th Floor, Courtroom #2, Wilmington, Delaware 19801, to determine whether the Bankruptcy Court will confirm the Plan. By [_____], the Debtors will file a memorandum of points and authorities and evidence supporting the entry of an order confirming

the Plan. This memorandum will be served on the U.S. Trustee and those parties that have requested special notice in these Cases.

Any party that objects to Confirmation of the Plan must file and serve its objection and evidence in support thereof by [_____]. Any objection to confirmation of the Plan must be in writing, specify the name and address of the party objecting, set forth the amount of the objecting party's claims and any other grounds giving the objector standing to object, set forth the specific grounds for the objection, and be accompanied by the evidence the objecting party intends to present in support of its objection. Such objection and evidence in support thereof shall be served on the parties identified above in this paragraph. Any affiant or declarant with respect to an affidavit or declaration filed in support of confirmation of the Plan, must be present at the Confirmation Hearing for cross-examination without the necessity of a subpoena. Failure to properly and timely file an opposition to Plan confirmation or appear at the Confirmation Hearing may be deemed to be consent to the Plan's confirmation. If you wish to obtain more information, you should contact:

**GENOVESE JOBLOVE & BATTISTA, P.A.**

Paul J. Battista (Fla. Bar No. 884126)
Heather L. Harmon (Fla. Bar No. 013192)
100 SE 2nd Street, Suite 4400
Miami, Florida 33131
Telephone:     (305) 349-2300
Facsimile:      (305) 349-2310
Email:            pbattista@gjb-law.com
                     hharmon@gjb-law.com

*Co-Counsel to Debtors and*
*Debtors-In-Possession*

**CHIPMAN BROWN CICERO & COLE, LLP**

William E. Chipman, Jr. (No. 3818)
Mark D. Olivere (No. 4291)
1007 North Orange Street, Suite 1110
Wilmington, Delaware 19801
Telephone:     (302) 295-0191
Facsimile:      (302) 295-0199
Email:            chipman@chipmanbrown.com
                     olivere@chipmanbrown.com

*Co-Counsel to Debtors and*
*Debtors-In-Possession*

## VIII.

## DESCRIPTION OF THE DEBTORS' BUSINESS, EVENTS PRECIPITATING THE FILING, AND SIGNIFICANT EVENTS IN THESE CHAPTER 11 CASES

### A.     Description of the Debtors' Corporate Structure.

DynaVox, Inc. is a publicly-traded Delaware corporation and the ultimate corporate parent of the DynaVox group of companies (collectively "DynaVox"). DynaVox Inc. completed an initial public offering on April 27, 2010 (the "IPO"). As a result of the IPO and certain other recapitalization transactions, DynaVox Inc. became the sole managing member of, and has a controlling interest in, Systems Holdings and its direct and indirect subsidiaries.

DynaVox Inc. has been a public reporting entity since April 22, 2010. Subsequent to its delisting from NASDAQ on April 16, 2013, DynaVox, Inc. filed a Form 15 with the Securities and Exchange Commission on July 1, 2013 to deregister its Class A common stock ("Go Dark"). DynaVox Inc.'s Class A common stock is currently trading on the OTC Markets OTCPink marketplace under the symbol "DVOX".

DynaVox Inc. is the holder and owner of 99.14% of the membership interests in Systems Holdings. In turn, Systems Holdings is the holder and owner of 100% of the membership interests in Intermediate. DynaVox, Inc., Systems Holdings and Intermediate are holding companies that do not have separate employees or operations. DynaVox's headquarters is located in Pittsburgh, Pennsylvania.

Prior to the Petition Date, Intermediate was the owner and holder of 100% of the membership interests in DynaVox Systems LLC ("Systems"). Systems and its direct and indirect subsidiaries were the operating entities in the DynaVox group of companies (sometimes collectively referred to herein as the "Operating Companies").

An organizational chart showing the corporate structure of DynaVox is attached hereto as Exhibit 3.

## B.    Description of the Business of the Operating Entities.

DynaVox was founded in 1983 on research completed at Carnegie Mellon University on the use of symbolic language to assist people with serious speech impairments. Nineteen years before the introduction of the iPad, DynaVox recognized the tremendous power of combining mobile computing with an intuitive user experience to unlock speech for a segment of the population that had been unable to communicate.

A corporate timeline showing a history of DynaVox from inception to the present is attached hereto as Exhibit 4.

With the introduction of the first DynaVox-branded Augmentative and Assistive Communication ("AAC") product in 1991, the Company established the AAC market by developing application software for use on touch screen computers utilizing its symbolic language, DynaSyms™. In 2004, the Company acquired Mayer-Johnson which provided access to another broadly-used symbol set. This capability was subsequently combined with DynaSyms™ to form the largest, most widely-used symbol set globally, Picture Communication Symbols™ ("PCS").

In addition to offering PCS and a world class delivery tool, DynaVox also offers "Boardmaker," which is the leading software solution used by therapists and special educators to develop custom, personalized and interactive communication and instructional material, as well as symbol-supported learning materials for students and adults with cognitive, language and communication deficits.

DynaVox has become the industry standard in providing innovative communication and special education solutions to the Speech Language Pathologist (SLP) community, teaching professionals, and school district administrators. Through its product leadership and strong

industry relationships, DynaVox established a 65% market share in AAC solutions and an 80% share in special education symbol-based software, resulting in over $84 million in annual revenue in 2012.

### C.    Description of Major Liabilities as of the Petition Date.

As of the Petition Date, the individual Debtors in these Cases had different and independent liabilities. As more particularly described below, the principal liabilities of DynaVox Inc. are general unsecured claims to former professionals. Systems Holdings has no known liabilities except a priority tax claim in the approximate amount of $50,000 owed to the State of Texas. The principal liability of Intermediate is the guaranty of the Operating Companies' Prepetition Credit Agreement (defined below) to JEC-BR Partners, LLC ("JEC"), as the assignee of the Prepetition Secured Lenders (defined below). In connection with the guaranty by Intermediate of the obligations of the Operating Companies under the Prepetition Credit Agreement, Intermediate pledged its Systems Membership Units (as defined below) as collateral for such obligations, all as more fully described below.

### 1.    Secured Liabilities.

On June 23, 2008, Intermediate, as guarantor, Systems, as the borrower, and the following direct and indirect subsidiaries of Systems: DynaVox Services Inc. ("Services"), Blink-Twice LLC ("Blink-Twice"), Mayer-Johnson LLC ("Mayer-Johnson"), DynaVox International Holdings Inc. ("International"), Eye Response Technologies, Inc. ("ERT") (Systems, Intermediate, Services, Blink-Twice, Mayer-Johnson, International and ERT are collectively referred to herein as the "Borrower Parties") entered into that certain Third Amended and Restated Credit Agreement, as amended (the "Prepetition Credit Agreement") with GE Business Financial Services Inc., as administrative agent and lender (the "Agent"), and those certain financial institutions as lenders under the Prepetition Credit Agreement (collectively, the "Prepetition Secured Lenders"). Pursuant to the Prepetition Credit Agreement, the Prepetition Secured Lenders agreed, subject to the terms and conditions set forth in the Prepetition Credit Agreement, to make certain loans and other financial accommodations to the Borrower Parties.

Pursuant to the Prepetition Credit Agreement and the other loan documents entered into in connection therewith (the "Prepetition Loan Documents"), the Agent, on behalf of the Prepetition Secured Lenders, asserted a first priority lien and security interest in and to substantially all of the assets of the Borrower Parties. Neither DynaVox, Inc. nor Systems Holdings, among other, was a borrower or guarantor under the Prepetition Credit Agreement and the Agent did not have a lien on any of the assets of DynaVox, Inc. or Systems Holdings.

However, on April 27, 2010, as part of the Prepetition Loan Documents, Intermediate and Agent entered into that certain Amended and Restated Pledge Agreement wherein Intermediate pledged its membership interests in Systems to Agent for the benefit of the Prepetition Secured Lenders as collateral security for the obligations owed under the Prepetition Credit Agreement (the "Intermediate Pledge Agreement"). As a result, the Agent, on behalf of the Prepetition Secured Lenders, asserted a lien on 100% of the membership interests owned by Intermediate in Systems (the "Systems Membership Units") and indirectly in the rest of the Operating

Companies. As of the Petition Date, the Systems Membership Units comprised substantially all of the assets of Intermediate.

Thereafter, on or about February 2014, the Agent and Prepetition Secured Lenders elected to market and sell the debt obligations under the Credit Agreement (as defined in the Prepetition Credit Agreement, the "Obligations"). On February 21, 2014, the Agent and Prepetition Secured Lenders in fact sold, assigned and transferred all of their right, title and interest in and to the Obligations and any and all other rights and remedies held by them under the Prepetition Credit Agreement and the Prepetition Loan Documents to JEC. As a result, JEC became and as of the Petition Date was the sole owner and holder of the Obligations under the Prepetition Credit Agreement as well as the rights and remedies thereon and under the Prepetition Loan Documents.

As of the Petition Date, and as further established under the Bidding Procedures Order (defined below), the amount owed to JEC under the Prepetition Credit Agreement was approximately $13,850,000.

## 2.    Unsecured Liabilities.

As of the Petition Date, DynaVox Inc. had undisputed general unsecured liabilities (excluding those claims voluntarily waived, as described below) in the approximate amount of $150,000.00. This general unsecured debt is comprised of amounts owed to the Debtors' pre-petition professionals, including Deloitte Tax LLP (tax accountant - $65,000.00), Ropes & Gray LLP (corporate counsel - $78,208.44), and SS&G, Inc. (sales tax consultant - $10,000.00).

Edward L. Donnelly, Jr., a former officer and director of the Debtors, filed an unsecured claim against each of the Debtors for an unliquidated amount on account of $500,000 in unpaid severance and indemnification for his prior role as a director and officer of DynaVox Inc. The Debtors dispute the claim for allegedly unpaid severance as Mr. Donnelly's employment agreement and separation agreement were between Mr. Donnelly and DynaVox Systems Inc., a non-debtor subsidiary as of the Petition Date. Nothing in the Plan seeks to modify Mr. Donnelly's claims, if any, against DynaVox Systems Inc.

Several of the Debtors' directors filed unliquidated general unsecured claims for indemnification against the Debtors. The Plan provides for the creation of a Directors and Officers Reserve Account in the amount of $100,000 to be held for the benefit of the Debtors' Indemnified Parties subject to the terms of the Plan. The amount in the Directors and Officers Reserve Account shall be available to pay the defense costs incurred by the Debtors' Indemnified Parties in the event that the Liquidating Trustee brings a Retained Action against any such Debtors' Indemnified Party, with such amount to be allocated pro rata among those Debtor Indemnified Parties subject of the Retained Action brought by the Liquidating Trustee. If no Retained Actions are initiated against a Debtor Indemnified Party prior to the Retained Actions Deadline, then the amount in the Directors and Officers Reserve Account shall be included in the Distributable Cash available for distribution to holders of Allowed Claims and Allowed Equity Interests in accordance with the Plan.

Pursuant to the Debtors' Amended Schedules filed October 3, 2014 [Docket No. 227], certain of the Debtors' current directors have unsecured claims for unpaid directors' fees for their participation at meetings of the Board of Directors and the Special Committee of the Board. The fee for each meeting agreed to by DynaVox was $2,000.00. From June 2013 through the Petition Date, the following directors participated in the following meetings: (i) Michael Regan – 23 Board of Directors meetings and 53 Special Committee meetings ($152,000.00); (ii) Michael Hammes – 20 Board of Directors meetings and 29 Special Committee meetings ($98,000.00); (iii) Michael Herling – 20 Board of Directors meetings and 52 Special Committee meetings ($144,000.00) and (iv) James Liken – 15 Board of Directors meetings ($30,000.00). These directors have voluntarily agreed to waive their unsecured claims on account of unpaid directors' fees.

In addition, certain Holders of Equity Interests mistakenly filed their proofs of interest as general unsecured claims. The Debtors will seek to reclassify those Claims to Equity Interests through the claim objection process.

To the best of the Debtors' knowledge as of the date hereof, neither Systems Holdings nor Intermediate have any general unsecured debt.

### 3.    Intercompany Claims.

As of the Petition Date, the books and records of the Debtors evidenced the following intercompany debt:

(a) DynaVox Inc. payable to Systems in the amount of $2,331,872.00;

(b) DynaVox Inc. payable to DynaVox Services, Inc. (subsidiary of Systems) in the amount of $14,569.00;

(c) Systems Holdings payable to Systems in the amount of $43,892.404.00;

(d) Systems Holdings payable to Mayer-Johnson LLC (subsidiary of Systems) in the amount of $4,722.00;

(e) Systems Holdings payable to DynaVox Canada Inc. (subsidiary of Systems) in the amount of $23,462.00;

(f) Systems Holdings receivable from Systems in the amount of $27,492,512.00;

(g) Systems Holdings receivable from DynaVox Services Inc. in the amount of $11,653.00; and

(h) Systems Holdings receivable from Blink-Twice LLC (subsidiary of Systems) in the amount of $711,775.00.

The above Intercompany Claims have been reflected on the applicable Debtors' books and records for years before the Petition Date and the origins or basis thereof is unknown. An investigation of the source and basis of the Intercompany Claims between the Debtors and certain of the non-debtor Operating Companies is unnecessary because the Sale Order (defined below) provided for the mutual release of all Intercompany Claims between the Operating Companies on the one hand and the Debtors on the other hand. In addition, the Plan provides for the substantive consolidation of the Debtors, therefore eliminating any Intercompany Claims that may be owing among the Debtors, which Intercompany Claims would be time consuming and expensive to reconcile. Therefore, no distributions on account of Intercompany Claims will be made under the Plan.

### 4.    Tax Receivable Agreement.

As part of the IPO and related transactions, DynaVox Inc. entered into a tax receivable agreement (the "TRA") with Systems Holdings and members holding membership interests in Systems Holdings, which agreement provided for the payment from time to time by DynaVox Inc. to the members in Systems Holdings an amount equal to 85% of the amount of the benefits, if any, that DynaVox Inc. was deemed to have realized as a result of (i) the existing tax basis in the intangible assets of Systems Holdings on the date of the IPO, (ii) an increase in the tax basis of the assets of Systems Holdings that otherwise would not have been available, and (iii) certain other tax benefits related to our entering into the tax receivable agreement, including tax benefits attributable to payments under the tax receivable agreement. The payment obligations under the TRA are obligations of DynaVox Inc. and not of Systems Holdings.

Under the TRA, the benefit deemed realized by DynaVox Inc. would be computed by comparing the actual income tax liability of DynaVox Inc. (calculated with certain assumptions) to the amount of such taxes that DynaVox Inc. would have been required to pay had there been no increase to the tax basis of the assets of Systems Holdings as a result of any purchase or exchange, had there been no tax benefit from the tax basis in the intangible assets of Systems Holdings on the date of the IPO and had DynaVox Inc. not entered into the TRA.

Effective October 18, 2013, the TRA was amended so that the TRA would terminate with no further obligations owed by DynaVox Inc. to its pre-IPO owners upon a change in control, other than a liquidation or dissolution, of the DynaVox. If there was no change in control, then the term of the TRA would continue until all such tax benefits had been utilized or expired, unless DynaVox Inc. exercised its right to terminate the TRA for an amount based on the agreed payments remaining to be made under the TRA or DynaVox Inc. breached any of its material obligations under the TRA in which case all obligations would generally be accelerated and due as if DynaVox Inc. had exercised its right to terminate the TRA.

Prior to the Petition Date, DynaVox Inc.'s largest shareholders, Vestar Capital Partners and Park Avenue Equity Partners, L.P., waived all rights to payment under the TRA. Pursuant to the Plan, no distributions will be made to Vestar, Park Avenue or the other parties to the TRA and all of the Debtors' obligations, if any, under the TRA shall be extinguished on the Effective Date. In addition, to the extent that TRA is an executory contract, the TRA shall be rejected pursuant to the Plan.

5.      **Equity Interests.**

DynaVox Inc. is the sole managing member of, and has a controlling equity interest in, Systems Holdings. After the effective date of the registration statement for the DynaVox Inc. IPO, but prior to the completion of the IPO, the limited liability company agreement of Systems Holdings was amended and restated to, among other things, modify its capital structure by replacing the different classes of interests previously held by the Systems Holdings owners to a single new class of units (the "New Holdings Units"). In addition, each holder of New Holdings Units received one share of the DynaVox Inc. Class B common stock

DynaVox Inc. and the Systems Holdings owners also entered into an exchange agreement under which (subject to certain of its terms) the holders of New Holdings Units had the right to exchange their New Holdings Units for shares of DynaVox Inc. Class A common stock on a one-for-one basis, subject to customary rate adjustments for stock splits, stock dividends and reclassifications.

Prior to the Petition Date, pursuant to the exchange agreement, all but one of the holders of the New Holdings Units exchanged their Class A stock in Systems Holdings for equivalent Class A shares in DynaVox Inc. In addition, each of Systems Holdings shareholders participating in the share exchange cancelled their single Class B share in DynaVox Inc. The transfers were facilitated by Wells Fargo, the Debtors' transfer agent.

As a result of the share exchange, as of the Petition Date, there were outstanding approximately 30,100,000 Class A Common Stock shares of DynaVox Inc. Approximately 62.2% of these Class A Units are held by the existing owners of DynaVox Inc. and approximately 37.8% of the Class A Units are held by public stockholders.

As of the Petition Date, DynaVox Inc. had never declared or paid cash dividends on its Class A common stock.

D.      **DynaVox Inc. Board of Directors.**

As of the Petition Date, the DynaVox Inc. Board of Directors consisted of Michael N. Hammes, Michael J. Herling, James W. Liken, William E. Mayer, Michael J. Regan and Erin L. Russell. Ms. Russell is a principal at Vestar Capital Partners, the largest shareholder of Dynavox Inc. Mr. Mayer is a representative of Park Avenue Equity, the second largest shareholder of DynaVox Inc. Each of Messrs. Hammes, Herling, Liken and Regan are independent as such term is defined under Section 5605(a)(2) of the NASDAQ Listing Rules.

E.      **Events Leading to the Filing of This Chapter 11 Case.**

By letter to Systems, dated April 4, 2013, the Agent notified Systems that the Agent was reserving all of its rights and remedies as a result of the existence of an event of default in respect of a financial covenant under the Prepetition Credit Agreement for the failure of Systems to maintain the Fixed Charge Coverage Ratio required under the Prepetition Credit Agreement for the quarter ended March 29, 2013 (the "Reservation Letter"). The Agent did not accelerate the obligations under the Prepetition Credit Agreement in the Reservation Letter, but instead notified Systems that it would monitor the situation on a "day to day" basis. The Agent also

reserved its rights, among other things, to terminate the commitment to make loans under the Prepetition Credit Agreement, to accelerate the obligations under the Prepetition Credit Agreement and to foreclose on or otherwise realize on its collateral in accordance with the Prepetition Loan Documents.  As of the Petition Date, the Agent had not accelerated the obligations under the Prepetition Credit Agreement.  In addition, no payment default had occurred under the Prepetition Credit Agreement.

On June 28, 2013, in response to the demand from the Agent, the Borrower Parties were required to prepay a portion of the principal due and owing under the Prepetition Credit Agreement in an amount equal to $10,000,000.  As of July 29, 2013, the Agent asserted that the outstanding principal balance of the obligations due under the Prepetition Credit Agreement, after application of such principal prepayment, was at least $15,200,000 exclusive of interest, fees and expenses.

On or about July 29, 2013, the Borrower Parties, the Agent and the Prepetition Secured Lenders entered into a Forbearance Agreement and Fifth Amendment to Prepetition Credit Agreement (the "Forbearance Agreement").  Among other things, the Forbearance Agreement provided for: (a) the Borrower Parties (i) to engage the services of an investment banking firm to assist in developing and conducting a marketing and sale process for the Borrower Parties or substantially all of their assets, and (ii) to negotiate, document and consummate a sale of the Borrower Parties or their assets, acceptable to the Prepetition Secured Lenders; (b) the Prepetition Secured Lenders to forbear from accelerating the obligations under the Prepetition Credit Agreement and exercising any default related rights or remedies thereunder if the Borrower Parties complied with the sale milestones set forth in the Forbearance Agreement in connection with such sale; and (c) the consummation of an acceptable sale prior to October 31, 2013.

From July 2013 through the end of October, 2013, the Borrower Parties, with the assistance of its investment banker, Bulger Partners, engaged in a fulsome marketing and sale process to sell the businesses of the Borrower Parties as a going concern in an effort to maximize the value of their assets for all creditor and equity constituencies in the DynaVox group of companies.  During that process, the Borrower Parties, through their investment banker, contacted and engaged with 105 potential buyers, including 60 financial buyers and 45 strategic buyers, to determine whether any such parties had an interest in pursuing a transaction with the Borrower Parties.

By the end of October 2013, several interested parties had performed a substantial amount of due diligence on the business and assets of the Borrower Parties and had presented written indications of interest to pursue a transaction.  Certain of the proposed transactions provided for consideration in excess of the obligations owing under the Prepetition Credit Agreement.  Notwithstanding the positive progress made by the Borrower Parties as of the end of October 2013, the Borrower Parties were unable to meet the deadline of October 31, 2013 to consummate an acceptable sale transaction pursuant to the terms of the Forbearance Agreement.

As a result, on October 21, 2013, the Agent and the Borrower Parties entered into a certain Consent and Amendments Under Forbearance Agreement (the "Consent").  Pursuant to

the Consent, the Agent agreed, among other things, to extend the outside date to consummate an acceptable sale to December 6, 2013.

Thereafter, through the end of 2013 and into the early part of 2014, the Borrower Parties continued to work with those potential purchasers who had made proposals to enter into a transaction in an attempt to finalize, document and consummate a transaction. Despite all best efforts on the part of the Borrower Parties to do so, the Borrower Parties were not able to finalize a transaction with any such potential purchasers that was acceptable to the Borrower Parties or the Agent. As a result, the Forbearance Agreement expired on its own terms and was not extended.

On March 18, 2014, JEC, as successor to Prepetition Secured Lenders and Agent, delivered copies of executed corporate resolutions to the Borrower Parties wherein JEC purported to exercise its rights under the Intermediate Pledge Agreement (and the accompanying Irrevocable Proxy Coupled With Interest dated April 30, 2012) (the "Resolutions"). Pursuant to the Resolutions, JEC removed the existing members of the management committee of Systems and also reconstituted the management committee of Systems with three of its own employees. JEC also executed similar resolutions taking control of the direct and indirect subsidiaries of Systems. Since then, JEC, through the reconstituted management committee, has been in control of the Operating Companies, including Systems and each of its direct and indirect subsidiaries.

Beginning March 18, 2014, the Debtors did not have access to the Operating Companies, including their books, records and management, and, going into the bankruptcy filings, did not know what actions the JEC-controlled management committee of Systems has taken in respect of the Operating Companies, their assets and businesses.

On March 21, 2014, JEC issued notice to the Debtors that JEC had scheduled a sale, at public auction, of 100% of the membership interests that Intermediate owns in Systems (the "Systems Membership Units") for March 31, 2014 (the "Public Sale"). Thereafter, on March 27, 2014, JEC issued notice to the Debtors that JEC had extended the date for the Public Sale from March 31, 2014 to April 7, 2014 at 10:00 a.m.

As a result of the commencement of the Chapter 11 case for Intermediate on April 6, 2014 (followed by the filing of Chapter 11 cases for DynaVox, Inc. and DynaVox Systems Holdings, LLC on April 7, 2014), the sale of the Systems Membership Units was stayed by the automatic operation of section 362(a) of the Bankruptcy Code.

Following the Petition Date, the Debtors remained in possession of their property and, until the closing of the sale to Tobii or its designee (discussed further below), operated their businesses as debtors in possession.

F.       **Significant Events in the Cases.**

1.       **Overview of Chapter 11 and the Plan Process.**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor-in-possession attempts to reorganize its business for the benefit of

itself, its creditors, and other parties in interest, or, in the alternative, use chapter 11 to effectuate an orderly liquidation of its assets.

The commencement of a chapter 11 case creates an estate consisting of all of the legal and equitable interests of the debtor in property as of the date that the petition is filed. Bankruptcy Code sections 1107 and 1108 provide that a debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession" unless the bankruptcy court orders the appointment of a trustee. The filing of a voluntary petition under chapter 11 also operates as an automatic stay of, among other things, all attempts to collect on prepetition claims from the debtor or otherwise interfere with the debtor's property or business. In a chapter 11 case, unless otherwise ordered by the bankruptcy court, the automatic stay remains in full force and effect through the effective date of a confirmed chapter 11 plan.

The formulation of a chapter 11 plan of reorganization is the principal objective of a chapter 11 case. A plan sets forth the means for satisfying the claims against and interests in the debtor. The Plan proposed by the Debtors, which is attached hereto as Exhibit 1, provides for a liquidation of the Debtors' assets to maximize the recoveries for creditors and equity interest holders.

### 2.    First Day Motions.

During the early days of the Cases, the Debtors focused their efforts on moving forward with the approval of debtor-in-possession financing to pay for the administrative costs of the Chapter 11 Cases and developing a process to facilitate due diligence associated with the marketing and sale of the Systems Membership Units. Specifically, the Debtors filed the following motions, all of which were granted by the Court:

- Motion of the Debtors for an Order Directing Joint Administration of Related Chapter 11 Cases [Docket No. 5];

- Debtors' Emergency Motion for Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507 (1) Approving Postpetition Financing, (2) Granting Liens and Providing Superpriority Administrative Expense Status, (3) Modifying Automatic Stay; and (4) Scheduling A Final Hearing [Docket No. 7] (the "DIP Motion"); and

- Emergency Motion of the Debtors for an Order (I) Directing DynaVox Systems, LLC, the Debtors' Operating Subsidiary, to Grant the Debtors Access to the Books, Records and Management of DynaVox Systems LLC and its Subsidiaries for the Purpose of Conducting Due Diligence, and (II) Granting Related Relief [Docket No. 6] (the "Due Diligence Motion");

Anyone wishing to receive a copy of one or more of these motions can visit **www.upshotservices.com/dynavox** and view them for no charge.

### 3. The Debtor In Possession Financing.

On April 4, 2014, the Debtors received an acquisition proposal dated April 3, 2014 (the "Proposal") from Tobii Technology AB, a Swedish corporation ("Tobii"), offering cash in excess of the amounts necessary to satisfy the Obligations owed to JEC and relieve the lien on the Systems Membership Units, subject to the performance by Tobii of due diligence and other conditions, such as agreement on mutually agreeable deal documentation.    Tobii is a high-technology company that develops and sells products for eye control and eye tracking.

To permit diligence while also protecting the interests of DynaVox (including the Operating Companies) in its confidential information, on April 4, 2014, Tobii and DynaVox Inc., on behalf of itself and its direct and indirect subsidiaries, entered into that certain Confidentiality and Nondisclosure Agreement ("NDA") wherein DynaVox Inc. agreed to disclose, and to use its best efforts to cause its direct and indirect subsidiaries (i.e., the Operating Companies) to disclose, certain confidential financial, technical and other business information to Tobii, which information is subject to, and required to be kept strictly confidential in accordance with, the terms of the NDA. In addition, and in order to facilitate the due diligence and a competitive sale process, as well as to evidence its commitment to the Proposal, on April 4, 2014, the Debtors and Tobii entered into a funding arrangement pursuant to a Secured Funding Agreement for Post-Petition Debtor-in-Possession Financing Facility (the "Tobii DIP Funding Agreement") for which the Debtors sought Court approval as one of their "first day" motions.    Among the conditions for the postpetition availability of credit under the Tobii DIP Funding Agreement was entry of an order granting Tobii access to the books, records, management and personnel of the Operating Companies so as to enable Tobii to conduct due diligence in connection with its contemplated purchase of the Systems Membership Units.  Consistent with that requirement, the Debtors filed their Due Diligence Motion seeking such access to information for all potential bidders.

Ultimately, the Tobii DIP Funding Agreement was not approved because, as described below, it was replaced by alternative funding offered by JEC.    In connection with the replacement of the Tobii DIP Funding Agreement, in addition to the other matters discussed below, the Debtors (and JEC) agreed that Tobii shall be pre-qualified as a bidder under any bidding procedures established for the sale of the Systems Membership Units.

### 4. The JEC Replacement Funding Agreement.

On April 9, 2014, the Debtors, Tobii and JEC negotiated the terms of a replacement funding agreement (the "JEC DIP Funding Agreement").  The JEC DIP Funding Agreement contained substantially similar terms as the Tobii DIP Funding Agreement, however, it provided other terms and conditions for the Debtors' estates, including certain Interim Availability Conditions (as defined therein) requiring the filing of the Sale Motion.

A copy of the JEC DIP Funding Agreement is attached as Exhibit A to the Interim Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507 (1) Approving Postpetition Financing, (2) Granting Liens and Providing Superpriority Administrative Expense Status, (3) Modifying Automatic Stay; and (4) Scheduling a Final Hearing [Docket No. 40] (the "Interim DIP Order"), approved by the Bankruptcy Court on April 14, 2014.

As set forth more fully on the record at the April 9, 2014 hearing before the Court, pursuant to the JEC DIP Funding Agreement, JEC committed to fund an amount up to $400,000 (the "DIP Loan") subject to the terms and conditions contained in the JEC DIP Funding Agreement, including the liens and security interests granted therein to JEC (the "DIP Liens") to be used solely: (i) to pay professional fees, costs and expenses of the Debtors incurred in connection with prosecuting the Debtors' bankruptcy cases and a sales process involving the Systems Membership Interests or assets of Systems and the Operating Companies (the "Target"); and (ii) any fees required to be paid under 28 U.S.C. §1930.

The JEC DIP Funding Agreement was also subject to certain Interim Availability Conditions (as defined therein), including: (i) the filing by the Debtors of a motion, on or before April 14, 2014, seeking the approval of a sale of the Systems Membership Units pursuant to section 363 of the Bankruptcy Code; (ii) a request for the approval of bid procedures in connection therewith; (iii) a request that the Court hold a hearing on the approval of such bid procedures on or before May 5, 2014; and (iv) a request that a hearing on the sale of the Systems Membership Units be held on or before May 22, 2014.

The JEC DIP Funding Agreement provided that it would terminate should the Court fail to enter an order: (a) approving the Bid Procedures on or before May 7, 2014, or (b) approving the Sale of the Systems Membership Units on or before May 23, 2014.

In accordance with the JEC DIP Funding Agreement, JEC was permitted to credit bid any amount not exceeding the accrued DIP Obligations (as defined therein). In addition, JEC reserved any and all rights to credit bid under section 363(k) of the Bankruptcy Code the total amount due and owing under the Prepetition Loan Documents, which amount was agreed to be $13,850,000 (the "JEC Prepetition Debt") (the DIP Obligations plus the JEC Prepetition Debt shall be referred to herein collectively as the "JEC Debt").

On May 5, 2014, the Court entered the Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507 (1) Approving Postpetition Financing, (2) Granting Liens and Providing Superpriority Administrative Expense Status, and (3) Modifying Automatic Stay [Docket No. 86] (the "Final Financing Order"), pursuant to which the Debtors' entry into the JEC DIP Funding Agreement was authorized and approved.

As set forth in paragraph 30 of the Final Financing Order, the Debtors, any Committee or another party-in-interest with standing and requisite authority may challenge the Prepetition Lien Claims by no later than 60 days from the entry of the Final Financing Order (the "Challenge Period"). The Challenge Period expired on July 7, 2014.

As no challenge was made to JEC's liens by the expiration of the Challenge Period, the Debtors sought Court approval to pay JEC from the sale proceeds and, as of the date hereof, JEC has been paid in full. For avoidance of doubt, any and all Claims of JEC, including Secured Claims and Claims under the DIP Facility, have been paid in full in accordance with (i) that certain Order Authorizing Debtors to Pay Undisputed Outstanding Prepetition and DIP Obligations to JEC, dated July 18, 2014 [Docket No. 168] (payment of $14,444,919.25), and (ii) that certain Order Authorizing Debtors to Pay Settled Related Persons Charge to JEC, dated August 25, 2014 [Docket No. 196] (payment of $90,000.00).

### 5.    The Debtors' Sale Motion and Post-Petition Sale and Marketing Process.

On April 14, 2014, in accordance with the Interim Availability Conditions, the Debtors filed the Sale Motion.  In addition to requesting approval of the sale of substantially all of the Debtors' assets (the "Sale"), the Sale Motion requested approval of certain bidding procedures. [See Docket No. 41].

On May 5, 2014, the Court entered an Order approving those procedures (the "Bidding Procedures Order") [Docket No. 85].  Pursuant to the Bidding Procedures Order, the Court, inter alia, established (i) May 15, 2014, at 4:00 p.m. as the Objection Deadline to the proposed Sale (the "Objection Deadline"); (ii) May 20, 2014 at 12:00 p.m. as the deadline for interested parties to submit a Qualified Bid (the "Bid Deadline"); (iii) May 21, 2014 as the date for the Debtors to conduct an Auction in the event the Debtors receive two (2) or more Qualified Bids on or before the Bid Deadline (the "Auction"); and (iv) May 22, 2014, at 11:00 a.m. as the date and time for the sale hearing (the "Sale Hearing").

Although the Debtors had previously engaged in a wholesale prepetition marketing and sale process spanning approximately six (6) months, on April 28, 2014, the Debtors retained Cassel Salpeter & Co., LLC ("Cassel Salpeter") as their financial advisor and investment banker for purposes of marketing the Debtors' assets in preparation of the contemplated Auction, so as to ensure the highest possible sale price for the Systems Membership Units.

Beginning on April 28, 2014, and continuing through May 21, 2014, Cassel Salpeter oversaw the Sale process to ensure its fairness, openness and transparency.  As part of its oversight process, Cassel Salpeter (a) contacted potential buyers in connection with the Sale; (b) assisted in the facilitation of available information with potential purchasers; (c) attended meetings and conference calls between the Debtors and potential buyers; (d) assisted in the facilitation of the Auction; and (e) advised the Debtors in connection with negotiations, and aided in consummation of the potential Sale.

Prior to the Bid Deadline, three (3) bids were received from: (i) Tobii Technology AP or its designed subsidiary ("Tobii"); (ii) Systems Acquisition Corporation ("Systems Acquisition") and (iii) JEC.  The Debtors determined that the bid by Tobii was the highest and best bid going into the Auction.  The Tobii bid provided, among other things, for a cash offer of $16,500,000.00 in immediately available funds, which offer was not contingent on obtaining any further internal approvals, obtaining financing or on the outcome or review of due diligence following the Auction.

An Auction was held on May 21, 2014.  At the conclusion of the Auction, the Debtors determined that the Successful Bid submitted by Tobii Technology AB or its designated subsidiary, in the amount of $18,000,000, and the Back-Up Bid submitted by Systems Acquisition Corporation, in the amount of $17,800,000, represented the highest and best price for the Debtors' assets.

On May 22, 2014, the Court entered an Order (I) Authorizing the Sale by the Debtors of the Membership Interests of DynaVox Systems LLC Free and Clear of All Liens, Claims,

Encumbrances, and Interests; and (II) Granting Related Relief [Docket No. 112] (the "Sale Order").

As contemplated in the Sale Order, the sale transaction closed on May 23, 2014 (the "Closing Date"), and all transactions contemplated thereby were consummated including, among other things, the execution of the Bill of Sale and payment of $18,000,000.00.

Following consummation of the Sale and the transfer of substantially all of the Debtors' assets to Tobii, the Debtors and their Estates focused on completing the chapter 11 plan process.

### 6.    Professionals Retained by the Estates.

During the Cases to date, the Debtors retained certain professionals to assist with the administration of the Estates.  The Bankruptcy Court has approved the employment of each of these professionals.  These professionals are listed below:

Genovese Joblove & Battista, P.A. as the Debtors' bankruptcy co-counsel;

Chipman Brown Cicero & Cole, LLP as the Debtors' bankruptcy co-counsel;

Cassel Salpeter & Co., LLC as the Debtors' financial advisor and investment banker;

Ernst & Young LLP as the Debtors' Tax Accountant; and

UpShot Services LLC as the Debtors' Claims, Solicitation and Noticing Agent.

The Bankruptcy Court has approved interim fee procedures for professionals seeking compensation from the Estates.  Subject to the Debtors' cash availability, Debtors' counsel is eligible to receive payment of 80% of their monthly fees and 100% of their monthly costs if no objection is timely filed and served with respect to monthly applications, with the opportunity to request and obtain payment of the "hold back" amounts at an interim or a final fee application hearing.

Pursuant to the interim fee procedures, Genovese Joblove & Battista and Chipman Brown Cicero & Cole, LLP ("CBCC") have been paid 80% of their fees and 100% of their costs from the Petition Date through July 2014.  To date, GJB has been paid $209,109.20 in fees and $11,395.85 in costs and CBCC has been paid $176,893.00 in fees and $9,605.46 in costs.  GJB has unpaid fees of $18,074.00 and costs of $9.00 for August 2014.  CBCC has unpaid fees of $12,473.50 and costs of $442.08 for August 2014.  In addition, GJB and CBCC are due fee holdbacks of $47,275.10 and $40,425.50, respectively, through July 2014.

On May 30, 2014, Cassel Salpeter & Co., LLC filed its First and Final Fee Application [Docket No. 117] seeking final allowance of fees in the amount of $307,500.00 and expenses in the amount of $3,947.22.  On June 19, 2014, the Court entered an Order approving the Application [Docket No. 125].  As of the date hereof, Cassel Salpeter & Co., LLC has been paid in full.

The Debtors' disbursement agent and claims and noticing agent is paid in full on monthly basis, pursuant to a separate procedure.

The Debtors' tax accountant is to be paid a flat fee of $172,000.00 for preparation and filing of all 2013 and 2014 federal and state tax returns pursuant to its retention agreement.

### 7.    Executory Contracts and Unexpired Leases.

On the Petition Date, the Debtors may have been a party to certain unexpired leases and executory contracts. On the Effective Date, all executory contracts and unexpired leases of the Debtors, except for the Confidentiality Agreements described in Section IV.A.2 of the Plan, will be rejected. The Confirmation Order will constitute a Bankruptcy Court order approving this rejection.

### 8.    Claims.

#### a.    The Schedules and the Bar Date.

Pursuant to their Schedules filed on or about April 21, 2014 and Amended Schedules filed on or about October 3, 2014, the Debtors calculated that the total amount of Claims (excluding Intercompany Claims) as of the Petition Date are the following:

(i)    DynaVox Inc. – Undisputed general unsecured claims in the amount of $150,000.00, unpaid directors' fees in the amount of $424,000.00 and disputed general unsecured claims in the approximate amount of $350,000.00;

(ii)    Systems Holdings – Priority tax claim in the approximate amount of $50,000.00; and

(iii)    Intermediate – Secured claim in the approximate amount of $13,850,000.00.

In addition, the Debtors owed $400,000.00, plus accrued interest, fees and costs to JEC on account of the DIP Loan.

As described above, all Claims of JEC have been paid in full.

On July 22, 2014, the Court approved the Debtors' motion requesting the establishment of a general bar date in these Cases and certain other related procedures and entered its Order (1) Fixing Bar Date for the Filing of Proofs of Claim, (2) Fixing Bar Date for the Filing of Proofs of Claim By Governmental Units, (3) Fixing a Bar Date for the Filing of Proofs of Interest (4) Fixing Bar Date for the Filing of Requests for Allowance of Administrative Expense Claims, (5) Designating Form and Manner of Notice Thereof, and (6) Granting Related Relief (the "Bar Date Order") [Docket No. 171].

Pursuant to the Bar Date Order, among other things, the Court established August 29, 2014 (the "General Bar Date") as the last date on which creditors or equity interest holders of the Debtors could file (i) a proof of claim against the Debtors' estate on account of a pre-Petition Date claim; (ii) a proof of interest against the Debtors' estates on account of Equity Interests in

DynaVox Inc. (ii) a request for allowance of an administrative expense claim arising under section 503(b)(9) of the Bankruptcy Code. The Bar Date Order also established additional bar dates for the prepetition claims of governmental units and claims arising from the Debtors' rejection of an executory contract or unexpired lease.

On or before July 24, 2014, the Debtors sent notice by first-class mail to all creditors and parties in interest in these Cases of the establishment of the General Bar Date and other related procedures. Additionally, on July 25, 2014, the Debtors published notice of the General Bar Date and related procedures one time in The New York Times. As a result, 49 proofs of claim and/or interest have been filed against the Debtors.

Five (5) taxing authorities filed priority and /or secured tax claims in the aggregate amount of $163,676.04. The majority of the asserted tax debt ($106,546.95 filed by the Comptroller of Public Account – Texas, subject to adjustment based on the tax return) has been paid in full by DynaVox Systems Inc. The remainder of the tax claims is estimated because the Debtors have not filed their 2013 tax returns. The Debtors have retained a tax accountant to file all state and federal returns for the Debtors. The Debtors believe that there will be minimal tax exposure after filing the outstanding returns.

As described above, the Debtors' independent directors have agreed to waive their Allowed General Unsecured Claims against the Debtors' estates. In addition, unliquidated claims of the Debtors' Indemnified Parties will be subject to the Directors and Officers Reserve Account as more specifically set forth in the Plan.

The amount of the distribution received by Holders of Equity Interests in Class 5 could be affected by, among other things, the ultimate amount of Allowed Claims in these Cases (which amount will include both Filed Claims and claims listed on the Debtors' Schedules that have not been superseded by Filed Claims).

THE DEBTORS, THE ESTATES, THE LIQUIDATING TRUSTEE AND THE LIQUIDATING ESTATES RESERVE ANY AND ALL RIGHTS, EXCEPT AS EXPRESSLY STATED IN THE PLAN, TO OBJECT TO OR DEFEND AGAINST ANY CLAIM ASSERTED AGAINST THE DEBTORS OR THEIR ESTATES.

### b.    Administrative Claims Bar Date.

On July 22, 2014, the Court entered the Bar Date Order, pursuant to which the Court has fixed a bar date ("Administrative Claims Bar Date") for filing requests for payment of administrative expenses as of August 1, 2014 (other than U.S. Trustee Fees and a Professional Fee Claim) allowable under section 330, 503(b), 507(a)(2) or 507(b) of the Bankruptcy Code ("Administrative Expense Requests"). The Debtors sought this deadline in order to determine the universe of administrative expenses as of August 1, 2014 that will need to be satisfied upon the occurrence of the Effective Date, and to determine whether there are sufficient funds available under the Plan to feasibly satisfy those administrative expenses upon the Effective Date.

The Administrative Claims Bar Date Order requires any party that holds or may hold an administrative expense (other than U.S. Trustee Fees and a Professional Fee Claim) against the

Estates must file with the Court and serve a statement: (i) setting forth the amount of its administrative expense as of August 1, 2014; and (ii) providing a description of the basis for the Administrative Claim and the documentary evidence supporting the Administrative Claim.

The Administrative Claims Bar Date does not apply to: (a) fees payable to the Office of the United States Trustee pursuant to 28 U.S.C. §1930; (b) administrative expenses that have already been approved by order of the Court, even if only approved on an interim basis; (c) administrative expenses that have been paid in full at any time prior to the Administrative Claims Bar Date; (d) administrative expenses of governmental units that are subject to Bankruptcy Code section 503(b)(1)(D); and (e) claims of Professionals.

### c. Claim Objections.

Pursuant to Section IV.D of the Plan, only the Liquidating Trustee and the Debtors are authorized to file Claim Objections to Claims and Equity Interests, through and including the Claim/Equity Interest Objection Deadline. Accordingly, all rights are reserved on behalf of the Debtors, the Estates, the Liquidating Estates and the Liquidating Trustee, with respect to the allowance or disallowance of any and all Claims and Equity Interests, including Claims and Equity Interests not referenced in the Disclosure Statement.

THEREFORE, IF THE COURT ORDERS SOLICITATION AND VOTING ON THE PLAN, THEN IN VOTING ON THE PLAN OR OTHERWISE, INCLUDNG WHETHER TO OBJECT TO THE PLAN, NO CREDITOR OR EQUITY INTEREST HOLDER MAY RELY ON THE ABSENCE OF AN OBJECTION TO THEIR PROOF OF CLAIM OR EQUITY INTEREST, RESPECTIVELY, AS ANY INDICATION THAT THE DEBTORS, THE ESTATES, THE LIQUIDATING ESTATES, THE LIQUIDATING TRUSTEE OR OTHER PARTIES IN INTEREST ULTIMATELY WILL NOT OBJECT TO THE AMOUNT, PRIORITY, SECURITY, OR ALLOWABILITY OF ITS CLAIM OR EQUITY INTEREST, OR SEEK TO SUBORDINATE SUCH CLAIM. CREDITORS AND EQUITY INTEREST HOLDERS SHOULD ASSUME THAT THE DEBTORS, THE ESTATES, LIQUIDATING ESTATES, LIQUIDATING TRUSTEE, OR OTHER PARTY IN INTEREST (I) WILL FILE AN OBJECTION TO ANY PROOF OF CLAIM OR EQUITY INTEREST THAT IS NOT LISTED IN THE DEBTORS' SCHEDULES OR STATEMENT OF EQUITY SECURITY HOLDERS, DIFFERS IN AMOUNT OR PRIORITY FROM THE AMOUNT OR PRIORITY OF THAT CREDITOR'S CLAIM OR EQUITY INTEREST, IF APPLICABLE, AS LISTED IN THE SCHEDULES, IF SUCH CREDITOR'S CLAIM IS LISTED IN THE SCHEDULES AS DISPUTED, CONTINGENT, OR UNLIQUIDATED, OR THE PERCENTAGE OF EQUITY INTERESTS AS LISTED IN THE DEBTORS' STATEMENT OF EQUITY SECURITY HOLDERS  (II) WILL PROSECUTE, ALL OBJECTIONS TO CLAIMS AND EQUITY INTERESTS AND COUNTERCLAIMS THEY MAY HAVE WITH RESPECT TO CLAIMS OR EQUITY INTERESTS ASSERTED, AND (III) EXCEPT AS SPECIFICALLY SET FORTH IN THE PLAN, WILL PROSECUTE CLAIMS AND EQUITY INTERESTS OF THE DEBTORS OR THE ESTATES (INCLUDING RIGHTS TO AFFIRMATIVE RECOVERY, RIGHTS TO SUBORDINATE CLAIMS, AND RIGHTS TO AVOID TRANSFERS).

9.     **Litigation and Avoidance Actions.**

a.     **Avoidance Actions Against Insiders and Others.**

Payments made by the Debtors within 90 days and, where made to Insiders, within one year of the Petition Date, may be recoverable by the Estates under Bankruptcy Code section 547 as preferential transfers. Also, the Estates may have other potential avoidance actions, including actions to avoid liens, set aside and/or recover fraudulent transfers of property arising under Bankruptcy Code sections 544 and 548 and applicable state law, which may apply to transfers preceding the Petition Date by four or more years.

As of the date of this Disclosure Statement, the Debtors have not identified any prepetition payments that may constitute preferential transfers under Bankruptcy Code section 547 as the Debtors did not have any operations prepetition except indirectly through the Operating Companies. As a result, the Debtors do not believe that any subsequently discovered payments would constitute recoverable preferences. Moreover, any such payments would be subject to significant defenses, and/or would not merit the cost of prosecution. Accordingly, the Debtors estimate that there will be minimal, if any, recoveries in respect of any such payments.

b.     **Preservation of All Claims, Causes of Action and Rights.**

NO PERSON SHOULD VOTE TO ACCEPT OR REJECT THE PLAN (IN THE EVENT THE COURT AUTHIRIZES VOTING) OR FAIL TO OBJECT TO THE PLAN IN THE EXPECTATION THAT THE DEBTORS, THE ESTATES, THE LIQUIDATING TRUSTEE AND/OR LIQUIDATING ESTATES MAY PURSUE OR REFRAIN FROM PURSUING ANY ACTION, REGARDLESS OF WHETHER THAT ACTION WAS COMMENCED PRIOR TO THE PETITION DATE, HAS BEEN COMMENCED SINCE THE PETITION DATE, OR IS SPECIFICALLY IDENTIFIED IN THIS DISCLOSURE STATEMENT. SUBJECT TO THE RELEASES CONTAINED IN THE PLAN, THE PLAN DOES NOT ACT AS A RELEASE OF ANY OF THE RIGHTS OF THE DEBTORS OR THE ESTATES TO COMMENCE ANY RETAINED ACTION. INSTEAD, UNDER THE PLAN, ALL CLAIMS, CAUSES OF ACTION, AND OTHER RIGHTS THAT THE DEBTORS OR THE ESTATES MAY HOLD OR HAVE AGAINST ANY ENTITY, ARE PRESERVED AND VESTED IN THE LIQUIDATING ESTATES, INCLUDING, WITHOUT LIMITATION, (I) ANY RETAINED ACTIONS AND ANY AVODANCE ACTIONS, (II) ANY LEGAL OR EQUITABLE RIGHTS TO SUBORDINATE AND/OR DISALLOW CLAIMS OR INTERESTS, (III) ANY CAUSES OF ACTION THAT MAY BE BROUGHT ON BEHALF OF THE DEBTORS, THE ESTATES OR THEIR CREDITORS OR EQUITY INTEREST HOLDERS; AND (IV) ANY AND ALL OTHER CLAIMS, RIGHTS, OR CAUSES OF ACTION OF ANY KIND OR NATURE OF THE DEBTORS OR THE ESTATES THAT MAY EXIST UNDER APPLICABLE BANKRUPTCY OR NONBANKRUPTCY LAW.

WITHOUT LIMITING THE GENERALITY OF ANY OF THE FOREGOING PARAGRAPHS, THE LIQUIDATING ESTATES SHALL, SUBJECT TO THE RELEASES CONTAINED IN THE PLAN, RETAIN THE RIGHT TO ASK THE COURT TO SUBORDINATE OR DISALLOW ANY CLAIM OR EQUITY INTEREST, NOTWITHSTANDING ANY REFERENCE TO SUCH A CLAIM OR EQUITY INTEREST

OR CLASSIFICATION OF SUCH A CLAIM OR EQUITY INTEREST UNDER THE PLAN (NEITHER OF WHICH CONSTITUTE AN ADMISSION THAT ANY SUCH CLAIM SHOULD BE AN ALLOWED CLAIM OR EQUITY INTEREST OR THAT ANY SUCH CLAIM OR EQUITY INTEREST SHOULD NOT BE SUBORDINATED.

Except as otherwise provided in the Plan, any of the above Retained Actions and related rights shall be retained by the Liquidating Estate free and clear of all Claims and Interests, and the Liquidating Estates may pursue the Retained Actions and related rights in accordance with their best interests.

### c.   Proceeds of Retained Actions.

All recoveries realized on Retained Actions, including Avoidance Actions, (i.e., the claims, causes of action and other rights preserved under the Plan) will be retained and used by the Liquidating Estates in accordance with the Plan.

### IX.

## SUMMARY OF MATERIAL PLAN PROVISIONS

The following is a narrative description of certain provisions of the Plan. The Plan is attached hereto as <u>Exhibit 1</u>. The following summary of the Plan is qualified in its entirety by the actual terms of the Plan. In the event of any conflict, the terms of the Plan will control over any summary set forth in this Disclosure Statement.

### A.   Designation of Classes and Treatment of Claims and Interests Generally.

The Bankruptcy Code requires that a chapter 11 plan divide the different claims against, and equity interests in, a debtor into separate classes based upon their legal nature. Claims of a substantially similar legal nature are usually classified together, as are equity interests of a substantially similar legal nature. The Bankruptcy Code does not require the classification of administrative claims and certain priority claims, and they are typically denominated "unclassified claims."

Under Bankruptcy Code section 1124, a class of claims is "impaired" unless the plan (i) leaves unaltered the legal, equitable, and contractual rights of the holders of claims in the class; or (ii) cures all defaults (other than those arising from the debtor's insolvency, the commencement of the case, or nonperformance of a nonmonetary obligation) that occurred before or after the commencement of the case, reinstates the maturity of the claims in the class, compensates the holders for their actual damages incurred as a result of their reasonable reliance on any acceleration rights, and does not otherwise alter their legal, equitable, and contractual rights. Except for any right to accelerate the debtor's obligations, the holder of an unimpaired claim will be placed in the position it would have been if the case had not been commenced.

A chapter 11 plan must designate each separate class of claims and equity interests either as "impaired" (affected by the plan) or "unimpaired" (unaffected by the plan). If a class of claims is "impaired," under the Bankruptcy Code the holders of claims in that class are entitled to vote on the plan (unless the plan provides for no distribution to the class, in which case the

class is deemed to reject the plan), and to receive, under the plan, property with a value at least equal to the value that the holder would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code. If a class of claims is unimpaired, the holders of claims in that class are deemed to accept the plan.

**B.     Summary and Classification of Claims and Equity Interests.**

This Section described the classification of Claims and Equity Interests for all purposes, including voting, confirmation, and distributions under the Plan, except for Administrative Claims and Priority Tax Claims, which are not classified. The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes, including voting, Confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or Equity Interest shall be deemed classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class. A Claim or Equity Interest is in a particular Class only to the extent that such Claim or Equity Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date. As the Plan provides for substantive consolidation of the Consolidated Debtors' Estates, there is only a single Class for each category of Claims or Equity Interests against the Consolidated Debtors into which all such Claims or Equity Interests against any one or more of the Consolidated Debtors are classified.

The following table summarizes unclassified Claims and the Classes of Claims and Equity Interests under the Plan:

| CLASS/ UNCLASSIFIED CLAIMS | DESCRIPTION | IMPAIRED/ UNIMPAIRED | VOTING STATUS |
|---|---|---|---|
| Unclassified Claims | Administrative Claims and Priority Tax Claims | Unimpaired | Not Entitled to Vote |
| Class 1 | Secured Tax Claims | Unimpaired | Deemed to Accept – Vote Not Solicited |
| Class 2 | Other Secured Claims | Unimpaired | Deemed to Accept - Vote Not Solicited |
| Class 3 | Priority Claims (Other than Priority Tax Claims) | Unimpaired | Deemed to Accept – Vote Not Solicited |
| Class 4 | General Unsecured Claims | Unimpaired | Deemed to Accept – Vote Not Solicited |
| Class 5 | Equity Interests | Unimpaired | Deemed to Accept – Vote Not Solicited |

NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE PLAN, NO DISTRIBUTIONS WILL BE MADE AND NO RIGHTS WILL BE RETAINED ON ACCOUNT OF ANY CLAIM OR EQUITY INTEREST THAT IS NOT ALLOWED.

The treatment in the Plan is in full and complete satisfaction of the legal, contractual, and equitable rights (including any Liens) that each entity holding an Allowed Claim or an Allowed Equity Interest may have in or against the Debtors, the Estates, the Liquidating Estates or their respective property.   This treatment supersedes and replaces any agreements or rights those entities may have in or against the Debtors, the Estates, the Liquidating Estates or their respective property.  All distributions in respect of Allowed Claims will be allocated first to the principal amount of such Allowed Claim, as determined for federal income tax purposes, and thereafter, to the remaining portion of such Allowed Claim, if any.

### C.    Allowance and Treatment of Unclassified Claims.

#### 1.    Administrative Claims.

##### a.    U.S. Trustee Fees.

U.S. Trustee Fees shall be allowed in accordance with 28 U.S.C. § 1930. The Debtors will pay to the U.S. Trustee all fees due and owing under 28 U.S.C. § 1930 in cash on the Effective Date. The Disbursing Agent shall thereafter pay the U.S. Trustee the appropriate sum required pursuant to 28 U.S.C. §1930(a)(6) for post-confirmation periods within the time periods set forth in 28 U.S.C. §1930(a)(6) until the earlier of the closing of this case by the issuance of a Final Decree by the Bankruptcy Court, or upon entry of an order of this Bankruptcy Court dismissing the case, or converting this case to another chapter under the United States Bankruptcy Code.  To date, the Debtors have paid all fees due and owing to the Office of the United States Trustee, and the Debtors or the Disbursing Agent, as applicable, anticipate paying all such fees through Confirmation of the Plan and thereafter as provided in the Plan.

##### b.    Professional Fee Claims.

A Professional Fee Claim will be allowed only if:

(i)    On or before 60 days after the Effective Date, the entity holding such Professional Fee Claim both Files with the Bankruptcy Court a final fee application or a motion requesting allowance of the fees and serves the application or motion on the Liquidating Trustee and his/her counsel, the Debtors and their counsel (to the extent, if any, that the final fee application is served prior to the Effective Date), the U.S. Trustee, and on all parties listed on the post-Effective Date special service list maintained by the Liquidating Trustee established in accordance with Section VI.H of the Plan; and

(ii)    The Bankruptcy Court allows the Professional Fee Claim.

Any party in interest may File an objection to such application or motion within the time provided by the Bankruptcy Rules or within any other period that the Bankruptcy Court establishes.  Entities holding Professional Fee Claims that do not timely File and serve a fee

application or motion for payment will be forever barred from asserting such Professional Fee Claim against the Debtors, the Estates, the Liquidating Estates, or their respective property.

With respect to all Professional Fee Claims that are accrued and not paid as of the Effective Date, the Liquidating Estates shall deposit into the Professional Fee Reserve Account an amount equal to the aggregate amount of asserted, unpaid Professional Fee Claims, which funds shall be released to the Professionals only in accordance with (i) existing or future orders of the Bankruptcy Court approving monthly interim compensation or the Professional's interim or final fee application, or (iii) any other applicable order of the Bankruptcy Court.

### c.    Other Administrative Claims.

Unless otherwise expressly provided in the Plan, an Administrative Claim (other than U.S. Trustee Fees and a Professional Fee Claim) will be allowed <u>only</u> if:

(i)    On or before the Administrative Claim Bar Date, the person or entity asserting an Administrative Claim Files and serves a request for allowance of an Administrative Claim in compliance with the procedures established by the Court under the Administrative Claim Bar Date Order; and

(ii)    The Court allows the Administrative Claim by Final Order.

Any party in interest may File an objection to such Administrative Claim within the time provided by the Bankruptcy Rules or within any other period that the Bankruptcy Court establishes.    **Except as otherwise expressly provided in the Plan, Entities holding Administrative Claims (other than U.S. Trustee Fees or Professional Fee Claims, which are addressed in Sections II.B.1(a) and II.B.1(b) of the Plan) that have not timely Filed and served a request for allowance an Administrative Claim by the Administrative Claim Bar Date are forever barred from asserting such Administrative Claim against the Debtors, the Estates, the Liquidating Estates, or their respective property.**

Unless the entity holding a Allowed Administrative Claim (other than U.S. Trustee Fees or Professional Fee Claims) agrees to different treatment, the Disbursing Agent will pay to the entity holding such Allowed Administrative Claim Cash in the full amount of such Allowed Administrative Claim, on or before the latest of: (a) a Distribution Date; (b) fifteen (15) days after the date of an order of the Bankruptcy Court allowing such Allowed Administrative Claim becomes a Final Order; and (c) the date on which the Allowed Administrative Claim first becomes due and payable in accordance with its terms.

### d.    Costs of the Liquidating Estate.

Allowance and payment of Post Confirmation Administrative Claims of the Liquidating Trustee, compensation to the Liquidating Trustee and the Post Confirmation Professionals shall be governed by the provisions of the Plan and the Liquidating Estate Agreement.

### 2. Priority Tax Claims.

Unless the entity holding an Allowed Priority Tax Claim agrees to different treatment, the Disbursing Agent will pay to the Holder of such Allowed Priority Tax Claim the full amount thereof from Distributable Cash on or before the latest of: (a) a Distribution Date; (b) fifteen (15) days after the date of an order of the Bankruptcy Court allowing such Priority Tax Claim becomes a Final Order; and (c) the date on which the Allowed Priority Tax Claim first becomes due and payable in accordance with its terms.

### D. Classification and Treatment of Classified Claims and Interests.

### 1. Class 1 (Secured Tax Claims).

Class 1 comprises all Secured Tax Claims against the Consolidated Debtors. Class 1 is unimpaired under the Plan. In full satisfaction of any Allowed Class 1 Claim that has not been satisfied or extinguished as of the Effective Date, the Disbursing Agent will pay the Holder of such Allowed Class 1 Secured Tax Claim the full amount thereof from Distributable Cash on or before the latest of: (a) a Distribution Date, and (b) fifteen (15) days after the date of an order of the Bankruptcy Court allowing such Claim becomes a Final Order.

### 2. Class 2 (Other Secured Claims).

Class 2 comprises all Other Secured Claims against the Consolidated Debtors that are not classified within any other Class under the Plan. Class 2 is unimpaired under the Plan. In full satisfaction of any Allowed Class 2 Claim that has not been satisfied or extinguished as of the Effective Date, the Disbursing Agent will, at its option. (1) pay the holder of such Allowed Class 2 Claim the full amount thereof from Distributable Cash on or before the latest of: (a) a Distribution Date, and (b) fifteen (15) days after the date of an order of the Bankruptcy Court allowing such Claim becomes a Final Order, or (B) surrender the Collateral securing the Allowed Class 2 Secured Claim to the Holder thereof, in full satisfaction thereof. For avoidance of doubt, any and all Claims of JEC, including Secured Claims and Claims under the DIP Facility, have been paid in full in accordance with (i) that certain Order Authorizing Debtors to Pay Undisputed Outstanding Prepetition and DIP Obligations to JEC, dated July 18, 2014 [Docket No. 168], and (ii) that certain Order Authorizing Debtors to Pay Settled Related Persons Charge to JEC, dated August 25, 2014 [Docket No. 196].

### 3. Class 3 (Priority Claims other than Priority Tax Claims).

Class 3 comprises all Priority Claims, other than Priority Tax Claims, against the Consolidated Debtors. Class 3 is unimpaired under the Plan. In full satisfaction of any Allowed Class 3 Claim that has not been satisfied or extinguished as of the Effective Date, the Disbursing Agent will pay the holder of such Allowed Class 3 Claim the full amount thereof from Distributable Cash on or before the latest of: (a) a Distribution Date, and (b) fifteen (15) days after the date of an order of the Bankruptcy Court allowing such Claim becomes a Final Order.

### 4.    Class 4 (General Unsecured Claims).

Class 4 comprises all General Unsecured Claims against the Consolidated Debtors.  Class 4 is unimpaired under the Plan.  In full satisfaction of each Allowed Class 4 Claim that has not been satisfied or extinguished as of the Effective Date, the Disbursing Agent will pay the Holder of such Allowed Class 4 Claim the full amount thereof, including Post-Petition Interest thereon from and after the Petition Date to the date of such payment, from Distributable Cash on or before the latest of: (a) a Distribution Date, and (b) fifteen (15) days after the date of an order of the Bankruptcy Court allowing such Claim becomes a Final Order.   No distribution shall be made to Holders of Allowed Class 4 General Unsecured Claims unless and until all Allowed Administrative Claims, Allowed Professional Fee Claims, U.S. Trustee Fees, Post-Confirmation Administrative Claims, Allowed Priority Tax Claims and all Allowed Claims in Classes 1, 2 and 3 have been paid in full, reserved or otherwise resolved, and/or included in or accounted for in the distribution at issue.

### 5.    Class 5 (Equity Interests).

Class 5 comprises all Equity Interests.  Class 5 is Unimpaired under the Plan.  In full satisfaction of any Allowed Class 5 Equity Interest that has not been satisfied or extinguished as of the Effective Date, the Class 5 Equity Interests shall not be cancelled or extinguished and the Disbursing Agent will pay to the Holder of such Allowed Class 5 Equity Interest its pro rata share of each distribution of Distributable Cash proposed to be made to all Holders of Allowed Class 5 Equity Interests by the Liquidating Trustee on any Distribution Date.  No distribution shall be made to Holders of Allowed Class 5 Equity Interests unless and until all Allowed Administrative Claims, Allowed Professional Fee Claims, U.S. Trustee Fees, Post-Confirmation Administrative Claims, Allowed Priority Tax Claims and all Allowed Claims in Classes 1, 2, 3 and 4 have been paid in full, reserved or otherwise resolved, and/or included in or accounted for in the distribution at issue.

### E.    Treatment of Executory Contracts and Unexpired Leases.

### 1.    Rejected Agreements.

On the Effective Date, all executory contracts and unexpired leases of the Debtors, except for the Confidentiality Agreements described in Section IV.A.2 of the Plan and the Directors and Officers Liability Policies, will be rejected.   The Confirmation Order will constitute a Bankruptcy Court order approving this rejection.

### 2.    Bar Date for Rejection Damage Claims.

Any Rejection Damage Claim or other Claim for damages arising from the rejection under the Plan of an executory contract or unexpired lease must be Filed and served on the Liquidating Trustee within thirty (30) days after the mailing of notice of the occurrence of the Effective Date (nothing herein or in the Plan shall extend the deadline for the filing of claims with respect to contracts or leases previously rejected).  Any such Claims that are not timely Filed and served will be entitled to no distribution under the Plan on account of such Claim and will be unenforceable against the Debtors, the Estates, the Liquidating Estates, and their

respective property, and entities holding such Claims will be barred by the Confirmation Order from receiving any distributions under the Plan on account of such untimely Claims.

F.    **Means of Execution and Implementation of the Plan.**

1.    **Ratification of Agreements.**

a.    **The Bill of Sale.**

Notwithstanding any other provision of the Plan, the Bill of Sale shall remain in full force and effect, and shall be fully enforceable on and after the Effective Date.

b.    **Confidentiality Agreements.**

Notwithstanding any other provision of the Plan, all Confidentiality Agreements shall remain in full force and effect, and shall be fully enforceable by the Liquidating Trustee, including all Confidentiality Agreements entered into in connection with the Sale. The Debtors' rights under all such Confidentiality Agreements shall inure to the benefit of the Liquidating Estates and shall be enforceable by the Liquidating Trustee on and after the Effective Date.

c.    **Directors and Officers Liability Policies.**

As of the Effective Date, the Debtors shall assume (and assign to the Liquidating Estates if necessary to continue the Directors and Officers Liability Insurance Policies in full force) all of the Directors and Officers Liability Policies pursuant to section 365(a) of the Bankruptcy Code. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption of each of the Directors and Officers Liability Policies. Notwithstanding anything to the contrary contained herein or in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the Directors and Officers Liability Policies, and each such indemnity obligation shall be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be Filed.

2.    **Substantive Consolidation of All Debtors' Estates.**

The Plan will effectuate a substantive consolidation of the Chapter 11 Cases of the Consolidated Debtors into a single entity solely for the purpose of the Chapter 11 Cases and all actions with respect to voting, confirmation, consummation and implementation of the Plan. On the Effective Date, the Plan essentially consolidates all the assets and liabilities of the Consolidated Debtors into a single estate. Accordingly, the Plan treats the Consolidated Debtors as a single entity and distributions are made on a collective basis to the Holders of Allowed Claims and Allowed Equity Interests against the Consolidated Debtors. Voting will be aggregated by type of Claim or Equity Interest without regard to which Debtor the Claim or Equity Interest is asserted against.

On the Effective Date, (i) all Intercompany Claims by, between and among the Consolidated Debtors shall be eliminated, (ii) all assets and liabilities of the Consolidated Debtors shall be merged or treated as if they were merged with the assets and liabilities of the

Consolidated Debtors, (iii) any obligation of a Consolidated Debtor and all guarantees thereof by one or more of the other Consolidated Debtors shall be deemed to be one obligation of the Consolidated Debtors, and (iv) each Claim filed or to be filed against any Consolidated Debtor shall be deemed filed as a single Claim against and a single obligation of the Consolidated Debtors. The Equity Interests are the Equity Interests in DynaVox Inc. and shall be treated as if they are Equity Interests in the Consolidated Debtors. On the Effective Date, in accordance with the terms of the Plan, and the consolidation of the assets and liabilities of the Consolidated Debtors, all Claims based upon guarantees of collection, payment, or performance made by the Consolidated Debtors as to the obligations of another Consolidated Debtor shall be released and of no further force and effect. The foregoing (a) shall not affect the rights of any Holder of a Secured Claim with respect to the Collateral securing its Claim, or the terms and implementation of any settlement, and the rights and obligations of the parties thereto, entered into in connection with the confirmation of the Plan and (b) shall not, and shall not be deemed to, prejudice the Retained Actions or the Avoidance Actions (subject to the releases set forth in Article V of the Plan), which shall survive entry of the Confirmation Order for the benefit of the Debtors and their Estates, as if there had been no substantive consolidation.

The Plan and Disclosure Statement, jointly, shall serve as, and shall be deemed to be, a motion for entry of an order granting substantive consolidation of the Consolidated Debtors' Chapter 11 Cases. If no objection to the Plan is timely filed and served by any Holder of Claim or Equity Interest affected by the Plan, as provided herein and in the Plan on or before the Ballot Deadline, or such other date as may be established by the Bankruptcy Court, the Confirmation Order will serve as the Order approving substantive consolidation pursuant to the terms of the Plan. If any such objections are timely filed and served, a hearing with respect to the Plan and the objections thereto shall be scheduled by the Bankruptcy Court, which hearing may, but is not required to, coincide with the Confirmation Hearing.

### 3. Funding of the Plan.

As set forth in Section II of the Plan, all obligations under the Plan will be paid by the Disbursing Agent from Distributable Cash, including the proceeds, if any, realized by the Liquidating Estates in respect of Retained Actions.

### 4. The Liquidating Estates.

#### a. Continuation of the Estates.

On and after the Effective Date, the Estates shall continue as the Liquidating Estates. In addition, on the Effective Date of the Plan, (i) the Assets shall vest in, and be transferred to, the Liquidating Estates, which Liquidating Estates shall constitute, be appointed as and be deemed a representative of the Estates pursuant to and in accordance with the terms of Section 1123(b)(3)(B) of the Bankruptcy Code solely for the benefit of all Holders of Allowed Claims and Allowed Equity Interests under the Plan with respect to, among other things, any Retained Actions, and (ii) the Liquidating Estates, through the Liquidating Trustee, is and shall be authorized and appointed to investigate, prosecute, enforce, pursue and settle, and continue to investigate, prosecute, enforce, pursue and settle, the liquidation of such Assets, including Retained Actions as a representative of the Estates pursuant to and in accordance with the terms

of Section 1123(b)(3)(B) of the Bankruptcy Code solely for the benefit of all Holders of Allowed Claims and Allowed Equity Interests under the Plan. The Liquidating Estates shall hold title to all of the Assets of the Estates, as well as any property acquired after the Effective Date that otherwise would become property of the Estates under Bankruptcy Code section 541, free and clear of all claims, liens, encumbrances and other interests, except as otherwise provided in the Plan. The Liquidating Estates shall be fully liquidated and Cash shall be distributed to holders of Allowed Claims and Allowed Equity Interests as soon as is reasonably practicable following the Effective Date in accordance with the Plan.

NOTWITHSTANDING ANYTHING IN THE PLAN TO THE CONTRARY, THE VESTING IN AND TRANSFER OF THE ASSETS TO THE LIQUIDATING ESTATES SHALL BE FREE AND CLEAR OF ANY AND ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS OF ANY KIND WHATSOEVER, EXCEPT AS EXPRESSLY PRESERVED AND PROVIDED FOR IN THE PLAN AND THE CONFIRMATION ORDER.

**Notwithstanding anything in the Plan to the contrary, confirmation of the Plan shall divest the Debtors of any and all right, title and/or interest in the Assets, such that the Debtors shall not have any rights or authority in respect of any Assets vested in the Liquidating Estates.**

**b.       Preservation/Vesting of Rights of Action.**

Except as expressly released pursuant to the Plan, pursuant to section 1123(b) of the Bankruptcy Code, the Liquidating Trustee, on behalf of the Liquidating Estates shall be vested with and shall retain and may enforce any and all Retained Actions that the Debtors or the Estates may hold or have against any entity, including (i) Avoidance Actions, (ii) any legal or equitable rights to subordinate and/or disallow Claims, (iii) any causes of action that could be brought on behalf of the Debtors, the Estates, the Liquidating Estates; and (iv) any and all other claims, rights or causes of action of any kind or nature of the Debtors, the Estates or the Liquidating Estates that may exist under applicable bankruptcy law or non-bankruptcy law. Upon the Effective Date, the Liquidating Trustee (and only the Liquidating Trustee) shall have standing to assert, abandon, prosecute and/or settle, if applicable, any and all Retained Actions vested in the Liquidating Estates.

**c.       Appointment of the Liquidating Trustee.**

Pursuant to 11 U.S.C. § 1129(a)(5), consistent with the interests of creditors and equity security holders, and consistent with public policy, the Confirmation Order shall appoint, effective on the Effective Date, Soneet R. Kapila to act as the Liquidating Trustee, or such other person as may be appointed pursuant to the terms of the Liquidating Estate Agreement. The Debtors believe that Mr. Kapila is well qualified and experienced in acting as a fiduciary for creditors and equity interest holders, including as a panel bankruptcy trustee in the Southern District of Florida, a liquidating trustee in numerous other chapter 11 bankruptcy proceedings and many other related positions and appointments. Mr. Kapila's professional biography is attached hereto as Exhibit 4.

The Liquidating Trustee shall be free to act as he deems appropriate, in his discretion, to effectuate the terms of the Plan and the Liquidating Estate Agreement.

The Liquidating Trustee and any Post Confirmation Professional shall be entitled to receive, on a monthly basis, payment of fees and reimbursement of reasonable expenses from the assets of the Liquidating Estates in accordance with the Liquidating Estate Agreement. In the event there is insufficient Cash to satisfy the fees and expenses incurred by the Liquidating Trustee and his professionals following the Effective Date, such fees and expenses shall be satisfied with the cash proceeds of the Retained Actions, when and to the extent they are realized.

The Liquidating Trustee shall serve for the duration of the Liquidating Estates, subject to earlier death, resignation, incapacity or removal as provided in the Liquidating Estate Agreement. If Soneet R. Kapila is not able to serve for the duration of the Liquidating Estates, a successor shall be chosen pursuant to the terms of the Liquidating Estate Agreement. The Liquidating Trustee shall be authorized, without further order of the Bankruptcy Court, to employ such persons, including professionals, as deemed necessary to enable the Liquidating Trustee to perform his functions under the Plan, and the costs of such employment and other expenditures shall be paid solely from assets of the Liquidating Estates in accordance with the Liquidating Estate Agreement.

The Liquidating Trustee shall perform his obligations under the Plan without bond. The Liquidating Trustee shall have no liability to any person or entity entitled to receive a distribution pursuant to the Plan for any losses, damages, claims or causes of action, other than those primarily resulting from the Liquidating Trustee's action or failure to act arising out of, in connection with or resulting from the Liquidating Trustee's gross negligence or willful misconduct  The Liquidating Estates shall indemnify, defend and hold the Liquidating Trustee and his agents and advisors, including Post Confirmation Professionals, harmless from and against any claims, damages, costs, fines, penalties, liabilities, attorneys' and other professional fees and disbursements, suffered, incurred by, or asserted against any such party in connection with the rendition of services to the Liquidating Estates, provided that such indemnification shall not apply to the extent any such claims, damages, costs, fines, penalties, liabilities, attorneys' and other professional fees and disbursements, resulted primarily from gross negligence or willful misconduct of the Liquidating Trustee, his agents and advisors, including Post Confirmation Professionals, as the case may be, as determined by a Final Order. Any such indemnification claims shall be paid prior and in preference to any other payments or distributions to be made from the Liquidating Estates.

### d.    Powers and Duties of the Liquidating Trustee.

On and after the Effective Date, the Liquidating Trustee shall be the duly authorized representative of the Liquidating Estates for the purpose of implementing the Plan. Among other things, the Liquidating Trustee shall have (i) the rights, powers and duties conferred to him by the Plan and the Liquidating Estate Agreement, (ii) the rights and powers of a trustee under sections 542 through 552 of the Bankruptcy Code and the duties of a trustee under sections 704(1),(2),(4),(5),(7) and (9) of the Bankruptcy Code, and (iii) the following rights, powers and duties:

a.      liquidate, in accordance with the Plan, the assets of the Liquidating Estates;

b.      serve as Disbursing Agent under the Plan, including to make distributions under the terms of the Plan;

c.      in the Liquidating Trustee's reasonable business judgment, investigate, prosecute, settle and/or abandon rights, actions or litigation of the Liquidating Estates, including the Retained Actions;

d.      manage the affairs of the Liquidating Estates;

e.      collect and marshal all assets of the Liquidating Estates, reduce such assets to Cash, and make interim and final distributions in accordance with the Plan;

f.      monitor and enforce the implementation of the Plan;

g.      file all tax and regulatory forms, returns, reports and other documents required with respect to the Liquidating Estates;

h.      as soon as reasonably practicable, but in no event later than fifteen (15) days after the Effective Date, serve a notice of Effective Date on all holders of Claims and Equity Interests. The notice of Effective Date shall include a notice that the bar date for filing Rejection Damage Claims (or other Claims for damages) arising from the rejection under the Plan of executory contracts or unexpired leases shall be 30 days after the mailing of notice of the Effective Date, as set forth in Section III.A.2 of the Plan;

i.      in the Liquidating Trustee's reasonable business judgment, manage, control, prosecute and/or settle on behalf of the Liquidating Estate, objections to Claims on account of which the Liquidating Trustee (as Disbursing Agent) will be responsible (if Allowed) for making distributions under the Plan;

j.      submit all required U.S. Trustee and Bankruptcy Court reports and pay all required U.S. Trustee Fees until the case is closed;

k.      take all actions necessary and create any documents necessary to wind up the affairs of the Liquidating Estates and implement the Plan; and

l.      take all necessary actions and File all appropriate motions to obtain an order closing the Cases.

**e.      Termination of the Liquidating Estates.**

The Liquidating Estates shall terminate when the Liquidating Trustee has performed all of his duties under the Plan, including the final distribution of all the property of the Liquidating Estates, including all Distributable Cash, which date shall not be more than 24 months after the Effective Date; provided, however, that, upon a motion filed by a party-in-interest, including the Liquidating Trustee, upon a showing of cause, the Bankruptcy Court may extend the duration of

the Liquidating Estates so long as shall be necessary to liquidate and distribute property and resolve any and all litigation relating to the Plan or the Cases.

**f.    Additional Provisions Regarding the Liquidating Estates.**

In addition to the provisions contained in the Plan with respect to duties of the Liquidating Trustee, the Liquidating Estate Agreement will provide for, among other things, other actions to be taken by the Liquidating Trustee, the removal of the Liquidating Trustee, or nomination of a successor Liquidating Trustee and the effect of actions by the Liquidating Trustee, subject to Bankruptcy Court approval.  To the extent not set forth in the Plan, the functions of the Liquidating Estates, the powers and duties of the Liquidating Trustee, and the rights of the holders of property in the Liquidating Estates shall be governed by the provisions of the Liquidating Estate Agreement.

**5.    Retained Actions (including Avoidance Actions), Claim Objections and Equity Interest Objection.**

On and after the Effective Date, only the Liquidating Trustee shall have the right and standing to prosecute, abandon, and/or settle any Retained Action, any Claim Objection and any Equity Interest Objection.

All Retained Actions, Claim Objections and Equity Interest Objections shall be subject to all defenses and setoffs that could have been asserted against the Debtors or the Estates with respect thereto.  The costs of investigating, litigating, settling, collecting, recovering or otherwise pursuing any Retained Action, Claim Objection or Equity Interest Objection shall be borne by the Liquidating Estates.

Except as provided in Section II.B.1 of the Plan (regarding the allowance of Administrative Claims), objections to any Claim or Equity Interest must be Filed and must be served on the entity holding such Claim or Equity Interest by the Claim/Equity Objection Deadline.

**6.    Distribution of Property Under the Plan.**

The following procedures set forth in the Plan apply to distributions made pursuant to the Plan by the Disbursing Agent.  The Disbursing Agent will serve without bond and shall make all distributions under the Plan, except where otherwise provided.  To the extent required by applicable law, the Disbursing Agent in making cash distributions under the Plan shall comply with all tax withholding and reporting requirements imposed on it by any governmental unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. The Liquidating Trustee may require any Holder of an Allowed Claim or Holder of an Allowed Equity Interest entitled to a distribution under the Plan to furnish its, his or her employer or taxpayer identification number (the "TIN") assigned by the Internal Revenue Service.  Any distribution under the Plan may be conditioned on the receipt of such TIN.  If any such Holder of an Allowed Claim or an Allowed Equity Interest entitled to a distribution hereunder fails to provide a requested TIN within forty-five (45) days after the request thereof, then such failure shall be deemed to be a waiver of such Holder's interest in any future distributions, including the right to receive any future distributions.

### a.    Manner of Cash Payments Under the Plan.

Cash payments to domestic entities holding Allowed Claims and Allowed Equity Interest will be tendered in United States dollars and will be made by checks drawn on a United States domestic bank or by wire transfer from a United States domestic bank.  Payments made to foreign creditors holding Allowed Claims or Allowed Equity Interests may be paid, at the option of the Liquidating Trustee, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

### b.    No *De Minimis* Distributions.

Notwithstanding anything to the contrary in the Plan, no cash payment of less than $25 will be made to any entity.  No consideration will be provided in lieu of the *de minimis* distributions that are not made under this Section.

### c.    No Distribution with Respect to Disputed Claims.

No payments of cash or distributions of other property or other consideration of any kind shall be made on account of any Disputed Claim or Disputed Equity Interest unless and until such Claim or Equity Interest becomes an Allowed Claim or an Allowed Equity Interest or is deemed to be such for purposes of distribution, and then only to the extent that the Claim or Equity Interest becomes, or is deemed to be for distribution purposes, an Allowed Claim or an Allowed Equity Interest.  The presence of a Disputed Claim or Disputed Equity Interest in any Class will not be a cause to delay distribution to Allowed Claims or Allowed Equity Interests in that Class or in other Classes, so long as a reserve is created for the Disputed Claim or Disputed Equity Interest in accordance herewith.  Unless otherwise provided in the Plan, any holder of a Claim or Equity Interest that becomes an Allowed Claim or an Allowed Equity Interest after the Effective Date will receive any distribution that it would have received had its Allowed Claim or Allowed Equity Interest been Allowed as of the Effective Date within fifteen (15) days from the date that such Claim or Equity Interest becomes an Allowed Claim or an Allowed Equity Interest.

### d.    Delivery of Distributions and Undeliverable/Unclaimed Distributions.

### (1)    Delivery of Distributions in General.

The Liquidating Trustee shall make distributions to each holder of an Allowed Claim or Allowed Equity Interest by mail as follows: (a) at the address set forth on the proof of Claim filed by such holder of an Allowed Claim; (b) at the address set forth in any written notice of address change delivered to the Liquidating Trustee after the date of any related proof of Claim; (c) at the address reflected in the Schedules if no proof of Claim is filed and the Liquidating Trustee has not received a written notice of a change of address; or (d) at the address of record for Holders of Equity Interests as determined by the Distribution Agent.

### (2)    Undeliverable and Unclaimed Distributions.

If the distribution to the Holder of any Allowed Claim or Allowed Equity Interest is returned as undeliverable, no further distribution shall be made to such Holder unless and until the Liquidating Trustee is notified in writing of such Holder's then current address. Subject to the other provisions of the Plan, undeliverable distributions shall remain in the possession of the Liquidating Trustee pursuant to this Section until such time as a distribution becomes deliverable. All undeliverable cash distributions will be held in unsegregated, interest-bearing bank accounts for the benefit of the entities entitled to the distributions. These entities will be entitled to any interest actually earned on account of the undeliverable distributions. The bank account will be maintained in the name of the Liquidating Trustee but it will be accounted for separately.

Any holder of an Allowed Claim or Allowed Equity Interest who does not assert a claim in writing for an undeliverable distribution within 180 days after the Effective Date shall no longer have any claim to or interest in such undeliverable distribution, and shall be forever barred from receiving any distributions under the Plan, or from asserting a Claim against the Debtors, the Estates, Liquidating Estates, or their respective property, and the Claim or Equity Interest giving rise to the undeliverable distribution will be barred.

Any undeliverable distributions that are not claimed under this Section will be transferred to the Liquidating Trustee to be included in Distributable Cash for the benefit of Holders of Allowed Equity Interests under the Plan.

### (3)    Estimation of Disputed Claims or Equity Interests for Distribution Purposes.

The Liquidating Trustee may move for a Bankruptcy Court order estimating any Disputed Claim or Disputed Equity Interest. The estimated amount of any Disputed Claim or Disputed Equity Interest so determined by the Bankruptcy Court shall constitute the maximum recovery that the holder thereof may recover from the Liquidating Estates, irrespective of the actual amount ultimately Allowed.

### 7.    Dissolution of Debtor Entities/Termination of Officers and Directors.

On the Effective Date, and without further action by any party: (A) the Debtors have no right to operate a business; and (B) the services of the Debtors' officers, directors, managers and authorized representative automatically are terminated and each such officer, director and/or manager shall be deemed to have resigned as of the Effective Date without any further action; provided, however, that notwithstanding the foregoing, the Liquidating Trustee shall have and retain such authority as set forth in the Plan and the Liquidating Estate Agreement to dispose of the assets of the Liquidating Estates and otherwise implement the Plan in accordance with its terms. On the Effective Date, the Debtors shall be deemed liquidated and dissolved as a legal entity pursuant to applicable federal and state law, without further action by any entity. The Liquidating Trustee shall be authorized to execute any documents that implement or are in aid of this Section, in particular, and the Plan in general. The Confirmation Order shall constitute a final decree closing all but one of the Debtors' Chapter 11 Cases.

**G.    Effect of Confirmation Of The Plan.**

**1.    Binding Effect of Plan/Non-Discharge of the Debtors.**

Upon the Effective Date, Bankruptcy Code section 1141 shall become applicable with respect to the Plan and the Plan shall be binding on all Persons and Entities to the fullest extent permitted by Bankruptcy Code section 1141(a).  In accordance with Bankruptcy Code section 1141(d)(3), the Plan does not discharge the Debtors.  Bankruptcy Code section 1141 nevertheless provides, among other things, that the Assets dealt with by the Plan shall be vested in the Liquidating Estates free and clear of all Claims and interests of creditors and equity security holders.  Accordingly, no Entity holding a Claim against or Equity Interest in the Debtors may receive any payment from, or seek recourse against, any Assets that are to be distributed under the Plan unless and only to the extent that such Entity is the Holder of an Allowed Claim or Allowed Equity Interest entitled to a distribution in accordance with the terms of the Plan.  As of the Effective Date, all Persons are precluded from asserting against any property or Assets that are to be distributed under the Plan any Claims, rights, causes of action, liabilities, or interests based upon any act, omission, transaction, or other activity that occurred before the Effective Date except as expressly provided in the Plan or the Confirmation Order.

**2.    Releases By The Debtors.**

Effective (i) automatically on the Retained Actions Deadline with respect to the Debtors' Indemnified Parties, and (ii) as of the Effective Date with regard to all other Debtor Released Parties (as defined below), for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors (in their individual capacities and as debtors and debtors-in-possession) will be deemed to forever release, waive, and discharge any and all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities (other than the rights of the Debtors to enforce the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered hereunder, and liabilities arising after the Effective Date in the ordinary course of business), including Retained Actions (collectively, the "Released Claims"), against the Debtors' Indemnified Parties and any of the representatives, agents, Professionals, advisors, consultants and attorneys of the foregoing (collectively, the "Debtor Released Parties") whether such Released Claims are liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise that are based in whole or part on any act omission, transaction, event, or other occurrences taking place before, on or after the Petition Date through and including the Effective Date in connection with, relating to, or arising out of the Debtors, the Chapter 11 Cases, the negotiation and filing of the Plan, the Disclosure Statement or any prior plans of reorganization, the filing of the Chapter 11 Cases, the pursuit of confirmation of the Plan or any prior plans of reorganization, the consummation of the Plan, the administration of the Plan, or the property to be liquidated and/or distributed under the Plan, and that could have been asserted by or on behalf of the Debtors or their Estates .  Notwithstanding anything in the Plan to the contrary, the release contained in the Plan shall not apply to any Retained Action that is commenced by the Liquidating Trustee on or before the Retained Action Deadline in accordance with the Plan.

3.    **Exculpation and Limitation of Liability.**

The Debtors and their respective officers, directors, members and managers, and the Professionals for the Debtors (acting in such capacity) (collectively, the "Exculpated Parties") shall neither have nor incur any liability whatsoever to any Person or Entity for any act taken or omitted to be taken in good faith in connection with or related to the formulation, preparation, dissemination, implementation, confirmation, or consummation of the Plan, the Disclosure Statement, or any contract, instrument, release, or other agreement or document created or entered into, or any other act taken or omitted to be taken, in connection with the Plan or the Chapter 11 Cases, in each case for the period on and after the Petition Date; provided, however, that this exculpation from liability provision shall not be applicable to any liability found by a court of competent jurisdiction to have resulted from fraud or the willful misconduct or gross negligence of any such party. With respect to Professionals, the foregoing exculpation and release provision shall also include claims of professional negligence arising from the services provided by such Professionals during the Chapter 11 Cases. Any such claims shall be governed by the standard of care otherwise applicable to the standard of negligence claims outside of bankruptcy. The Confirmation Order shall enjoin the prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any such claim, obligation, suit, judgment, damage, loss, right, remedy, cause of action, charge, cost, debt, indebtedness, or liability which arose or accrued during such period or was or could have been asserted against any of the Exculpated Parties, except as otherwise provided in the Plan or in the Confirmation Order. Each of the Exculpated Parties shall have the right to independently seek enforcement of this release provision. All such Exculpated Parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities hereunder and under the Bankruptcy Code. Notwithstanding anything in the Plan to the contrary, the exculpation and limitation of liability provided for in the Plan shall not apply to any acts of omissions that occurred prior to the Petition Date. The rights granted hereunder are cumulative with (and not restrictive of) any and all rights, remedies, and benefits that the Exculpated Parties have or obtain pursuant to any provision of the Bankruptcy Code or other applicable law. This exculpation from liability provision is an integral part of the Plan and is essential to its implementation. Notwithstanding anything in the Plan to the contrary, any Exculpated Party shall be entitled to reasonably rely upon the advice of counsel with respect to its duties and responsibilities (if any) under the Plan and such reasonable reliance shall form an absolute defense to any such claim, cause of action, or liability. Without limiting the generality of the foregoing, each Exculpated Party shall be entitled to and granted the protections of section 1125(e) of the Bankruptcy Code.

4.    **Injunctive Relief Relating To Releases.**

Except as otherwise expressly provided in the Plan, all Entities that have held, hold or may hold Claims against or Equity Interests in the Debtors are permanently enjoined, from and after the Effective Date, from taking any of the following actions against any of the Debtors, their Estates, the Liquidating Trustee, the Liquidating Estates, the Professionals, or any of their property on account of any Claims or causes of action arising from events prior to the Effective Date, (i) enforcing, attaching, collecting or recovering by any manner or in any place or means any judgment, award, decree or order; (ii) creating, perfecting, or enforcing any Lien or encumbrance of any kind; (iii) asserting any right of setoff, right of subrogation or recoupment against any obligation, debt or liability due to the Debtors, and (iv) any act, in any manner, in

41

any place whatsoever, that does not conform to or comply with the provisions of the Plan with respect to such Claim or Equity Interest. Except as expressly provided in the Plan, the Debtors, the Liquidating Estates and the Liquidating Trustee expressly reserve all rights and defenses that the Debtors may have (including, without limitation, the rights of subrogation and recoupment) with respect to any obligation, debt or liability allegedly due to any Entity.

By accepting distributions pursuant to the Plan, each Holder of an Allowed Claim and Allowed Equity Interest receiving distributions pursuant to the Plan will be deemed to have specifically consented to the injunctions set forth in the Plan. Nothing in this section shall prohibit the Holder of a timely Filed Proof of Claim or Equity Interest from litigating its right to seek to have such Claim declared an Allowed Claim or Allowed Equity Interest and paid in accordance with the distribution provisions of the Plan, or enjoin or prohibit the interpretation or enforcement by the Holder of any obligations of the Debtors under the Plan.

### 5.    Terms of Existing Injunctions or Stays.

Unless otherwise provided in the Plan, all injunctions or stays provided for in these Chapter 11 Cases pursuant to sections 105, 362 or 525(a) of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date. The Plan and Confirmation Order will permanently enjoin the commencement or prosecution by any Entity, whether directly, derivatively or otherwise, of any Claims, Equity Interests, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities released or enjoined pursuant to the Plan and the Bankruptcy Code.

### H.    Other Plan Provisions.

### 1.    The Effective Date.

The Plan will not become binding or effective until and unless the Effective Date occurs. The Effective Date will be the first Business Day, as determined by the Debtors, in its reasonable discretion, on which the following conditions have been satisfied, unless waived by the Debtors:

(1)    The Confirmation Order in form and substance satisfactory to the Debtors shall have been entered and become a Final Order and shall provide that the Debtors, the Liquidating Trustee and the Liquidating Estates are authorized and directed to take all actions necessary or appropriate to enter into, implement and consummate the contracts, instruments, releases and other agreements or documents created in connection with the Plan or effectuate, advance, or further the purposes thereof;

(2)    All Plan Exhibits shall be, in form and substance, reasonably acceptable to the Debtors and shall have been executed and delivered by all parties' signatory thereto;

(3)    The Debtors shall be authorized and directed to take all actions necessary or appropriate to enter into, implement and consummate the contracts, instruments, releases and the agreements or documents created in connection with, and expressly provided for under, the Plan;

(4)     All other actions, documents, and agreements necessary to implement the Plan shall have been effected or executed; and

(5)     In the reasonable judgment of the Liquidating Trustee, the Debtors shall have sufficient Cash available to satisfy in full, or adequately reserve for, all Allowed Claims.

(6)     The Debtors may waive any of the conditions of the Confirmation and/or consummation of the Plan, in whole or in part, set forth herein at any time, without notice, without leave or order of the Bankruptcy Court, and without any formal action other than proceeding to obtain Confirmation and/or achieve Consummation of the Plan.

### 2.     Stay of Confirmation Order Shortened.

The 14-day stay otherwise applicable to the Confirmation Order under Federal Rule of Bankruptcy Procedure 3020(e) shall be shortened from fourteen (14) days to three (3) days following entry of the Confirmation Order.

### 3.     Revocation of Plan/No Admissions.

Notwithstanding anything to the contrary in the Plan, if the Plan is not confirmed or the Effective Date does not occur, the Plan will be null and void, and nothing contained in the Plan or the Disclosure Statement will: (a) be deemed to be an admission by the Debtors with respect to any matter set forth in the Plan, including liability on any Claim or the propriety of any Claim's classification; (b) constitute a waiver, acknowledgment, or release of any Claims against, or any Equity Interests in, the Debtors, or of any claims of the Debtors; or (c) prejudice in any manner the rights of any party in any further proceedings.

### 4.     Exemption from Certain Transfer Taxes.

In accordance with Bankruptcy Code section 1146(a), neither (i) the issuance, transfer or exchange of a security, nor (ii) the delivery of an instrument or transfer under the Plan or the Sale Order shall be taxed under any law imposing a stamp or similar tax, regardless, in the case of the transfers effectuated under the Sale Order, of the fact that such transfers occurred before entry of the Confirmation Order. The Confirmation Order shall direct all governmental officials and agents to forego the assessment and collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without payment of such tax or other governmental assessment.

### 5.     Modifications of Plan.

Subject to the restrictions set forth in Bankruptcy Code section 1127, the Debtors reserve the right to non-materially alter, amend, or modify the Plan before its substantial consummation.

6.      **Cram-Down.**

The Debtors reserves the right to request the Bankruptcy Court confirm the Plan in accordance with Bankruptcy Code section 1129(b) if one or more impaired Classes votes to reject the Plan (provided the other requirements of Bankruptcy Code section 1129 are satisfied).

7.      **Post-Effective Date Effect of Evidences of Claims or Equity Interests.**

Commencing on the Effective Date, notes, certificates, warrants, and other evidences of Claims against or Equity Interests in the Debtors constitute only the right to receive the distributions, if any, to the extent set forth under the Plan.

8.      **Post-Effective Date Notices.**

Following the Effective Date, all parties-in-interest who wish to receive, or continue to receive; notices of all pleadings Filed in the Cases must File a new request for special notice and serve it on the Liquidating Trustee and his counsel and the U.S. Trustee. The Liquidating Trustee shall maintain and keep current the post-Effective Date special notice list, and make it available to all parties in interest upon written request. All pleadings, notices and other papers Filed in the Cases following the Effective Date (other than the notice of Effective Date) must be served on the parties on the post-Effective Date special notice list maintained by the Liquidating Trustee.

9.      **Successors and Assigns.**

The rights, benefits, and obligations of any entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such Entity, whether or not such entity is impaired under the Plan and whether or not such Entity has accepted the Plan.

10.     **Saturday, Sunday or Legal Holiday.**

If any payment or act under the Plan is required to be made or performed on a day that is not a Business Day, then the payment or act may be completed on the next day that is a Business Day, in which event the payment or act will be deemed to have been completed on the required day.

11.     **Headings.**

The headings used in the Plan are inserted for convenience only and do not constitute a portion of the Plan or in any manner affect the provisions of the Plan or their meaning.

12.     **Severability of Plan Provisions.**

If before confirmation the Bankruptcy Court holds that any Plan term or provision is invalid, void, or unenforceable, the Bankruptcy Court may alter or interpret that term or provision so that it is valid and enforceable to the maximum extent possible consistent with the original purpose of that term or provision. That term or provision will then be applicable as

altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the Plan's remaining terms and provisions will remain in full force and effect and will in no way be affected, impaired, or invalidated. The Confirmation Order will constitute a judicial determination providing that each Plan term and provision, as it may have been altered or interpreted in accordance with this Section, is valid, enforceable, and, as of the Effective Date, binding under its terms.

### 13. Governing Law.

Unless a rule of law or procedure is supplied by (a) federal law (including the Bankruptcy Code and Bankruptcy Rules), or (b) an express choice of law provision in any agreement, contract, instrument, or document provided for, or executed in connection with, the Plan, the rights and obligations arising under the Plan and any agreements, contracts, documents, and instruments executed in connection with the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware without giving effect to the principles of conflict of laws thereof.

### 14. Retention of Jurisdiction.

Notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Case after the Effective Date to the fullest extent provided by law, including the jurisdiction to:

1.    Allow, disallow, determine, liquidate, classify, establish the priority or secured or unsecured status of, estimate, or limit any Claim or Equity Interest;

2.    Grant or deny any and all applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Effective Date;

3.    Ensure that distributions to holders of Allowed Claims and Allowed Equity Interests are accomplished pursuant to the provisions of the Plan;

4.    Resolve any and all applications, motions, adversary proceedings, and other matters involving the Estates that may be pending on the Effective Date or that may be instituted thereafter in accordance with the terms of the Plan;

5.    Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents entered into in connection with the Plan;

6.    Resolve any and all controversies, suits, or issues that may arise in connection with the consummation, interpretation, or enforcement of the Plan or any entity's rights or obligations in connection with the Plan;

7.    Resolve any and all controversies, suits, or issues that may arise in connection with the consummation, interpretation, or enforcement of the Bill of Sale or the Sale Order;

8.      Modify the Plan before or after the Effective Date pursuant to Bankruptcy Code section 1127, or modify the Disclosure Statement or any contract, instrument, release, or other agreement or document created in connection with the Plan or Disclosure Statement; or remedy any defect or omission or reconcile any inconsistency in any order of the Bankruptcy Court, the Plan, the Disclosure Statement, or any contract, instrument, release, or other agreement or document created in connection with the Plan or Disclosure Statement, in such manner as may be necessary or appropriate to consummate the Plan, to the extent authorized by the Bankruptcy Code;

9.      Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation or enforcement of the Plan;

10.     Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

11.     Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with the Plan or the Disclosure Statement; and

12.     Enter an order closing the Cases.

If the Bankruptcy Court abstains from exercising jurisdiction or is otherwise without jurisdiction over any matter, this Section shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

### 15.      Plan Embodies Settlement.

As described in the Disclosure Statement and in the Plan, the Plan constitutes a good faith compromise and settlement of certain claims and interests between and among the Debtors and other parties-in-interest in accordance with Bankruptcy Code section 1123(b).

### 16.      Term of Bankruptcy Injunctions or Stays.

All injunctions or stays provided for in the Cases under Bankruptcy Code sections 105 or 362, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

### 17.      Objections to Confirmation.

Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014. UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED IT WILL NOT BE CONSIDERED BY THE COURT.

### 18.    Notices.

Any notice required or permitted to be provided under the Plan shall be in writing and served by either (a) certified mail, return receipt requested, postage prepaid, (b) had delivery or (c) overnight delivery service, freight prepaid, and addressed as follows:

For the Debtors:

**GENOVESE JOBLOVE & BATTISTA, P.A.**
Paul J. Battista (Fla. Bar No. 884126)
Heather L. Harmon (Fla. Bar No. 013192)
100 SE 2nd Street, Suite 4400
Miami, Florida 33131
Telephone:      (305) 349-2300
Facsimile:      (305) 349-2310)
Email:          pbattista@gjb-law.com
                hharmon@gjb-law.com


        and

**CHIPMAN BROWN CICERO & COLE, LLP**
William E. Chipman, Jr. (No. 3818)
Mark D. Olivere (No. 4291)
1007 North Orange Street, Suite 1110
Wilmington, Delaware  19801
Telephone:      (302) 295-0191
Facsimile:      (302) 295-0199
Email:          chipman@chipmanbrown.com
                olivere@chipmanbrown.com


## X.

## BEST INTERESTS OF CREDITORS AND FEASIBILITY

### A.    "Best Interests Test."

In addition to the other requirements described in this Disclosure Statement, the Bankruptcy Code requires that a chapter 11 plan satisfy the "best interests of creditors" test. Under this test, if the holder of an Allowed Claim or Allowed Equity Interest is in an impaired Class and does not vote to accept the Plan, then that entity must receive or retain under the Plan property of a value not less than the amount that such entity would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

In a chapter 7 case, a debtor's assets are usually sold by a chapter 7 trustee.  Secured creditors are paid first from the sales proceeds of property on which the secured creditors have liens.  Administrative claims are paid next.  Unsecured creditors thereafter are paid from any remaining sales proceeds, according to their legal rights of priority.  Unsecured creditors with the

same priority share in proportion to the amount of their allowed claims in relationship to the amount of total allowed unsecured claims. Finally, interest holders receive the balance that remains after all creditors are paid, if any.

For the Court to be able to confirm the Plan, the Court must find that all creditors and interest holders who do not accept the Plan will receive at least as much under the Plan as such holders would receive under a chapter 7 forced liquidation. The Debtors maintain that any prospects for recovery that may be realized by unsecured creditors and equity interest holders on account of their Claims or Equity Interests, as applicable should be at least as great, if not greater, pursuant to the terms embodied in Plan, than they would be in chapter 7. Generally, the Plan requires the proceeds to be distributed, to the extent available, in accordance with the priority scheme established by the Bankruptcy Code.

Under the Plan and under chapter 7, the remaining assets of the Estates will be liquidated and reduced to money. The Debtors assume that those assets are worth what they are worth. However, under the Plan, a greater recovery will inure to the holders of General Unsecured Claims and Equity Interests, due to decreased costs and the elimination of litigation risk.

As set forth above, the Debtors assert that each Class of Claims and Equity Interests is Unimpaired. As a result, the Debtors anticipate satisfying all Allowed Claims in full as set forth in the Plan and making distributions to Holders of Allowed Equity Interests of the remaining Assets of the Liquidating Estates. Thus, the Debtors believe that the Plan is in the best interests of creditors, and should be confirmed.

## B.     Feasibility.

The Bankruptcy Code requires that, in order for the Plan to be confirmed by the Bankruptcy Court, it must be demonstrated that consummation of the Plan is not likely to followed by the liquidation or the need for further financial reorganization of the Debtors, unless such liquidation or reorganization is proposed in the Plan. See 11 U.S.C. § 1129(a)(11). The Plan provides for the liquidation of the Debtors' assets, to the extent not already liquidated, and the distribution of the proceeds to holders of Allowed Claims and Allowed Equity Interests. The Debtors will show at the Confirmation Hearing that the Plan satisfies the feasibility requirement set forth in Bankruptcy Code section 1129. As discussed at Section VIII.F.10.b of the Plan, the Administrative Claims Bar Date is important to making this showing. By establishing a binding deadline for the submission of administrative expense requests prior to the Confirmation Hearing, the Debtors will be able to analyze the universe of outstanding administrative expenses, determine whether sufficient cash is available to satisfy those expenses, and report to the Court accordingly.

XI.

**CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN**

The following discussion is a summary of certain material U.S. federal income tax consequences of the implementation of the Plan to the Debtors and to certain Holders of Claims. This discussion does not address the federal income tax consequences of the Plan to (a) the Holders of unclassified Claims under the Plan (i.e., Administrative Claims and Priority Claims), (b) the Holders of Secured Claims, or (c) the Holders of Equity Interests.

Due to the complexity of certain aspects of the Plan, the lack of applicable legal precedent, the possibility of changes in the law; the differences in the nature of the Claims. (including Claims within the same Class) and Equity Interests, the Holder's status and method of accounting (including Holders within the same Class) and the potential for disputes as to legal and factual matters with the IRS, the tax consequences described herein are subject to significant uncertainties. No legal opinions have been requested from counsel with respect to any of the tax aspects of the Plan and no rulings have been or will be requested from the IRS with respect to any of the issues discussed below. Furthermore, legislative, judicial or administrative changes may occur, perhaps with retroactive effect, which could affect the accuracy of the statements and conclusions set forth below as well as the tax consequences to the Debtors and the Holders of Claims and Equity Interests.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or certain Holders of Claims in light of their personal circumstances, nor does the discussion deal with tax-issues with respect to taxpayers subject to special treatment under the U.S. federal income tax laws (including, for example, banks, governmental authorities or agencies, pass-through entities, brokers and dealers in securities, insurance companies, financial institutions, tax-exempt organizations, small business investment companies, regulated investment companies and foreign taxpayers). This discussion does not address the tax consequences to certain Holders of Claims who did not acquire such Claims at the issue price on original issue. No aspect of foreign, state, local or estate and gift taxation is addressed.

THE FOLLOWING SUMMARY IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE PERSONAL CIRCUMSTANCES OF EACH HOLDER OF A CLAIM OR EQUITY INTEREST. EACH HOLDER OF A CLAIM OR EQUITY INTEREST IS URGED TO CONSULT WITH SUCH HOLDER'S TAX ADVISORS CONCERNING THE U.S. FEDERAL, STATE, LOCAL, FOREIGN AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

1.    **Tax Consequences To Holders Of Claims and Equity Interests.**

The federal income tax consequences of the Plan to a Holder of a Claim will depend upon several factors including but not limited to: (i) the origin on the Holder's Claim or Equity Interest, (ii) whether the Holder is a resident of the United States for tax purposes (or falls into any of the special classes of taxpayers excluded from this discussion as noted above), (iii)

whether the Holder reports income or the accrual or cash basis method, (iv) whether the Holder has taken a bad debt deduction or worthless security deduction with respect to this Claim or Equity Interest and (v) whether the Holder receives distributions under the Plan in more than one taxable-year.    HOLDERS ARE STRONGLY ADVISED TO CONSULT THEIR TAX ADVISORS WITH RESPECT TO THE TAX TREATMENT UNDER THE PLAN OF THEIR PARTICULAR CLAIMS OR EQUITY INTERESTS.

Generally, a Holder of an Allowed Claim or Equity Interest will recognized gain or loss equal to the difference between the "amount realized" by such Holder and such Holder's adjusted tax basis in the Allowed Claim or Equity Interest. The "amount realized" is equal to the sum of the Cash and the fair market value of any other consideration received under the Plan in respect of a Holder's Claim or Equity Interest. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE RECOGNITION OF GAIN OR LOSS, FOR FEDERAL INCOME TAX PURPOSES, ON THE SATISFACTION OF THEIR ALLOWED CLAIMS.

Pursuant to the Plan, distributions received in respect of Allowed Claims will be allocated first to the principal amount of such Allowed Claims, with any excess allocated to accrued but unpaid interest.  However, there is no assurance that the IRS will respect such allocation for federal income tax purposes.  Holders of Allowed Claims not previously required to include in their taxable income any accrued by unpaid interest on an Allowed Claim may be treated as receiving taxable interest, to the extent any consideration they receive under the Plan is allocable to such accrued but unpaid interest.  Holders previously required to include in their taxable income any accrued but unpaid interest on an Allowed Claim may be entitled to recognize a deductible loss, to the extent that such accrued but unpaid interest is not satisfied under the Plan.  HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE ALLOCATION OF CONSIDERATION RECEIVED IN SATISFACTION OF THEIR ALLOWED CLAIMS AND THE FEDERAL INCOME TAX TREATMENT OF ACCRUED BUT UNPAID INTEREST.

Where gain or loss is recognized by a Holder of an Allowed Claim or Equity Interest, the character of such gain or loss as a long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including, but not limited to, the status of the Holder, the nature of the Allowed Claim or Equity Interest in such Holder's hands (i.e., whether the claim of equity interest constitutes a capital asset in the hands of the holder), the purpose and circumstances of its acquisition, the Holder's holding period of the Allowed Claim or Equity Interest, and the extent to which the Holder previously claimed a deduction for the worthlessness of all or a portion of the Allowed Claim. The Holder's aggregate tax basis for any consideration received under the Plan will generally equal the amount realized in the exchange (less any amount allocable to interest as described in the previous paragraph).  The holding period for any consideration received under the Plan will generally begin on the day following the receipt of such consideration.

A Holder that purchased its Claim from a prior Holder at a market discount may be subject to the market discount rules of the Internal Revenue Code.  Under those rules, assuming that the holder has made no election to amortize the market discount into income on a current basis with respect to any market discount instrument, any gain recognized on the exchange of

such Claim (subject to a *de minimis* rule) generally would be characterized ordinary income to the extent of the accrued market discount on such Claim as of the date of the exchange.

## 2. Withholding.

All distributions to Holders of Allowed Claims and Equity Interests under the Plan are subject to any applicable withholding, including employment tax withholding. The Debtors will withhold appropriate employment taxes with respect to payments made to a Holder of an Allowed Claim or Equity Interest that constitutes a payment for compensation. Payers of interest, dividends, and payments if the payee fails to furnish such payee's correct taxpayer identification number (social security number or employer identification number), to the payer. The Debtors may be required to withhold a portion of any payments made to a Holder of an Allowed Claim or Equity Interest if the Holder (a) fails to furnish the correct social security number or other taxpayer identification number ("TIN") of such Holder, (b) furnishes an incorrect TIN, (c) has failed property to report interest or dividends to the IRS in the past, or (d) under certain circumstances, fails to provide a certified statement signed under penalty of perjury, that the TIN provided is the correct number and that such Holder is not subject to backup withholding. Backup withholding is not an addition tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

AS INDICATED ABOVE, THE FOREGOING IS INTENDED TO BE A SUMMARY ONLY FOR INFORMATIONAL PURPOSES AND NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND; IN SOME CASES UNCERTAIN. ACCORDINGLY, EACH HOLDER OF A CLAIM OR EQUITY INTEREST IS URGED TO CONSULT SUCH HOLDER'S TAX ADVISORS CONCERNING THE FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

## 3. Duties of Regulatory Agencies.

Nothing in this Disclosure Statement or in the Plan shall be construed to preclude a regulatory agency, such as the Securities and Exchange Commission or the Internal Revenue Service, from fulfilling its statutory duties.

## 4. Importance of Obtaining Independent Professional Tax Assistance.

THE FOREGOING IS INTENDED AS A SUMMARY ONLY, AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE FEDERAL, STATE AND LOCAL INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN SOME CASES, UNCERTAIN. SUCH CONSEQUENCES MAY ALSO VARY BASED ON THE PARTICULAR CIRCUMSTANCES OF EACH HOLDER OF AN ALLOWED CLAIM OR AN ALLOWED EQUITY INTEREST. ACCORDINGLY, EACH HOLDER OF AN ALLOWED CLAIM AND ALLOWED EQUITY INTEREST IS STRONGLY URGED TO CONSULT WITH HIS, HER OR ITS OWN TAX

ADVISOR REGARDING THE FEDERAL, STATE AND LOCAL INCOME TAX AND OTHER TAX CONSEQUENCES UNDER THE PLAN.

## XII.

## CERTAIN RISK FACTORS TO BE CONSIDERED

**A.     Risk Factors.**

**1.     Introduction**

This section summarizes some of the risks associated with the Plan and the Debtors' ability to comply with the terms of the Plan.  However, this analysis is not exhaustive and must be supplemented by an evaluation of the Plan and this Disclosure Statement as a whole by each Holder of a Claim or Equity Interest with such Holder's own advisors.

AS SUCH, HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE ESTATES SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT.  THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN, ITS IMPLEMENTATION OR ITS SUCCESS.

The risk factors present in a typical plan of reorganization are not present in the Plan because the Plan provides for the liquidation and distribution of all of the Assets through the Liquidating Estate under the control of the Liquidating Trustee.  In a typical plan of reorganization, the risks involved in the continued operation and success of a business are usually important to creditors in that proposed distributions to creditors often hinge on the ability of the business to generate sufficient revenue and profit.

**2.     Bankruptcy Risks.**

**(a)     Risks Relating to Confirmation.**

All Classes of Claims and Equity Interests are Unimpaired under the Plan and therefore deemed to have accepted the Plan under Section 1126(f) of the Bankruptcy Code. Notwithstanding the foregoing, there can be no assurance that the Bankruptcy Court will confirm the Plan.

If the Plan were not to be confirmed, it is unclear what Distribution Holders of Claims and Equity Interests ultimately would receive with respect to their Claims and Equity Interests. If an alternative plan could not be agreed to, it is likely that Holders of Claims and Equity Interests would receive less than they would have received pursuant to the Plan.

Any objection to the Plan by a member of a class of Claims or Equity Interests could also either prevent Confirmation of the Plan or delay such Confirmation for a significant period of time.

(b)    **Other Bankruptcy Risks.**

If non-Professional Administrative Claims, Priority Tax Claims and/or Priority Claims are determined to be Allowed in amounts greatly exceeding the Debtors' estimates, then there may be inadequate Distributable Cash or other property available on the Effective Date to pay such Claims or Equity Interests under the Plan, and the Plan would not become effective.  The Debtors believe, however, that there is and will be sufficient Distributable Cash to satisfy all Administrative Claims, including such non-Professional Administrative Claims, Priority Tax Claims and Priority Claims on the Effective Date as provided in the Plan.

## XIII.

## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed and consummated, the legal alternatives to the Plan include (i) liquidation of the Debtors under chapter 7 of the Bankruptcy Code and (ii) an alternative chapter 11 plan.

### A.    Liquidation under Chapter 7.

If no plan can be confirmed, the Cases may be converted to a case under chapter 7 of the Bankruptcy Code, pursuant to which a chapter 7 trustee would distribute the Estates' assets in accordance with the priorities established by the Bankruptcy Code.  A discussion of the effects that a chapter 7 liquidation would have on the recoveries of holders of Claims and Equity Interests is set forth in Section X.A of this Disclosure Statement (the "Best Interests Test").  The Debtors believe that liquidation under chapter 7 would result in smaller distributions being made to equity interest holders than those provided for in the Plan.

### B.    Alternative Plan of Liquidation.

If the Plan is not confirmed, the Debtors or any other party in these cases could theoretically attempt to formulate a different plan.  However, as substantially all of the Debtors' assets have already been liquidated and the Plan proposes to pay all Allowed Claims in full and provides for a distribution to Holders of Equity Interests, it is unlikely that any alternative plan could be pursued by a third party.

## XIV.

## RECOMMENDATION AND CONCLUSION

The Debtors respectfully submit that the Plan is in the best interests of all creditors and parties in interest.

Dated: October 3, 2014

**DYNAVOX, INC.**

       */s/ Erin L. Russell*
By:    Erin L. Russell
Its:    Authorized Representative


**DYNAVOX INTERMEDIATE LLC**

       */s/ Erin L. Russell*
By:    Erin L. Russell
Its:    Authorized Representative


**DYNAVOX SYSTEMS HOLDINGS LLC**

       */s/ Erin L. Russell*
By:    Erin L. Russell
Its:    Authorized Representative

**SUBMITTED BY:**

**CHIPMAN BROWN CICERO & COLE, LLP**


_____/s/ William E. Chipman, Jr._____
William E. Chipman, Jr. (No. 3818)
Mark D. Olivere (No. 4291)
The Nemours Building
1007 North Orange Street Suite 1110
Wilmington, Delaware  19801
Telephone:      (302) 295-0193
Facsimile:      (302) 295-0199
Email:          chipman@chipmanbrown.com
                olivere@chipmanbrown.com

_Co-Counsel to Debtors and_
_Debtors-in-Possession_

-AND-

**GENOVESE JOBLOVE & BATTISTA, P.A.**


_____/s/ Paul J. Battista_____
Paul J. Battista (Fla. Bar No. 884126)
Heather L. Harmon (Fla. Bar No. 013192)
(Admitted _Pro Hac Vice_)
100 SE 2nd Street, Suite 4400
Miami, Florida 33131
Telephone:      (305) 349-2300
Facsimile:      (305) 349-2310
Email:          Pbattista@gjb-law.com
                Hharmon@gjb-law.com

_Co-Counsel to Debtors and_
_Debtors-In-Possession_

# EXHIBIT 1

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| DYNAVOX INC., *et al.*, | Case No. 14-10791 (PJW) |
| Debtors. | Jointly Administered |

## JOINT PLAN OF LIQUIDATION OF DYNAVOX INC., DYNAVOX INTERMEDIATE LLC AND DYNAVOX SYSTEMS HOLDINGS LLC
## UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

### DATED:  October 3, 2014

**GENOVESE JOBLOVE & BATTISTA, P.A.**

Paul J. Battista (Fla. Bar No. 884126)
Heather L. Harmon (Fla. Bar No. 013192)
100 SE 2nd Street, Suite 4400
Miami, Florida 33131
Telephone:     (305) 349-2300
Facsimile:      (305) 349-2310)
Email:          pbattista@gjb-law.com
                hharmon@gjb-law.com

*Co-Counsel to Debtors and*
*Debtors-In-Possession*

**CHIPMAN BROWN CICERO & COLE, LLP**

William E. Chipman, Jr. (No. 3818)
Mark D. Olivere (No. 4291)
1007 North Orange Street, Suite 1110
Wilmington, Delaware  19801
Telephone:     (302) 295-0191
Facsimile:      (302) 295-0199
Email:          chipman@chipmanbrown.com
                olivere@chipmanbrown.com

*Co-Counsel to Debtors and*
*Debtors-In-Possession*

**TABLE OF CONTENTS**

I. DEFINITIONS AND RULES OF CONSTRUCTION ........................................................1

    A.    Definitions.............................................................................................................1

    B.    Rules of Construction. ........................................................................................11

II. DESIGNATION OF CLASSES AND TREATMENT OF CLAIMS AND INTERESTS...............12

    A.    Summary and Classification of Claims and Equity Interests...........................12

    B.    Allowance and Treatment of Unclassified Claims ..........................................13

        1.    Administrative Claims. ........................................................................13

        2.    Priority Tax Claims.............................................................................15

    C.    Classification and Treatment of Classified Claims and Interests. ...................15

        1.    Class 1 (Secured Tax Claims)..............................................................15

        2.    Class 2 (Other Secured Claims)...........................................................16

        3.    Class 3 (Priority Claims other than Priority Tax Claims)....................16

        4.    Class 4 (General Unsecured Claims). ...................................................16

        5.    Class 5 (Equity Interests). ....................................................................16

III. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ........................17

    A.    Rejection of Executory Contracts and Unexpired Leases.................................17

        1.    Rejected Agreements. ...........................................................................17

        2.    Bar Date for Rejection Damage Claims................................................17

IV. MEANS OF EXECUTION AND IMPLEMENTATION OF THE PLAN.......................................17

    A.    Ratification of Agreements. ...............................................................................17

        1.    The Bill of Sale. ...................................................................................17

        2.    Confidentiality Agreements. .................................................................17

        3.    Directors and Officers Liability Policies. .............................................18

    B.    Substantive Consolidation of All Debtors' Estates..........................................18

    C.    Funding of the Plan. ..........................................................................................19

D.     The Liquidating Estates. ........................................................................19

     1.     Continuation of the Estates. ..........................................................19

     2.     Preservation/Vesting of Rights of Action. .....................................19

     3.     Appointment of the Liquidating Trustee. .......................................20

     4.     Powers and Duties of the Liquidating Trustee. ..............................21

     5.     Termination of the Liquidating Estates. .........................................22

     6.     Additional Provisions Regarding the Liquidating Estates. ..............22

E.     Avoidance Actions and Claims Objections. ...........................................22

F.     Distribution of Property Under the Plan. ................................................22

     1.     Manner of Cash Payments Under the Plan. ...................................23

     2.     No *De Minimis* Distributions. ........................................................23

     3.     No Distribution with Respect to Disputed Claims. ..........................23

     4.     Delivery of Distributions and Undeliverable/Unclaimed Distributions. ............23

G.     Dissolution of Debtor Entities/Termination of Officers and Directors. ..............24

V. EFFECT OF CONFIRMATION OF THE PLAN .................................................25

     A.     Binding Effect of Plan/Non-Discharge of the Debtors. ..................................25

     B.     Releases By The Debtors. ..........................................................................25

     C.     Exculpation and Limitation of Liability. ....................................................26

     D.     Injunctive Relief Relating To Releases. ....................................................26

     E.     Terms of Existing Injunctions or Stays ......................................................27

VI. OTHER PLAN PROVISIONS ............................................................................27

     A.     The Effective Date. ...................................................................................27

     B.     Stay of Confirmation Order Shortened. ......................................................28

     C.     Revocation of Plan/No Admissions. ...........................................................28

     D.     Exemption from Certain Transfer Taxes. ....................................................28

     E.     Modifications of Plan. ...............................................................................28

     F.     Cram-Down. .............................................................................................28

G.    Post-Effective Date Effect of Evidences of Claims or Equity Interests. .........................29

H.    Post-Effective Date Notices. ...................................................................................29

I.    Successors and Assigns. .........................................................................................29

J.    Saturday, Sunday or Legal Holiday. ........................................................................29

K.    Headings. .............................................................................................................29

L.    Severability of Plan Provisions. ..............................................................................29

M.    Governing Law. ....................................................................................................30

N.    Retention of Jurisdiction. .......................................................................................30

O.    Plan Embodies Settlement. .....................................................................................31

P.    Term of Bankruptcy Injunctions or Stays. ................................................................31

Q.    Objections to Confirmation. ....................................................................................31

R.    Notices. ...............................................................................................................32

VII. RECOMMENDATION AND CONCLUSION ...................................................................32

Exhibits:

A.  Liquidating Estates Agreement

DynaVox Inc. ("DynaVox Inc."), a Delaware corporation, DynaVox Intermediate LLC ("Intermediate"), a Delaware limited liability company and DynaVox Systems Holdings LLC ("Systems Holdings"), a Delaware limited liability company, the debtors and debtors-in-possession in the above-captioned chapter 11 cases (collectively, the "Debtors") hereby propose the following Joint Plan of Liquidation for the Debtors (the "Plan") pursuant to section 1121(c) of title 11 of the United States Code.

# I.

## DEFINITIONS AND RULES OF CONSTRUCTION

### A.    Definitions.

In addition to such other terms as are defined elsewhere in the Plan, the following terms (which appear in the Plan as capitalized terms) have the following meanings as used in the Plan:

"**Administrative Claim**" means a Claim for costs and expenses of administration under section 503(b), 507(b), 503(b)(9) or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date of preserving the Estates; (b) the value of any goods received by a Debtors within 20 days before the Petition Date to the extent that goods were sold to the Debtors in the ordinary course of the Debtors' business; (c) compensation for legal, financial advisory, accounting and other services and reimbursement of expenses awarded or allowed under section 330(a) or 331 of the Bankruptcy Code; (d) all fees and charges assessed against the Estates under 28 U.S.C. §§ 1911-1930; (e) all obligations designated as Allowed Administrative Claims pursuant to an order of the Bankruptcy Court; and (f) any Allowed Tax Claims incurred by the Debtors after the Petition Date or relating to a tax year or period which occurs after the Petition Date.

"**Administrative Claims Bar Date**" means the applicable last date set by the Bankruptcy Court pursuant to an Administrative Claims Bar Date Order for a Claimant (other than Professionals) to file a request for payment of any Administrative Claim.  For Administrative Claims (other than Professional Fee Claims) arising between the Petition Date and August 1, 2014, the Administrative Claim Bar Date was August 29, 2014 as set forth in the Administrative Claims Bar Date Order.   For Administrative Claims arising between August 1, 2014 and the Effective Date, the Confirmation Order shall establish the Administrative Claims Bar Date.

"**Administrative Claims Bar Date Order**" means (a) with respect to Administrative Claims (other than Professional Fee Claims) arising on or prior to August 1, 2014, that certain Order Pursuant to Bankruptcy Rules 2002 and 3003, and Local Rules 2002-1(e) and 3003-1 (I) Setting Bar Dates for Filing Proofs of Claim and Interest, (II) Approving the Form and Manner for Filing such Claims, and (III) Approving Notice Thereof, dated July 22, 2014 [Docket No. 171], and (b) with respect to Administrative Claims (other than Professional Fee Claims) arising between August 1, 2014 and the Effective Date,  the Confirmation Order.

"**Administrative/Priority Reserve Account**" means a subaccount to be established and administered by the Liquidating Estates containing funds deposited from the Debtors' Cash on hand on the Effective Date in an amount equal to the aggregate amount of asserted and unpaid Administrative Claims (other than Professional Fee Claims) and Priority Claims incurred on or before the Effective Date whether or not subject to dispute, but other than Administrative Claims and Priority Claims that are

1

disallowed on or before the Effective Date pursuant to a Final Order of the Bankruptcy Court. The Administrative/Priority Reserve Account may be an existing account of the Debtors.

**"Allowed"** means, with respect to any Claim or Equity Interest, except as otherwise provided herein: (a) a Claim or Equity Interest that has been scheduled by the Debtors in their Schedules as other than disputed, contingent or unliquidated and as to which the Debtors have not Filed an objection on or before the 90th day after the Effective Date; (b) a Claim that is set forth in a timely Filed Proof of Claim as to which no objection has been Filed and which is not otherwise a Disputed Claim; (c) a Claim or Equity Interest that has been allowed by a Final Order; (d) a Claim or Equity Interest that is allowed: (i) in any stipulation in the amount and nature of Claim or Equity Interest executed by the Debtors prior to the Effective Date and approved by the Bankruptcy Court, (ii) in any stipulation in the amount and nature of Claim or Equity Interest executed by the Liquidating Trustee on or after the Effective Date, (iii) in any contract, instrument, indenture or other agreement entered into or assumed by Debtors in connection with and in accordance with the Plan; or (e) a Claim or Equity Interest that is Allowed pursuant to the terms of this Plan.

**"Allowed Claim"** means a Claim that has been Allowed.

**"Allowed Equity Interest"** means an Equity Interest that has been Allowed.

**"Assets"** mean any and all real property or personal property assets, rights or interests of Debtors, whether tangible or intangible, and any proceeds realized therefrom, including without limitation, all property of the Estates under Section 541 of the Bankruptcy Code, all Cash of the Debtors, all Retained Actions (including Avoidance Actions), and any Net Litigation Proceeds.

**"Avoidance Actions"** mean all claims and causes of action that the Debtors have or had the power to assert pursuant to Chapter 5 of the Bankruptcy Code, including any or all of sections 510, 544, 545, 547, 548, 549, 550 and 551 of the Bankruptcy Code, under any similar or related law, or under fraudulent transfer or preference laws.

**"Ballots"** mean the ballots upon which Holders of Impaired Claims or Impaired Equity Interests shall indicate their acceptance or rejection of the Plan in accordance with the Plan, provided however that the Debtors do not anticipate the need for Ballots as all Classes of Claims and Equity Interests are Unimpaired under the Plan and therefore deemed to have accepted the Plan under Section 1126(f) of the Bankruptcy Code.

**"Ballot Deadline"** means the deadline, if applicable, established by the Bankruptcy Court for the delivery of executed Ballots to the Ballot Tabulator.

**"Ballot Tabulator"** means, if required, UpShot Services, LLC.

**"Bankruptcy Code"** or **"Code"** means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as applicable in the Case.

**"Bankruptcy Court"** or **"Court"** means the United States Bankruptcy Court for the District of Delaware, or any other court that properly exercises jurisdiction over the Case.

**"Bankruptcy Rules"** means, together, (a) the Federal Rules of Bankruptcy Procedure and (b) the Local Rules of the Bankruptcy Court, as applicable in these Cases.

**"Bar Date"** means August 29, 2014 with respect to all Claims and Equity Interests, other than Administrative Claims, provided that with respect to any such Claim of a Governmental Unit (other than an Administrative Claim), it means October 6, 2014, as set forth in the Bar Date Order.

**"Bar Date Order"** means that certain Order Pursuant to Bankruptcy Rules 2002 and 3003, and Local Rules 2002-1(e) and 3003-1 (I) Setting Bar Dates for Filing Proofs of Claim and Interest, (II) Approving the Form and Manner for Filing such Claims, and (III) Approving Notice Thereof, dated July 22, 2014 [Docket No. 171].

**"Bill of Sale"** means that certain Bill of Sale by and from DynaVox Intermediate, LLC to and in favor of Tobii, dated as of May 23 2014, as approved by the Sale Order.

**"Business Day"** means a day that is not a Saturday, Sunday, or legal holiday.

**"Cases"** or **"Chapter 11 Cases"** means the Debtors' cases under chapter 11 of the Bankruptcy Code.

**"Cash"** means cash and cash equivalents, including, but not limited to, bank deposits, wire transfers, checks, and readily marketable securities, instruments and legal tender of the United States of America or instrumentalities thereof.

**"Claim"** means a claim (as defined in section 101(5) of the Bankruptcy Code) against Debtors, including, but not limited to: (a) any right to payment from Debtors whether or not such right is reduced to judgment, liquidated, unliquidated, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; or (b) any right to an equitable remedy for breach of performance if such performance gives rise to a right of payment from Debtors, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

**"Claimant"** means the Holder of a Claim.

**"Claim Objection"** means any right to object to, obtain the disallowance of, or obtain the subordination of a Claim pursuant to the Bankruptcy Code or applicable law.

**"Claim/Equity Objection Deadline"** means, unless extended by Order of the Court for good cause, the later of: (a) 90 days after the Effective Date, and (b) 90 days after the date on which the subject proof of Claim or Equity Interest is or was Filed.

**"Class"** means a group of Claims or Equity Interests as classified in Section II.A.

**"Collateral"** means property, or an interest in property, of the Estates that is encumbered by a Lien to secure payment or performance of a Claim.

**"Confidentiality Agreements"** means all pre-petition and post-petition confidentiality and similar agreements addressing the treatment of confidential information of the Debtors into which the Debtors and other parties entered prior to the Effective Date, including in connection with the Sale.

**"Confirmation Date"** means the date upon which the Confirmation Order is entered by the Bankruptcy Court on its docket, within the meaning of Bankruptcy Rules 5003 and 9021.

"**Confirmation Hearing**" means the hearing by the Bankruptcy Court held pursuant to Bankruptcy Code section 1128(a) regarding confirmation of the Plan.

"**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan under Bankruptcy Code section 1129.

"**Consolidated Debtors**" means all of the Debtors.

"**Creditor**" means any Holder of a Claim against Debtors that arose on or prior to the Petition Date.

"**Debtors**" means DynaVox Inc., a Delaware corporation, DynaVox Intermediate LLC, a Delaware limited liability company and DynaVox Systems Holdings LLC, a Delaware limited liability company.

"**Debtors' Counsel**" means (i) Genovese Joblove & Battista, P.A., 100 SE 2nd Street, Suite 4400, Miami, Florida, 33131; and (ii) Chipman Brown Cicero & Cole, LLP, 1007 North Orange Street, Suite 1110, Wilmington, Delaware, 19801.

"**Debtors' Indemnified Parties**" shall mean any Person which the Debtors are obligated to indemnify and exculpate, including its present and former officers, directors and managers, as provided in any of: (i) the Debtors' respective certificates of incorporation or organization; (ii) the Debtors' by-laws; (iii) any written agreement with the Debtors; (iv) similar documents or agreements of or with the Debtors; or (v) applicable law.

"**DIP Facility**" means that certain *Secured Funding Agreement for Post-Petition Debtor-in-Possession Financing Facility* (as may be amended, supplemented, restated, or otherwise modified from time to time), by and among the Debtors and JEC and the Interim Financing Order and the Final Financing Order.

"**DIP Lender**" means JEC.

"**Directors and Officers Liability Policies**" means any and all existing insurance policies, including "tail" coverage, under which coverage is available in respect of damages resulting from the acts or omissions of the present and former officers, directors and/or managers of the Debtors.

"**Directors and Officers Reserve Account**" means a subaccount to be established and administered by the Liquidating Estates containing funds deposited from the Debtors' Cash on hand on the Effective Date in an amount of $100,000 to be held for the benefit of the Debtors' Indemnified Parties. The Cash in the Directors and Officers Reserve Account shall be available to pay the defense costs incurred by the Debtors' Indemnified Parties in the event that the Liquidating Trustee brings a Retained Action against any such Debtors' Indemnified Party, with such amount to be allocated pro rata among those Debtor Indemnified Parties subject of the Retained Action brought by the Liquidating Trustee. If no Retained Actions are initiated prior to the Retained Actions Deadline, then the Cash in the Directors and Officers Reserve Account shall be included in the Distributable Cash available for distribution to holders of Allowed Claims and Allowed Equity Interests in accordance with the Plan. The Directors and Officers Reserve Account may be an existing account of the Debtors.

**"Directors and Officers Investigation Reserve"** means a subaccount to be established and administered by the Liquidating Estates containing funds deposited from the Debtors' Cash on hand on the Effective Date in an amount of $150,000 to be used by the Liquidating Trustee to investigate and prosecute, if applicable, any and all Retained Actions against any Debtor Indemnified Party. If no Retained Action is initiated by the Liquidating Trustee against a Debtor Indemnified Party prior to the Retained Actions Deadline, then the Cash remaining in the Directors and Officers Investigation Reserve (after payment of any Post Confirmation Administrative Claims in connection with such investigation) shall be included in the Distributable Cash available for distribution to holders of Allowed Claims and Allowed Equity Interests in accordance with the Plan.

**"Disallowed Claim"** means (i) a Claim, or any portion thereof, that has been disallowed by a Final Order or by other agreement of a Claimant; (ii) a Claim that has been listed in the Schedules at zero or as contingent, disputed, or unliquidated and as to which no Proof of Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court pursuant to the Bankruptcy Code, Final Order, or other applicable law; or (iii) a Claim that has not been listed in the Schedules and as to which no Proof of Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court pursuant to the Bankruptcy Code, Final Order, or other applicable law.

**"Disallowed Equity Interest"** means an Equity Interest, or any portion thereof, that has been disallowed by a Final Order or by other agreement of an Equity Interest holder.

**"Disbursing Agent"** means the Liquidating Trustee or any entity employed or retained by the Liquidating Trustee to serve as disbursing agent under the Plan.

**"Disclosure Statement"** means that certain *Disclosure Statement Describing the Plan of Liquidation Plan of Dynavox Inc., Dynavox Intermediate LLC and Dynavox Systems Holdings LLC Under Chapter 11 of the Bankruptcy Code (Dated: October 3, 2014)*, as it may be subsequently amended or modified, Filed in connection with the Plan.

**"Disputed"** means, with respect to any Claim or Equity Interest, any Claim or Equity Interest: (a) listed on the Schedules as unliquidated, disputed or contingent; (b) as to which Debtors or any other party in interest has interposed a timely objection or request for estimation in accordance with the Bankruptcy Code and the Bankruptcy Rules or is otherwise disputed by Debtors in accordance with applicable law, which objection, request for estimation or dispute has not been withdrawn or determined by a Final Order; or (c) unless otherwise indicated in the Plan, a Claim or Equity Interest as to which the period within which to object to such Claim or Equity Interest has not yet expired.

**"Disputed Claim"** means: (i) any Claim or portion of a Claim as to which an objection to the allowance thereof has been interposed as of the Claim/Equity Objection Deadline or any later deadline fixed under the Plan or by order of the Bankruptcy Court, which objection has not been withdrawn or determined by Final Order; (ii) any Claim scheduled by the Debtors in the Schedules as disputed, contingent or unliquidated; (iii) a Proof of Claim Filed in a greater amount, or of a different nature or priority, than the amount, nature, or priority listed for that Claim in the Schedules; or (iv) a Claim that is not listed in the Schedules.

**"Disputed Equity Interest"** means any Equity Interest or portion of an Equity Interest as to which an objection to the allowance thereof has been interposed as of the Claim/Equity Objection Deadline or any later deadline fixed under the Plan or by order of the Bankruptcy Court, which objection has not been withdrawn or determined by Final Order.

**"Distribution Date(s)"** means: (i) the date which is as soon as reasonably possible after the Effective Date of the Plan on which the Debtors or the Liquidating Trustee, as applicable, shall make initial distributions to Holders of Allowed Claims and, if applicable, Allowed Equity Interests in accordance with and as required under the Plan, (ii) with respect to each distribution thereafter, on the date or dates when there is sufficient Distributable Cash, in the Liquidating Trustee's discretion, to make a meaningful distribution to Holders of Allowed Claims and Allowed Equity Interests under this Plan, provided that with respect to Disputed Claims and Disputed Equity Interests, the distributions thereon shall be held in reserve, provided however, that no distributions shall be made unless Distributable Cash exists in excess of any reserves determined to be appropriate by the Liquidating Trustee, including for Post Confirmation Administrative Claims, and those amounts reserved for distributions on Disputed Claims and Disputed Equity Interests.

**"Distributable Cash"** means any Cash of the Debtors or the Liquidating Estates available for distribution by the Liquidating Estates to the Holders of Allowed Claims and Allowed Equity Interests under the Plan, including any Net Litigation Proceeds, in all cases after deduction for (i) the costs of administering the Liquidating Estates, and satisfying any other unpaid obligations due under the Plan (including, without limitation, any amounts owing to the Holders of Allowed Post Confirmation Administrative Claims, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Tax Claims, Allowed Other Secured Claims, Allowed Priority Claims (other than Allowed Priority Tax Claims), Allowed Professional Fee Claims and Allowed General Unsecured Claims), and (ii) Cash held in reserve in the exercise of the Liquidating Trustee's business judgment for the payment of Disputed Claims and Disputed Equity Interests, and to enable the Liquidating Trustee to perform his duties hereunder, including for the payment of prospective Post Confirmation Administrative Claims.

**"Effective Date"** means the first Business Day following the Confirmation Date, on which the conditions set forth in Section VI.A are satisfied.

**"Entity"** means an entity as defined in section 101(15) of the Bankruptcy Code.

**"Equity Interest"** means any equity interest in any Debtor, including, but not limited to, all issued, unissued, authorized or outstanding shares of stock and any limited liability company membership interests, together with any warrants, options or contract rights to purchase or acquire such interests at any time.

**"Equity Interest Objection"** means any right to object to, obtain the disallowance of, or obtain the subordination of an Equity Interest pursuant to the Bankruptcy Code or applicable law.

**"Estates"** means the estates of the Debtors in these Chapter 11 Cases created pursuant to section 541 of the Bankruptcy Code upon the commencement of these Chapter 11 Cases.

**"Estate Cash"** means the cash in the Estates on and after the Effective Date.

"**File**", "**Filed**", or "**Filing**" means duly and properly filed with the Bankruptcy Court and reflected on the Bankruptcy Court's official docket.

"**Final Decree**" means the decree contemplated under Bankruptcy Rule 3022.

"**Final Order**" means an order or judgment of the Bankruptcy Court or other court of competent jurisdiction: (i) which has not been reversed, stayed, modified or amended; (ii) as to which the time to or the right to appeal or seek reconsideration, review, rehearing, or certiorari has expired or been waived (without regard to whether the time to seek relief from a judgment under Bankruptcy Rule 9024 has expired); and (iii) as to which no timely appeal or petition for reconsideration, review, rehearing, or certiorari is pending, provided however that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or analogous rule under the Bankruptcy Rules, may be filed with respect to such order or judgment shall not cause such order or judgment not to be a Final Order.

"**Final Financing Order**" means that certain *Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507 (1) Approving Postpetition Financing, (2) Granting Liens and Providing Superpriority Administrative Expense Status, and (3) Modifying Automatic Stay*, dated May 5, 2014 [Docket No. 86].

"**General Unsecured Claim**" means a Claim that is not an Administrative Claim, a Priority Claim, a Priority Tax Claim or a Secured Claim.

"**Governmental Unit**" has the meaning specified in Bankruptcy Code section 101(27).

"**Holder**" means an Entity holding a Claim or Equity Interest.

"**Impaired**" means with respect to a Claim or Equity Interest, or a Class of Claims or Equity Interests, a Claim or Equity Interest, or Class of Claims or Equity Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

"**Insider**" means an insider of any Debtor, as defined in section 101(31) of the Bankruptcy Code.

"**Intercompany Claim**" means a Claim held by a Debtor against another Debtor.

"**Interim Financing Order**" means that certain *Interim Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507 (1) Approving Postpetition Financing, (2) Granting Liens and Providing Superpriority Administrative Expense Status, (3) Modifying Automatic Stay; and (4) Scheduling a Final Hearing*, dated April 14, 2014 [Docket No. 40].

"**JEC**" means JEC-BR Partners, LLC.

"**Lien**" means a lien, as defined in Bankruptcy Code section 101(37), except a lien that has been avoided in accordance with Bankruptcy Code sections 544, 545, 546, 547, 548, or 549 or is otherwise invalid under the Bankruptcy Code or applicable state law.

"**Liquidating Estates**" means the Consolidated Debtors' Estates on and after the Effective Date.

**"Liquidating Estate Agreement"** means that certain *Liquidating Estate Agreement* among the Debtors and the Liquidating Trustee setting forth the terms and conditions of the Liquidating Trustee's retention by the Liquidating Estates, in substantially the form attached hereto as Exhibit A.

**"Liquidating Trustee"** means Soneet R. Kapila, appointed pursuant to the Confirmation Order to administer the Liquidating Estates, or such other person determined as a replacement Liquidating Trustee in accordance with the Plan or the Liquidating Estate Agreement.

**"Net Litigation Proceeds"** means the cash proceeds realized by the Liquidating Trustee on any and all Retained Actions, after deduction for the costs of realizing such proceeds and administering the Liquidating Estates.

**"Person"** or **"person"** shall mean any individual, corporation, limited liability company, partnership, joint venture, association, joint-stock company, estate, trust, unincorporated association or organization, governmental agency or political subdivision thereof, or other entity.

**"Petition Date"** means with regard to: (i) Intermediate, April 6, 2014, the date on which it filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code; and (ii) DynaVox Inc. and Systems Holdings, April 7, 2014, the date on which each filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

**"Plan"** means this Joint Plan of Liquidation, either in its present form or as it may be altered, amended, modified or supplemented from time to time in accordance with the Plan, the Bankruptcy Code and the Bankruptcy Rules, including, without limitation, any exhibits and schedules hereto, either in its present form or as the same may be amended, modified or supplemented from time to time in accordance with the terms and provisions hereof.

**"Post-Confirmation Administrative Claim"** shall mean a Claim for services rendered or expenses incurred after the Effective Date in connection with these Chapter 11 Cases by the Liquidating Estates, the Liquidating Trustee and/or the Post Confirmation Professionals.

**"Post Confirmation Professionals"** shall mean those professionals engaged by the Liquidating Estates from and after the Effective Date.

**"Post-petition Interest"** means interest calculated at an annual rate equal to the federal judgment rate as of the Petition Date to be accrued on any Allowed General Unsecured Claims for the period from the Petition Date through the date of payment in full of such Allowed General Unsecured Claim under the terms of this Plan.

**"Prepetition Credit Agreement"** means that certain *Third Amended and Restated Credit Agreement*, dated as of June 23, 2008, by and among DynaVox Intermediate LLC (one of the Debtors herein), its wholly owned non-debtor subsidiary, DynaVox Systems, LLC, and certain other direct and indirect subsidiaries of DynaVox Systems, LLC, as borrowers, and JEC, successor by assignment to GE Business Financial Services Inc., as lender.

**"Priority Claim"** means any Claim, other than an Administrative Claim or a Priority Tax Claim, to the extent entitled to priority under section 507(a) of the Bankruptcy Code.

8

"**Priority Tax Claim**" means a Claim of a governmental unit of the kind specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

"**Pro Rata**" means proportionately so that, with respect to a Claim or Equity Interest, the ratio of: (a) (i) the amount of property distributed on account of a particular Claim or Equity Interest to (ii) the Allowed amount of the Claim or Equity Interest, is the same as the ratio of (b) (i) the amount of property distributed on account of all Allowed Claims or Allowed Equity Interest in the Class or Classes entitled to share in the applicable distribution to (ii) the amount of all Allowed Claims or Allowed Equity Interests in such Class or Classes.

"**Professional**" means an Entity: (a) employed pursuant to a Final Order in accordance with sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to the Effective Date, pursuant to sections 327, 328, 329, 330 and 331 of the Bankruptcy Code, or (b) for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

"**Professional Fees Reserve Account**" means an account to be established and administered by the Liquidating Estates for the payment of Professional Fee Claims, which account shall be free and clear of any liens, claims, interests and/or encumbrances other than the Professional Fee Claims. The Professional Fees Reserve Account may be an existing account of the Debtors.

"**Professional Fee Claim**" means those fees and expenses claimed by Professionals pursuant to sections 330, 331 and/or 503 of the Bankruptcy Code, and accrued and unpaid as of the Effective Date.

"**Proof of Claim**" or "**Proof of Interest**" means a proof of Claim or proof of Interest Filed pursuant to section 501 of the Bankruptcy Code and/or any order of the Bankruptcy Court, together with supporting documents.

"**Rejection Damage Claim**" means a claim arising under Bankruptcy Code section 365 from the rejection by the Debtors of an unexpired lease or executory contract.

"**Retained Actions**" means any and all claims, choses in action, causes of action suits, accounts, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payments and claims, whether known or unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured and whether assertable directly or derivatively, in law, equity or otherwise, which are owned or held by, or have accrued to, the Debtors or the Estates, whether arising before or after the Petition Date, including without limitation, those which are: (i) property of the Estates of the Debtors under and pursuant to Section 541 of the Bankruptcy Code; (ii) for subrogation and contribution; (iii) for turnover; (iv) for Avoidable Actions; (v) related to federal or state securities laws; (vi) direct or derivative claims or causes of action of any type or kind; (vii) against any and all current and/or former officers, directors and/or managers of the Debtors, including for breach of fiduciary duty, aiding and abetting breach of fiduciary duty or improper dividends; (viii) under and pursuant to any policies of insurance maintained by the Debtors, including without limitation, the directors' and officers' liability insurance policy; (ix) for theft of corporate opportunity; (x) for collection on accounts, accounts receivables, loans, notes receivables or other rights to payment; (xi) for the right to seek a determination by the Bankruptcy Court of any tax, fine or penalty relating to a tax, or any addition to a tax, under Section 505 of the Bankruptcy Code; (xii) which arise under or as a result of any section of the Bankruptcy Code, including Section

362; (xiii) for lender liability against any lender of the Debtors, including but not limited to claims against any such lender for exerting excessive or unreasonable control over the Debtors, for, charging, taking, reserving, collecting or receiving interest in excess of the highest lawful rate, for any breach of fiduciary duty, breach of any duty of fair dealing, breach of confidence, or any cause of action or defense based on the negligence of such lender, for any "lender liability" theories, breach of funding commitment, undue influence, duress, economic coercion, conflict of interest, negligence, bad faith, malpractice, violations of the Racketeer Influenced and Corrupt Organizations Act, intentional or negligent infliction of mental distress, tortious interference with contractual relations, tortious interference with corporate governance or prospective business advantage, breach of contract, fraud, mistake, deceptive trade practices, libel, slander, conspiracy, fraudulent conveyance, or any claim for wrongfully taking any action in connection with the foregoing; (xiv) for substantive consolidation, piercing the corporate veil, alter ego, domination, constructive trust and similar principles of state or federal creditors' rights laws, and (xv) to the extent not otherwise set forth above, as described in the Disclosure Statement.

"**Retained Actions Deadline**" means (i) solely for Debtors' Indemnified Parties, the date which is 180 days after the Effective Date, and (ii) for all other Retained Actions, the applicable bankruptcy or non-bankruptcy statute of limitations, in each case unless extended by Order of the Court for good cause shown.

"**Sale**" means the transaction that was approved pursuant to the Sale Order, under which Tobii acquired Membership Interests of DynaVox Systems LLC on or about May 23, 2014.

"**Sale Closing**" means the closing of Sale.

"**Sale Order**" means that certain *Order (I) Authorizing the Sale by the Debtors of the Membership Interests of DynaVox Systems LLC Free and Clear of All Liens, Claims, Encumbrances, and Interests; and (II) Granting Related Relief, dated May 22, 2014 [Docket No. 112]*.

"**Schedules**" means the Schedules of Assets and Liabilities Filed by the Debtors on or about April 21, 2014, as they may be amended subsequently.

"**Secured Claim**" or "**Other Secured Claim**" means any Claim that is secured in whole or part, as of the Petition Date, by a Lien that is valid, perfected and enforceable under applicable law and is not subject to avoidance under the Bankruptcy Code or applicable non-bankruptcy law, or subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of such Lien or right of setoff as determined under sections 506(a) or 1129(b) of the Bankruptcy Code, as applicable.

"**Secured Tax Claim**" means the Secured Claim of a Governmental Unit for unpaid taxes arising before the Petition Date.

"**Tax**" means any tax, charge, fee, levy, impost or other assessment by any federal, state, local or foreign taxing authority, including, without limitation, income, excise, property, sales, transfer, employment, payroll, franchise, profits, license, use, ad valorem, estimated, severance, stamp, occupation and withholding tax. "Tax" shall include any interest or additions attributable to, imposed on or with respect to such assessments.

"**Tax Claim**" means all or that portion of an Allowed Claim held by a Governmental Unit for a tax assessed or assessable against the Debtors, including income and employment taxes and any related penalties or interest.

"**Unimpaired**" means with respect to a Claim or Equity Interest or Class of Claims or Equity Interests, a Claim or Equity Interest or Class of Claims or Equity Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

"**Unliquidated Claim**" means any Claim for which a Proof of Claim has been Filed with the Bankruptcy Court but was not Filed in a sum certain, and which Claim has not been estimated, fixed or liquidated by the Bankruptcy Court at a sum certain as of the Effective Date.

"**Tobii**" means Tobii Assistive Technology, Inc.

"**U.S. Trustee**" means the Office of the United States Trustee for the District of Delaware.

"**U.S. Trustee Fees**" means fees or charges assessed against the Estates pursuant to 28 U.S.C. § 1930.

"**Voting Record Date**" means the date as of which the identity of the Holders of Equity Interests is set for purposes of determining which Holders of Equity Interests entitled to receive distributions under the Plan subject in all events to an Equity Interest Objection.  Pursuant to Bankruptcy Rules 3017(d) and 3018(a), the Voting Record Date shall be the date the Bankruptcy Court's order approving the Disclosure Statement is entered on the Bankruptcy Court's docket, or such other date as the Bankruptcy Court may set.

### B.    Rules of Construction.

1.    The rules of construction in Bankruptcy Code section 102 apply to this Plan.

2.    Bankruptcy Rule 9006(a) applies when computing any time period under the Plan.

3.    A term that is used in this Plan and that is not defined in this Plan has the meaning, if any, attributed to that term in the Bankruptcy Code or the Bankruptcy Rules.

4.    The definition given to any term or provision in the Plan supersedes and controls any different meaning that may be given to that term or provision in the Disclosure Statement.

5.    Whenever it is appropriate from the context, each term in this Plan, whether stated in the singular or the plural, includes both the singular and the plural.

6.    Any reference to a document or instrument being in a particular form or on particular terms means that the document or instrument will be substantially in that form or on those terms.  No material change to the form or terms may be made after the Confirmation Date without the consent of any party materially and negatively affected by the change.

7.    Any reference to an existing document means the document as it has been, or may be, amended or supplemented.

8.     Any reference to a person or entity includes the successors and assigns of such person or entity.

9.     Unless otherwise indicated, the phrase "under the Plan" or "under this Plan" and similar words or phrases refer to this Plan in its entirety rather than to only a portion of the Plan.

10.     Unless otherwise specified, all references to Sections or Exhibits are references to this Plan's Sections or Exhibits.

11.     The words "herein," "hereto," "hereunder," and other words of similar import refer to this Plan in its entirety rather than to only a particular portion.

## II.

## <u>DESIGNATION OF CLASSES AND TREATMENT OF CLAIMS AND INTERESTS</u>

### A.     Summary and Classification of Claims and Equity Interests.

This Section classifies Claims and Equity Interests for all purposes, including voting, confirmation, and distributions under the Plan, except for Administrative Claims and Priority Tax Claims, which are not classified.  The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes, including voting, Confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or Equity Interest shall be deemed classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class.  A Claim or Equity Interest is in a particular Class only to the extent that such Claim or Equity Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date.  As the Plan provides for substantive consolidation of the Consolidated Debtors' Estates, there is only a single Class for each category of Claims or Equity Interests against the Consolidated Debtors into which all such Claims or Equity Interests against any one or more of the Consolidated Debtors are classified.

The following table summarizes unclassified Claims and the Classes of Claims and Equity Interests under the Plan:

| CLASS/ UNCLASSIFIED CLAIMS | DESCRIPTION | IMPAIRED/ UNIMPAIRED | VOTING STATUS |
|---|---|---|---|
| Unclassified Claims | Administrative Claims and Priority Tax Claims | Unimpaired | Not Entitled to Vote |
| Class 1 | Secured Tax Claims | Unimpaired | Deemed to Accept – Vote Not Solicited |
| Class 2 | Other Secured Claims | Unimpaired | Deemed to Accept - Vote Not Solicited |
| Class 3 | Priority Claims (Other than Priority Tax Claims) | Unimpaired | Deemed to Accept – Vote Not Solicited |
| Class 4 | General Unsecured Claims | Unimpaired | Deemed to Accept – Vote Not Solicited |
| Class 5 | Equity Interests | Unimpaired | Deemed to Accept – Vote Not Solicited |

**NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE PLAN, NO DISTRIBUTIONS WILL BE MADE AND NO RIGHTS WILL BE RETAINED ON ACCOUNT OF ANY CLAIM OR EQUITY INTEREST THAT IS NOT ALLOWED.**

The treatment in this Plan is in full and complete satisfaction of the legal, contractual, and equitable rights (including any Liens) that each entity holding an Allowed Claim or an Allowed Equity Interest may have in or against the Debtors, the Estates, the Liquidating Estates or their respective property. This treatment supersedes and replaces any agreements or rights those entities may have in or against the Debtors, the Estates, the Liquidating Estates or their respective property. All distributions in respect of Allowed Claims will be allocated first to the principal amount of such Allowed Claim, as determined for federal income tax purposes, and thereafter, to the remaining portion of such Allowed Claim, if any.

**B.        Allowance and Treatment of Unclassified Claims.**

**1.        Administrative Claims.**

**(a) U.S. Trustee Fees.**

U.S. Trustee Fees shall be allowed in accordance with 28 U.S.C. § 1930. The Debtors will pay to the U.S. Trustee all fees due and owing under 28 U.S.C. § 1930 in cash on the Effective Date. The Disbursing Agent shall thereafter pay the U.S. Trustee the appropriate sum required pursuant to 28 U.S.C. §1930(a)(6) for post-confirmation periods within the time periods set forth in 28 U.S.C. §1930(a)(6) until the earlier of the closing of this case by the issuance of a Final Decree by the

Bankruptcy Court, or upon entry of an order of this Bankruptcy Court dismissing the case, or converting this case to another chapter under the United States Bankruptcy Code. To date, the Debtors have paid all fees due and owing to the Office of the United States Trustee, and the Debtors or the Disbursing Agent, as applicable, anticipate paying all such fees through Confirmation of the Plan and thereafter as provided herein.

### (b) Professional Fee Claims.

A Professional Fee Claim will be allowed only if:

        (i)      On or before 60 days after the Effective Date, the entity holding such Professional Fee Claim both Files with the Bankruptcy Court a final fee application or a motion requesting allowance of the fees and serves the application or motion on the Liquidating Trustee and his/her counsel, the Debtors and their counsel (to the extent, if any, that the final fee application is served prior to the Effective Date), the U.S. Trustee, and on all parties listed on the post-Effective Date special service list maintained by the Liquidating Trustee established in accordance with Section VI.H of the Plan; and

        (ii)     The Bankruptcy Court allows the Professional Fee Claim.

Any party in interest may File an objection to such application or motion within the time provided by the Bankruptcy Rules or within any other period that the Bankruptcy Court establishes. Entities holding Professional Fee Claims that do not timely File and serve a fee application or motion for payment will be forever barred from asserting such Professional Fee Claim against the Debtors, the Estates, the Liquidating Estates, or their respective property.

With respect to all Professional Fee Claims that are accrued and not paid as of the Effective Date, the Liquidating Estates shall deposit into the Professional Fee Reserve Account an amount equal to the aggregate amount of asserted, unpaid Professional Fee Claims, which funds shall be released to the Professionals only in accordance with (i) existing or future orders of the Bankruptcy Court approving monthly interim compensation or the Professional's interim or final fee application, or (iii) any other applicable order of the Bankruptcy Court.

### (c) Other Administrative Claims.

Unless otherwise expressly provided in the Plan, an Administrative Claim (other than U.S. Trustee Fees and a Professional Fee Claim) will be allowed only if:

        (i)      On or before the Administrative Claim Bar Date, the person or entity asserting an Administrative Claim Files and serves a request for allowance of an Administrative Claim in compliance with the procedures established by the Court under the Administrative Claim Bar Date Order; and

        (ii)     The Court allows the Administrative Claim by Final Order.

Any party in interest may File an objection to such Administrative Claim within the time provided by the Bankruptcy Rules or within any other period that the Bankruptcy Court establishes. **Except as otherwise expressly provided in the Plan, Entities holding Administrative Claims (other than U.S. Trustee Fees or Professional Fee Claims, which are addressed in Sections II.B.1(a) and II.B.1(b) above) that have not timely Filed and served a request for allowance an Administrative Claim by the Administrative Claim Bar Date are forever barred from asserting such Administrative Claim against the Debtors, the Estates, the Liquidating Estates, or their respective property.**

Unless the entity holding a Allowed Administrative Claim (other than U.S. Trustee Fees or Professional Fee Claims) agrees to different treatment, the Disbursing Agent will pay to the entity holding such Allowed Administrative Claim Cash in the full amount of such Allowed Administrative Claim, on or before the latest of: (a) a Distribution Date; (b) fifteen (15) days after the date of an order of the Bankruptcy Court allowing such Allowed Administrative Claim becomes a Final Order; and (c) the date on which the Allowed Administrative Claim first becomes due and payable in accordance with its terms.

#### (d) Costs of the Liquidating Estate.

Allowance and payment of Post Confirmation Administrative Claims of the Liquidating Trustee, compensation to the Liquidating Trustee and the Post Confirmation Professionals shall be governed by the provisions of the Plan and the Liquidating Estate Agreement.

#### 2.      Priority Tax Claims.

Unless the entity holding an Allowed Priority Tax Claim agrees to different treatment, the Disbursing Agent will pay to the Holder of such Allowed Priority Tax Claim the full amount thereof from Distributable Cash on or before the latest of: (a) a Distribution Date; (b) fifteen (15) days after the date of an order of the Bankruptcy Court allowing such Priority Tax Claim becomes a Final Order; and (c) the date on which the Allowed Priority Tax Claim first becomes due and payable in accordance with its terms.

#### C.      Classification and Treatment of Classified Claims and Interests.

#### 1.      Class 1 (Secured Tax Claims).

Class 1 comprises all Secured Tax Claims against the Consolidated Debtors. Class 1 is unimpaired under the Plan. In full satisfaction of any Allowed Class 1 Claim that has not been satisfied or extinguished as of the Effective Date, the Disbursing Agent will pay the Holder of such Allowed Class 1 Secured Tax Claim the full amount thereof from Distributable Cash on or before the latest of: (a) a Distribution Date, and (b) fifteen (15) days after the date of an order of the Bankruptcy Court allowing such Claim becomes a Final Order.

## 2.    Class 2 (Other Secured Claims).

Class 2 comprises all Other Secured Claims against the Consolidated Debtors that are not classified within any other Class under the Plan.  Class 2 is unimpaired under the Plan.  In full satisfaction of any Allowed Class 2 Claim that has not been satisfied or extinguished as of the Effective Date, the Disbursing Agent will, at its option. (1) pay the holder of such Allowed Class 2 Claim the full amount thereof from Distributable Cash on or before the latest of: (a) a Distribution Date, and (b) fifteen (15) days after the date of an order of the Bankruptcy Court allowing such Claim becomes a Final Order, or (B) surrender the Collateral securing the Allowed Class 2 Secured Claim to the Holder thereof, in full satisfaction thereof.  For avoidance of doubt, any and all Claims of JEC, including Secured Claims and Claims under the DIP Facility, have been paid in full in accordance with (i) that certain Order Authorizing Debtors to Pay Undisputed Outstanding Prepetition and DIP Obligations to JEC, dated July 18, 2014 [Docket No. 168], and (ii) that certain Order Authorizing Debtors to Pay Settled Related Persons Charge to JEC, dated August 25, 2014 [Docket No. 196].

## 3.    Class 3 (Priority Claims other than Priority Tax Claims).

Class 3 comprises all Priority Claims, other than Priority Tax Claims, against the Consolidated Debtors.  Class 3 is unimpaired under the Plan.  In full satisfaction of any Allowed Class 3 Claim that has not been satisfied or extinguished as of the Effective Date, the Disbursing Agent will pay the holder of such Allowed Class 3 Claim the full amount thereof from Distributable Cash on or before the latest of: (a) a Distribution Date, and (b) fifteen (15) days after the date of an order of the Bankruptcy Court allowing such Claim becomes a Final Order.

## 4.    Class 4 (General Unsecured Claims).

Class 4 comprises all General Unsecured Claims against the Consolidated Debtors.  Class 4 is unimpaired under the Plan.  In full satisfaction of each Allowed Class 4 Claim that has not been satisfied or extinguished as of the Effective Date, the Disbursing Agent will pay the Holder of such Allowed Class 4 Claim the full amount thereof, including Post-Petition Interest thereon from and after the Petition Date to the date of such payment, from Distributable Cash on or before the latest of: (a) a Distribution Date, and (b) fifteen (15) days after the date of an order of the Bankruptcy Court allowing such Claim becomes a Final Order.   No distribution shall be made to Holders of Allowed Class 4 General Unsecured Claims unless and until all Allowed Administrative Claims, Allowed Professional Fee Claims, U.S. Trustee Fees, Post-Confirmation Administrative Claims, Allowed Priority Tax Claims and all Allowed Claims in Classes 1, 2 and 3 have been paid in full, reserved or otherwise resolved, and/or included in or accounted for in the distribution at issue.

## 5.    Class 5 (Equity Interests).

Class 5 comprises all Equity Interests.  Class 5 is Unimpaired under the Plan.  In full satisfaction of any Allowed Class 5 Equity Interest that has not been satisfied or extinguished as of the Effective Date, the Class 5 Equity Interests shall not be cancelled or extinguished and the Disbursing Agent will pay to the Holder of such Allowed Class 5 Equity Interest its pro rata share of each distribution of Distributable Cash proposed to be made to all Holders of Allowed Class 5 Equity Interests by the Liquidating Trustee on any Distribution Date.  No distribution shall be made to Holders of Allowed Class 5 Equity Interests unless and until all Allowed Administrative Claims, Allowed Professional Fee Claims, U.S. Trustee Fees, Post-Confirmation Administrative Claims, Allowed Priority Tax Claims and

all Allowed Claims in Classes 1, 2, 3 and 4 have been paid in full, reserved or otherwise resolved, and/or included in or accounted for in the distribution at issue.

III.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**A.    Rejection of Executory Contracts and Unexpired Leases.**

**1.    Rejected Agreements.**

On the Effective Date, all executory contracts and unexpired leases of the Debtors, except for the Confidentiality Agreements described in Section IV.A.2 and the Directors and Officers Liability Policies, will be rejected.   The Confirmation Order will constitute a Bankruptcy Court order approving this rejection.

**2.    Bar Date for Rejection Damage Claims.**

Any Rejection Damage Claim or other Claim for damages arising from the rejection under the Plan of an executory contract or unexpired lease must be Filed and served on the Liquidating Trustee within thirty (30) days after the mailing of notice of the occurrence of the Effective Date (nothing herein shall extend the deadline for the filing of claims with respect to contracts or leases previously rejected). Any such Claims that are not timely Filed and served will be entitled to no distribution under the Plan on account of such Claim and will be unenforceable against the Debtors, the Estates, the Liquidating Estates, and their respective property, and entities holding such Claims will be barred by the Confirmation Order from receiving any distributions under the Plan on account of such untimely Claims.

IV.

## MEANS OF EXECUTION AND IMPLEMENTATION OF THE PLAN

**A.    Ratification of Agreements.**

**1.    The Bill of Sale.**

Notwithstanding any other provision of the Plan, the Bill of Sale shall remain in full force and effect, and shall be fully enforceable on and after the Effective Date.

**2.    Confidentiality Agreements.**

Notwithstanding any other provision of the Plan, all Confidentiality Agreements shall remain in full force and effect, and shall be fully enforceable by the Liquidating Trustee, including all Confidentiality Agreements entered into in connection with the Sale.   The Debtors' rights under all such Confidentiality Agreements shall inure to the benefit of the Liquidating Estates and shall be enforceable by the Liquidating Trustee on and after the Effective Date.

**3.      Directors and Officers Liability Policies.**

As of the Effective Date, the Debtors shall assume (and assign to the Liquidating Estates if necessary to continue the Directors and Officers Liability Insurance Policies in full force) all of the Directors and Officers Liability Policies pursuant to section 365(a) of the Bankruptcy Code.  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption of each of the Directors and Officers Liability Policies.  Notwithstanding anything to the contrary contained herein, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the Directors and Officers Liability Policies, and each such indemnity obligation shall be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be Filed.

**B.      Substantive Consolidation of All Debtors' Estates.**

This Plan will effectuate a substantive consolidation of the Chapter 11 Cases of the Consolidated Debtors into a single entity solely for the purpose of the Chapter 11 Cases and all actions with respect to voting, confirmation, consummation and implementation of the Plan.  On the Effective Date, the Plan essentially consolidates all the assets and liabilities of the Consolidated Debtors into a single estate.  Accordingly, the Plan treats the Consolidated Debtors as a single entity and distributions are made on a collective basis to the Holders of Allowed Claims and Allowed Equity Interests against the Consolidated Debtors.  Voting will be aggregated by type of Claim or Equity Interest without regard to which Debtor the Claim or Equity Interest is asserted against.

On the Effective Date, (i) all Intercompany Claims by, between and among the Consolidated Debtors shall be eliminated, (ii) all assets and liabilities of the Consolidated Debtors shall be merged or treated as if they were merged with the assets and liabilities of the Consolidated Debtors, (iii) any obligation of a Consolidated Debtor and all guarantees thereof by one or more of the other Consolidated Debtors shall be deemed to be one obligation of the Consolidated Debtors, and (iv) each Claim filed or to be filed against any Consolidated Debtor shall be deemed filed as a single Claim against and a single obligation of the Consolidated Debtors.  The Equity Interests are the Equity Interests in DynaVox Inc. and shall be treated as if they are Equity Interests in the Consolidated Debtors.  On the Effective Date, in accordance with the terms of the Plan, and the consolidation of the assets and liabilities of the Consolidated Debtors, all Claims based upon guarantees of collection, payment, or performance made by the Consolidated Debtors as to the obligations of another Consolidated Debtor shall be released and of no further force and effect.  The foregoing (a) shall not affect the rights of any Holder of a Secured Claim with respect to the Collateral securing its Claim, or the terms and implementation of any settlement, and the rights and obligations of the parties thereto, entered into in connection with the confirmation of the Plan and (b) shall not, and shall not be deemed to, prejudice the Retained Actions or the Avoidance Actions (subject to the releases set forth in Article V of the Plan), which shall survive entry of the Confirmation Order for the benefit of the Debtors and their Estates, as if there had been no substantive consolidation.

The Plan and Disclosure Statement, jointly, shall serve as, and shall be deemed to be, a motion for entry of an order granting substantive consolidation of the Consolidated Debtors' Chapter 11 Cases.  If no objection to the Plan is timely filed and served by any Holder of Claim or Equity Interest affected by the Plan, as provided herein on or before the Ballot Deadline, or such other date as may be established by the Bankruptcy Court, the Confirmation Order will serve as the Order approving substantive consolidation pursuant to the terms of the Plan.  If any such objections are timely filed and

served, a hearing with respect to the Plan and the objections thereto shall be scheduled by the Bankruptcy Court, which hearing may, but is not required to, coincide with the Confirmation Hearing.

## C.    Funding of the Plan.

As set forth in Section II of the Plan, all obligations under the Plan will be paid by the Disbursing Agent from Distributable Cash, including the proceeds, if any, realized by the Liquidating Estates in respect of Retained Actions.

## D.    The Liquidating Estates.

### 1.    Continuation of the Estates.

On and after the Effective Date, the Estates shall continue as the Liquidating Estates. In addition, on the Effective Date of the Plan, (i) the Assets shall vest in, and be transferred to, the Liquidating Estates, which Liquidating Estates shall constitute, be appointed as and be deemed a representative of the Estates pursuant to and in accordance with the terms of Section 1123(b)(3)(B) of the Bankruptcy Code solely for the benefit of all Holders of Allowed Claims and Allowed Equity Interests under the Plan with respect to, among other things, any Retained Actions, and (ii) the Liquidating Estates, through the Liquidating Trustee, is and shall be authorized and appointed to investigate, prosecute, enforce, pursue and settle, and continue to investigate, prosecute, enforce, pursue and settle, the liquidation of such Assets, including Retained Actions as a representative of the Estates pursuant to and in accordance with the terms of Section 1123(b)(3)(B) of the Bankruptcy Code solely for the benefit of all Holders of Allowed Claims and Allowed Equity Interests under the Plan. The Liquidating Estates shall hold title to all of the Assets of the Estates, as well as any property acquired after the Effective Date that otherwise would become property of the Estates under Bankruptcy Code section 541, free and clear of all claims, liens, encumbrances and other interests, except as otherwise provided in the Plan. The Liquidating Estates shall be fully liquidated and Cash shall be distributed to holders of Allowed Claims and Allowed Equity Interests as soon as is reasonably practicable following the Effective Date in accordance with the Plan.

NOTWITHSTANDING ANYTHING IN THE PLAN TO THE CONTRARY, THE VESTING IN AND TRANSFER OF THE ASSETS TO THE LIQUIDATING ESTATES SHALL BE FREE AND CLEAR OF ANY AND ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS OF ANY KIND WHATSOEVER, EXCEPT AS EXPRESSLY PRESERVED AND PROVIDED FOR IN THE PLAN AND THE CONFIRMATION ORDER.

**Notwithstanding anything in the Plan to the contrary, confirmation of the Plan shall divest the Debtors of any and all right, title and/or interest in the Assets, such that the Debtors shall not have any rights or authority in respect of any Assets vested in the Liquidating Estates.**

### 2.    Preservation/Vesting of Rights of Action.

Except as expressly released pursuant to the Plan, pursuant to section 1123(b) of the Bankruptcy Code, the Liquidating Trustee, on behalf of the Liquidating Estates shall be vested with and shall retain and may enforce any and all Retained Actions that the Debtors or the Estates may hold or have against any entity, including (i) Avoidance Actions, (ii) any legal or equitable rights to subordinate and/or disallow Claims, (iii) any causes of action that could be brought on behalf of the Debtors, the Estates, the Liquidating Estates; and (iv) any and all other claims, rights or causes of action of any kind or nature

of the Debtors, the Estates or the Liquidating Estates that may exist under applicable bankruptcy law or non-bankruptcy law. Upon the Effective Date, the Liquidating Trustee (and only the Liquidating Trustee) shall have standing to assert, abandon, prosecute and/or settle, if applicable, any and all Retained Actions vested in the Liquidating Estates.

### 3.    Appointment of the Liquidating Trustee.

Pursuant to 11 U.S.C. § 1129(a)(5), consistent with the interests of creditors and equity security holders, and consistent with public policy, the Confirmation Order shall appoint, effective on the Effective Date, Soneet R. Kapila to act as the Liquidating Trustee, or such other person as may be appointed pursuant to the terms of the Liquidating Estate Agreement. The Liquidating Trustee shall be free to act as he deems appropriate, in his discretion, to effectuate the terms of the Plan and the Liquidating Estate Agreement.

The Liquidating Trustee and any Post Confirmation Professional shall be entitled to receive, on a monthly basis, payment of fees and reimbursement of reasonable expenses from the assets of the Liquidating Estates in accordance with the Liquidating Estate Agreement. In the event there is insufficient Cash to satisfy the fees and expenses incurred by the Liquidating Trustee and his professionals following the Effective Date, such fees and expenses shall be satisfied with the cash proceeds of the Retained Actions, when and to the extent they are realized.

The Liquidating Trustee shall serve for the duration of the Liquidating Estates, subject to earlier death, resignation, incapacity or removal as provided in the Liquidating Estate Agreement. If Soneet R. Kapila is not able to serve for the duration of the Liquidating Estates, a successor shall be chosen pursuant to the terms of the Liquidating Estate Agreement. The Liquidating Trustee shall be authorized, without further order of the Bankruptcy Court, to employ such persons, including professionals, as deemed necessary to enable the Liquidating Trustee to perform his functions under the Plan, and the costs of such employment and other expenditures shall be paid solely from assets of the Liquidating Estates in accordance with the Liquidating Estate Agreement.

The Liquidating Trustee shall perform his obligations under the Plan without bond. The Liquidating Trustee shall have no liability to any person or entity entitled to receive a distribution pursuant to the Plan for any losses, damages, claims or causes of action, other than those primarily resulting from the Liquidating Trustee's action or failure to act arising out of, in connection with or resulting from the Liquidating Trustee's gross negligence or willful misconduct   The Liquidating Estates shall indemnify, defend and hold the Liquidating Trustee and his agents and advisors, including Post Confirmation Professionals, harmless from and against any claims, damages, costs, fines, penalties, liabilities, attorneys' and other professional fees and disbursements, suffered, incurred by, or asserted against any such party in connection with the rendition of services to the Liquidating Estates, provided that such indemnification shall not apply to the extent any such claims, damages, costs, fines, penalties, liabilities, attorneys' and other professional fees and disbursements, resulted primarily from gross negligence or willful misconduct of the Liquidating Trustee, his agents and advisors, including Post Confirmation Professionals, as the case may be, as determined by a Final Order. Any such indemnification claims shall be paid prior and in preference to any other payments or distributions to be made from the Liquidating Estates.

### 4.    Powers and Duties of the Liquidating Trustee.

On and after the Effective Date, the Liquidating Trustee shall be the duly authorized representative of the Liquidating Estates for the purpose of implementing the Plan.  Among other things, the Liquidating Trustee shall have (i) the rights, powers and duties conferred to him by the Plan and the Liquidating Estate Agreement, (ii) the rights and powers of a trustee under sections 542 through 552 of the Bankruptcy Code and the duties of a trustee under sections 704(1),(2),(4),(5),(7) and (9) of the Bankruptcy Code, and (iii) the following rights, powers and duties:

a.    liquidate, in accordance with the Plan, the assets of the Liquidating Estates;

b.    serve as Disbursing Agent under the Plan, including to make distributions under the terms of the Plan;

c.    in the Liquidating Trustee's reasonable business judgment, investigate, prosecute, settle and/or abandon rights, actions or litigation of the Liquidating Estates, including the Retained Actions;

d.    manage the affairs of the Liquidating Estates;

e.    collect and marshal all assets of the Liquidating Estates, reduce such assets to Cash, and make interim and final distributions in accordance with the Plan;

f.    monitor and enforce the implementation of the Plan;

g.    file all tax and regulatory forms, returns, reports and other documents required with respect to the Liquidating Estates;

h.    as soon as reasonably practicable, but in no event later than fifteen (15) days after the Effective Date, serve a notice of Effective Date on all holders of Claims and Equity Interests. The notice of Effective Date shall include a notice that the bar date for filing Rejection Damage Claims (or other Claims for damages) arising from the rejection under the Plan of executory contracts or unexpired leases shall be 30 days after the mailing of notice of the Effective Date, as set forth in Section III.A.2;

i.    in the Liquidating Trustee's reasonable business judgment, manage, control, prosecute and/or settle on behalf of the Liquidating Estate, objections to Claims on account of which the Liquidating Trustee (as Disbursing Agent) will be responsible (if Allowed) for making distributions under the Plan;

j.    submit all required U.S. Trustee and Bankruptcy Court reports and pay all required U.S. Trustee Fees until the case is closed;

k.    take all actions necessary and create any documents necessary to wind up the affairs of the Liquidating Estates and implement the Plan; and

l.    take all necessary actions and File all appropriate motions to obtain an order closing the Cases.

**5.      Termination of the Liquidating Estates.**

The Liquidating Estates shall terminate when the Liquidating Trustee has performed all of his duties under the Plan, including the final distribution of all the property of the Liquidating Estates, including all Distributable Cash, which date shall not be more than 24 months after the Effective Date; provided, however, that, upon a motion filed by a party-in-interest, including the Liquidating Trustee, upon a showing of cause, the Bankruptcy Court may extend the duration of the Liquidating Estates so long as shall be necessary to liquidate and distribute property and resolve any and all litigation relating to the Plan or the Cases.

**6.      Additional Provisions Regarding the Liquidating Estates.**

In addition to the provisions contained in the Plan with respect to duties of the Liquidating Trustee, the Liquidating Estate Agreement will provide for, among other things, other actions to be taken by the Liquidating Trustee, the removal of the Liquidating Trustee, or nomination of a successor Liquidating Trustee and the effect of actions by the Liquidating Trustee, subject to Bankruptcy Court approval.  To the extent not set forth in the Plan, the functions of the Liquidating Estates, the powers and duties of the Liquidating Trustee, and the rights of the holders of property in the Liquidating Estates shall be governed by the provisions of the Liquidating Estate Agreement.

**E.      Retained Actions (including Avoidance Actions), Claim Objections and Equity Interest Objections.**

On and after the Effective Date, only the Liquidating Trustee shall have the right and standing to prosecute, abandon, and/or settle any Retained Action, any Claim Objection and any Equity Interest Objection.

All Retained Actions, Claim Objections and Equity Interest Objections shall be subject to all defenses and setoffs that could have been asserted against the Debtors or the Estates with respect thereto.  The costs of investigating, litigating, settling, collecting, recovering or otherwise pursuing any Retained Action, Claim Objection or Equity Interest Objection shall be borne by the Liquidating Estates.

Except as provided in Section II.B.1 (regarding the allowance of Administrative Claims), objections to any Claim or Equity Interest must be Filed and must be served on the entity holding such Claim or Equity Interest by the Claim/Equity Objection Deadline.

**F.      Distribution of Property Under the Plan.**

The following procedures set forth in the Plan apply to distributions made pursuant to the Plan by the Disbursing Agent.  The Disbursing Agent will serve without bond and shall make all distributions under the Plan, except where otherwise provided.  To the extent required by applicable law, the Disbursing Agent in making cash distributions under the Plan shall comply with all tax withholding and reporting requirements imposed on it by any governmental unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  The Liquidating Trustee may require any Holder of an Allowed Claim or Holder of an Allowed Equity Interest entitled to a distribution under the Plan to furnish its, his or her employer or taxpayer identification number (the "TIN") assigned by the Internal Revenue Service.  Any distribution under the Plan may be conditioned on the receipt of such TIN.  If any such Holder of an Allowed Claim or an Allowed Equity Interest entitled to a distribution hereunder fails to provide a requested TIN within forty-five (45) days after the request thereof, then such

22

failure shall be deemed to be a waiver of such Holder's interest in any future distributions, including the right to receive any future distributions.

### 1.    Manner of Cash Payments Under the Plan.

Cash payments to domestic entities holding Allowed Claims and Allowed Equity Interest will be tendered in United States dollars and will be made by checks drawn on a United States domestic bank or by wire transfer from a United States domestic bank.  Payments made to foreign creditors holding Allowed Claims or Allowed Equity Interests may be paid, at the option of the Liquidating Trustee, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

### 2.    No *De Minimis* Distributions.

Notwithstanding anything to the contrary in this Plan, no cash payment of less than $25 will be made to any entity.  No consideration will be provided in lieu of the *de minimis* distributions that are not made under this Section.

### 3.    No Distribution with Respect to Disputed Claims.

No payments of cash or distributions of other property or other consideration of any kind shall be made on account of any Disputed Claim or Disputed Equity Interest unless and until such Claim or Equity Interest becomes an Allowed Claim or an Allowed Equity Interest or is deemed to be such for purposes of distribution, and then only to the extent that the Claim or Equity Interest becomes, or is deemed to be for distribution purposes, an Allowed Claim or an Allowed Equity Interest.  The presence of a Disputed Claim or Disputed Equity Interest in any Class will not be a cause to delay distribution to Allowed Claims or Allowed Equity Interests in that Class or in other Classes, so long as a reserve is created for the Disputed Claim or Disputed Equity Interest in accordance herewith.  Unless otherwise provided in the Plan, any holder of a Claim or Equity Interest that becomes an Allowed Claim or an Allowed Equity Interest after the Effective Date will receive any distribution that it would have received had its Allowed Claim or Allowed Equity Interest been Allowed as of the Effective Date within fifteen (15) days from the date that such Claim or Equity Interest becomes an Allowed Claim or an Allowed Equity Interest.

### 4.    Delivery of Distributions and Undeliverable/Unclaimed Distributions.

#### (a)    Delivery of Distributions in General.

The Liquidating Trustee shall make distributions to each holder of an Allowed Claim or Allowed Equity Interest by mail as follows: (a) at the address set forth on the proof of Claim filed by such holder of an Allowed Claim; (b) at the address set forth in any written notice of address change delivered to the Liquidating Trustee after the date of any related proof of Claim; (c) at the address reflected in the Schedules if no proof of Claim is filed and the Liquidating Trustee has not received a written notice of a change of address; or (d) at the address of record for Holders of Equity Interests as determined by the Distribution Agent.

(b)    **Undeliverable and Unclaimed Distributions.**

If the distribution to the Holder of any Allowed Claim or Allowed Equity Interest is returned as undeliverable, no further distribution shall be made to such Holder unless and until the Liquidating Trustee is notified in writing of such Holder's then current address.  Subject to the other provisions of the Plan, undeliverable distributions shall remain in the possession of the Liquidating Trustee pursuant to this Section until such time as a distribution becomes deliverable.  All undeliverable cash distributions will be held in unsegregated, interest-bearing bank accounts for the benefit of the entities entitled to the distributions.  These entities will be entitled to any interest actually earned on account of the undeliverable distributions.  The bank account will be maintained in the name of the Liquidating Trustee but it will be accounted for separately.

Any holder of an Allowed Claim or Allowed Equity Interest who does not assert a claim in writing for an undeliverable distribution within 180 days after the Effective Date shall no longer have any claim to or interest in such undeliverable distribution, and shall be forever barred from receiving any distributions under the Plan, or from asserting a Claim against the Debtors, the Estates, Liquidating Estates, or their respective property, and the Claim or Equity Interest giving rise to the undeliverable distribution will be barred.

Any undeliverable distributions that are not claimed under this Section will be transferred to the Liquidating Trustee to be included in Distributable Cash for the benefit of Holders of Allowed Equity Interests under the Plan.

(c)    **Estimation of Disputed Claims or Equity Interests for Distribution Purposes.**

The Liquidating Trustee may move for a Bankruptcy Court order estimating any Disputed Claim or Disputed Equity Interest.  The estimated amount of any Disputed Claim or Disputed Equity Interest so determined by the Bankruptcy Court shall constitute the maximum recovery that the holder thereof may recover from the Liquidating Estates, irrespective of the actual amount ultimately Allowed.

**G.    Dissolution of Debtor Entities/Termination of Officers and Directors.**

On the Effective Date, and without further action by any party: (A) the Debtors have no right to operate a business; and (B) the services of the Debtors' officers, directors, managers and authorized representative automatically are terminated and each such officer, director and/or manager shall be deemed to have resigned as of the Effective Date without any further action; provided, however, that notwithstanding the foregoing, the Liquidating Trustee shall have and retain such authority as set forth in the Plan and the Liquidating Estate Agreement to dispose of the assets of the Liquidating Estates and otherwise implement the Plan in accordance with its terms.  On the Effective Date, the Debtors shall be deemed liquidated and dissolved as a legal entity pursuant to applicable federal and state law, without further action by any entity.  The Liquidating Trustee shall be authorized to execute any documents that implement or are in aid of this Section, in particular, and the Plan in general.  The Confirmation Order shall constitute a final decree closing all but one of the Debtors' Chapter 11 Cases.

## V.

## EFFECT OF CONFIRMATION OF THE PLAN

A.      **Binding Effect of Plan/Non-Discharge of the Debtors.**

Upon the Effective Date, Bankruptcy Code section 1141 shall become applicable with respect to the Plan and the Plan shall be binding on all Persons and Entities to the fullest extent permitted by Bankruptcy Code section 1141(a).  In accordance with Bankruptcy Code section 1141(d)(3), the Plan does not discharge the Debtors.  Bankruptcy Code section 1141 nevertheless provides, among other things, that the Assets dealt with by the Plan shall be vested in the Liquidating Estates free and clear of all Claims and interests of creditors and equity security holders.  Accordingly, no Entity holding a Claim against or Equity Interest in the Debtors may receive any payment from, or seek recourse against, any Assets that are to be distributed under the Plan unless and only to the extent that such Entity is the Holder of an Allowed Claim or Allowed Equity Interest entitled to a distribution in accordance with the terms of the Plan.  As of the Effective Date, all Persons are precluded from asserting against any property or Assets that are to be distributed under the Plan any Claims, rights, causes of action, liabilities, or interests based upon any act, omission, transaction, or other activity that occurred before the Effective Date except as expressly provided in the Plan or the Confirmation Order.

B.      **Releases By The Debtors.**

Effective (i) automatically on the Retained Actions Deadline with respect to the Debtors' Indemnified Parties, and (ii) as of the Effective Date with regard to all other Debtor Released Parties (as defined below), for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors (in their individual capacities and as debtors and debtors-in-possession) will be deemed to forever release, waive, and discharge any and all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities (other than the rights of the Debtors to enforce the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered hereunder, and liabilities arising after the Effective Date in the ordinary course of business), including Retained Actions (collectively, the "Released Claims"), against the Debtors' Indemnified Parties and any of the representatives, agents, Professionals, advisors, consultants and attorneys of the foregoing (collectively, the "Debtor Released Parties") whether such Released Claims are liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise that are based in whole or part on any act omission, transaction, event, or other occurrences taking place before, on or after the Petition Date through and including the Effective Date in connection with, relating to, or arising out of the Debtors, the Chapter 11 Cases, the negotiation and filing of the Plan, the Disclosure Statement or any prior plans of reorganization, the filing of the Chapter 11 Cases, the pursuit of confirmation of the Plan or any prior plans of reorganization, the consummation of the Plan, the administration of the Plan, or the property to be liquidated and/or distributed under the Plan, and that could have been asserted by or on behalf of the Debtors or their Estates . Notwithstanding anything herein to the contrary, the release contained herein shall not apply to any Retained Action that is commenced by the Liquidating Trustee on or before the Retained Action Deadline in accordance with the Plan.

C.       **Exculpation and Limitation of Liability.**

The Debtors and their respective officers, directors, members and managers, and the Professionals for the Debtors (acting in such capacity) (collectively, the "Exculpated Parties") shall neither have nor incur any liability whatsoever to any Person or Entity for any act taken or omitted to be taken in good faith in connection with or related to the formulation, preparation, dissemination, implementation, confirmation, or consummation of the Plan, the Disclosure Statement, or any contract, instrument, release, or other agreement or document created or entered into, or any other act taken or omitted to be taken, in connection with the Plan or the Chapter 11 Cases, in each case for the period on and after the Petition Date; provided, however, that this exculpation from liability provision shall not be applicable to any liability found by a court of competent jurisdiction to have resulted from fraud or the willful misconduct or gross negligence of any such party. With respect to Professionals, the foregoing exculpation and release provision shall also include claims of professional negligence arising from the services provided by such Professionals during the Chapter 11 Cases. Any such claims shall be governed by the standard of care otherwise applicable to the standard of negligence claims outside of bankruptcy. The Confirmation Order shall enjoin the prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any such claim, obligation, suit, judgment, damage, loss, right, remedy, cause of action, charge, cost, debt, indebtedness, or liability which arose or accrued during such period or was or could have been asserted against any of the Exculpated Parties, except as otherwise provided in the Plan or in the Confirmation Order. Each of the Exculpated Parties shall have the right to independently seek enforcement of this release provision. All such Exculpated Parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities hereunder and under the Bankruptcy Code. Notwithstanding anything herein to the contrary, the exculpation and limitation of liability provided for herein shall not apply to any acts of omissions that occurred prior to the Petition Date. The rights granted hereunder are cumulative with (and not restrictive of) any and all rights, remedies, and benefits that the Exculpated Parties have or obtain pursuant to any provision of the Bankruptcy Code or other applicable law. This exculpation from liability provision is an integral part of the Plan and is essential to its implementation. Notwithstanding anything herein to the contrary, any Exculpated Party shall be entitled to reasonably rely upon the advice of counsel with respect to its duties and responsibilities (if any) under this Plan and such reasonable reliance shall form an absolute defense to any such claim, cause of action, or liability. Without limiting the generality of the foregoing, each Exculpated Party shall be entitled to and granted the protections of section 1125(e) of the Bankruptcy Code.

D.       **Injunctive Relief Relating To Releases.**

Except as otherwise expressly provided in this Plan, all Entities that have held, hold or may hold Claims against or Equity Interests in the Debtors are permanently enjoined, from and after the Effective Date, from taking any of the following actions against any of the Debtors, their Estates, the Liquidating Trustee, the Liquidating Estates, the Professionals, or any of their property on account of any Claims or causes of action arising from events prior to the Effective Date, (i) enforcing, attaching, collecting or recovering by any manner or in any place or means any judgment, award, decree or order; (ii) creating, perfecting, or enforcing any Lien or encumbrance of any kind; (iii) asserting any right of setoff, right of subrogation or recoupment against any obligation, debt or liability due to the Debtors, and (iv) any act, in any manner, in any place whatsoever, that does not conform to or comply with the provisions of this Plan with respect

to such Claim or Equity Interest.   Except as expressly provided herein, the Debtors, the Liquidating Estates and the Liquidating Trustee expressly reserve all rights and defenses that the Debtors may have (including, without limitation, the rights of subrogation and recoupment) with respect to any obligation, debt or liability allegedly due to any Entity.

By accepting distributions pursuant to this Plan, each Holder of an Allowed Claim and Allowed Equity Interest receiving distributions pursuant to this Plan will be deemed to have specifically consented to the injunctions set forth herein.  Nothing in this section shall prohibit the Holder of a timely Filed Proof of Claim or Equity Interest from litigating its right to seek to have such Claim declared an Allowed Claim or Allowed Equity Interest and paid in accordance with the distribution provisions of this Plan, or enjoin or prohibit the interpretation or enforcement by the Holder of any obligations of the Debtors under this Plan.

### E.    Terms of Existing Injunctions or Stays.

Unless otherwise provided herein, all injunctions or stays provided for in these Chapter 11 Cases pursuant to sections 105, 362 or 525(a) of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date. The Plan and Confirmation Order will permanently enjoin the commencement or prosecution by any Entity, whether directly, derivatively or otherwise, of any Claims, Equity Interests, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities released or enjoined pursuant to this Plan and the Bankruptcy Code.

## VI.

## OTHER PLAN PROVISIONS

### A.    The Effective Date.

The Plan will not become binding or effective until and unless the Effective Date occurs.  The Effective Date will be the first Business Day, as determined by the Debtors, in its reasonable discretion, on which the following conditions have been satisfied, unless waived by the Debtors:

(1)    The Confirmation Order in form and substance satisfactory to the Debtors shall have been entered and become a Final Order and shall provide that the Debtors, the Liquidating Trustee and the Liquidating Estates are authorized and directed to take all actions necessary or appropriate to enter into, implement and consummate the contracts, instruments, releases and other agreements or documents created in connection with the Plan or effectuate, advance, or further the purposes thereof;

(2)    All Plan Exhibits shall be, in form and substance, reasonably acceptable to the Debtors and shall have been executed and delivered by all parties' signatory thereto;

(3)    The Debtors shall be authorized and directed to take all actions necessary or appropriate to enter into, implement and consummate the contracts, instruments, releases and the agreements or documents created in connection with, and expressly provided for under, the Plan;

(4)    All other actions, documents, and agreements necessary to implement the Plan shall have been effected or executed; and

(5)    In the reasonable judgment of the Liquidating Trustee, the Debtors shall have sufficient Cash available to satisfy in full, or adequately reserve for, all Allowed Claims.

(6)    The Debtors may waive any of the conditions of the Confirmation and/or consummation of this Plan, in whole or in part, set forth in this Article VI at any time, without notice, without leave or order of the Bankruptcy Court, and without any formal action other than proceeding to obtain Confirmation and/or achieve Consummation of this Plan.

### B.    Stay of Confirmation Order Shortened.

The 14-day stay otherwise applicable to the Confirmation Order under Federal Rule of Bankruptcy Procedure 3020(e) shall be shortened from fourteen (14) days to three (3) days following entry of the Confirmation Order.

### C.    Revocation of Plan/No Admissions.

Notwithstanding anything to the contrary in the Plan, if the Plan is not confirmed or the Effective Date does not occur, the Plan will be null and void, and nothing contained in the Plan or the Disclosure Statement will: (a) be deemed to be an admission by the Debtors with respect to any matter set forth in the Plan, including liability on any Claim or the propriety of any Claim's classification; (b) constitute a waiver, acknowledgment, or release of any Claims against, or any Equity Interests in, the Debtors, or of any claims of the Debtors; or (c) prejudice in any manner the rights of any party in any further proceedings.

### D.    Exemption from Certain Transfer Taxes.

In accordance with Bankruptcy Code section 1146(a), neither (i) the issuance, transfer or exchange of a security, nor (ii) the delivery of an instrument or transfer under the Plan or the Sale Order shall be taxed under any law imposing a stamp or similar tax, regardless, in the case of the transfers effectuated under the Sale Order, of the fact that such transfers occurred before entry of the Confirmation Order. The Confirmation Order shall direct all governmental officials and agents to forego the assessment and collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without payment of such tax or other governmental assessment.

### E.    Modifications of Plan.

Subject to the restrictions set forth in Bankruptcy Code section 1127, the Debtors reserve the right to non-materially alter, amend, or modify the Plan before its substantial consummation.

### F.    Cram-Down.

The Debtors reserves the right to request the Bankruptcy Court confirm the Plan in accordance with Bankruptcy Code section 1129(b) if one or more impaired Classes votes to reject the Plan (provided the other requirements of Bankruptcy Code section 1129 are satisfied).

### G.    Post-Effective Date Effect of Evidences of Claims or Equity Interests.

Commencing on the Effective Date, notes, certificates, warrants, and other evidences of Claims against or Equity Interests in the Debtors constitute only the right to receive the distributions, if any, to the extent set forth under the Plan.

### H.    Post-Effective Date Notices.

Following the Effective Date, all parties-in-interest who wish to receive, or continue to receive, notices of all pleadings Filed in the Cases must File a new request for special notice and serve it on the Liquidating Trustee and his counsel and the U.S. Trustee.  The Liquidating Trustee shall maintain and keep current the post-Effective Date special notice list, and make it available to all parties in interest upon written request.  All pleadings, notices and other papers Filed in the Cases following the Effective Date (other than the notice of Effective Date) must be served on the parties on the post-Effective Date special notice list maintained by the Liquidating Trustee.

### I.    Successors and Assigns.

The rights, benefits, and obligations of any entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such Entity, whether or not such entity is impaired under this Plan and whether or not such Entity has accepted this Plan.

### J.    Saturday, Sunday or Legal Holiday.

If any payment or act under the Plan is required to be made or performed on a day that is not a Business Day, then the payment or act may be completed on the next day that is a Business Day, in which event the payment or act will be deemed to have been completed on the required day.

### K.    Headings.

The headings used in the Plan are inserted for convenience only and do not constitute a portion of this Plan or in any manner affect the provisions of this Plan or their meaning.

### L.    Severability of Plan Provisions.

If before confirmation the Bankruptcy Court holds that any Plan term or provision is invalid, void, or unenforceable, the Bankruptcy Court may alter or interpret that term or provision so that it is valid and enforceable to the maximum extent possible consistent with the original purpose of that term or provision. That term or provision will then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the Plan's remaining terms and provisions will remain in full force and effect and will in no way be affected, impaired, or invalidated.  The Confirmation Order will constitute a judicial determination providing that each Plan term and provision, as it may have been altered or interpreted in accordance with this Section, is valid, enforceable, and, as of the Effective Date, binding under its terms.

**M.      Governing Law.**

Unless a rule of law or procedure is supplied by (a) federal law (including the Bankruptcy Code and Bankruptcy Rules), or (b) an express choice of law provision in any agreement, contract, instrument, or document provided for, or executed in connection with, the Plan, the rights and obligations arising under the Plan and any agreements, contracts, documents, and instruments executed in connection with the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware without giving effect to the principles of conflict of laws thereof.

**N.      Retention of Jurisdiction.**

Notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Case after the Effective Date to the fullest extent provided by law, including the jurisdiction to:

1.      Allow, disallow, determine, liquidate, classify, establish the priority or secured or unsecured status of, estimate, or limit any Claim or Equity Interest;

2.      Grant or deny any and all applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Effective Date;

3.      Ensure that distributions to holders of Allowed Claims and Allowed Equity Interests are accomplished pursuant to the provisions of the Plan;

4.      Resolve any and all applications, motions, adversary proceedings, and other matters involving the Estates that may be pending on the Effective Date or that may be instituted thereafter in accordance with the terms of the Plan;

5.      Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents entered into in connection with the Plan;

6.      Resolve any and all controversies, suits, or issues that may arise in connection with the consummation, interpretation, or enforcement of the Plan or any entity's rights or obligations in connection with the Plan;

7.      Resolve any and all controversies, suits, or issues that may arise in connection with the consummation, interpretation, or enforcement of the Bill of Sale or the Sale Order;

8.      Modify the Plan before or after the Effective Date pursuant to Bankruptcy Code section 1127, or modify the Disclosure Statement or any contract, instrument, release, or other agreement or document created in connection with the Plan or Disclosure Statement; or remedy any defect or omission or reconcile any inconsistency in any order of the Bankruptcy Court, the Plan, the Disclosure Statement, or any contract, instrument, release, or other agreement or document created in connection with the Plan or Disclosure Statement, in such manner as may be necessary or appropriate to consummate the Plan, to the extent authorized by the Bankruptcy Code;

9.      Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation or enforcement of the Plan;

10.     Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

11.     Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with the Plan or the Disclosure Statement; and

12.     Enter an order closing the Cases.

If the Bankruptcy Court abstains from exercising jurisdiction or is otherwise without jurisdiction over any matter, this Section shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

**O.      Plan Embodies Settlement.**

As described in the Disclosure Statement and in this Plan, this Plan constitutes a good faith compromise and settlement of certain claims and interests between and among the Debtors and other parties-in-interest in accordance with Bankruptcy Code section 1123(b).

**P.      Term of Bankruptcy Injunctions or Stays.**

All injunctions or stays provided for in the Cases under Bankruptcy Code sections 105 or 362, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

**Q.      Objections to Confirmation.**

Objections to confirmation of this Plan are governed by Bankruptcy Rule 9014.  UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED IT WILL NOT BE CONSIDERED BY THE COURT.

**R.      Notices.**

Any notice required or permitted to be provided under the Plan shall be in writing and served by either (a) certified mail, return receipt requested, postage prepaid, (b) had delivery or (c) overnight delivery service, freight prepaid, and addressed as follows:

<u>For the Debtors:</u>

**GENOVESE JOBLOVE & BATTISTA, P.A.**
Paul J. Battista (Fla. Bar No. 884126)
Heather L. Harmon (Fla. Bar No. 013192)
100 SE 2nd Street, Suite 4400
Miami, Florida 33131
Telephone:        (305) 349-2300
Facsimile:        (305) 349-2310
Email:        pbattista@gjb-law.com
                hharmon@gjb-law.com

        and

**CHIPMAN BROWN CICERO & COLE, LLP**
William E. Chipman, Jr. (No. 3818)
Mark D. Olivere (No. 4291)
1007 North Orange Street, Suite 1110
Wilmington, Delaware  19801
Telephone:        (302) 295-0191
Facsimile:        (302) 295-0199
Email:        chipman@chipmanbrown.com
                olivere@chipmanbrown.com

## VII.

## RECOMMENDATION AND CONCLUSION

The Debtors respectfully submit that the foregoing Plan is in the best interests of all creditors and parties in interest.

Dated: October 3, 2014                **DYNAVOX, INC.**


                        _/s/ Erin L. Russell_____
                        By:  Erin L. Russell
                        Its:  Authorized Representative


                        **DYNAVOX INTERMEDIATE LLC**


                        _/s/ Erin L. Russell_____
                        By:  Erin L. Russell
                        Its:  Authorized Representative

**DYNAVOX SYSTEMS HOLDINGS LLC**

_____*/s/ Erin L. Russell*_____ _____
By:  Erin L. Russell
Its:  Authorized Representative

# EXHIBIT A

## LIQUIDATING ESTATES AGREEMENT

# TO BE FILED

# EXHIBIT 2

## SONEET R. KAPILA, CPA*, CIRA, CFE, CFF
kapila@kapilamukamal.com

Soneet R. Kapila is a founding partner of Kapila & Company and KapilaMukamal, LLP.  For over twenty years, Kapila & Company and KapilaMukamal has concentrated its efforts in the areas of consulting in insolvency, fiduciary and creditors' rights matters.

### Professional Experience

Mr. Kapila's practice is concentrated in the area of creditors' rights, bankruptcy, and financial transactions litigation.  He represents both creditors and debtors in and out of bankruptcy court, and has considerable expertise representing secured creditors.  He also regularly advises clients about the insolvency implications involved in business transactions and operation of distressed businesses.

As a fiduciary, he has served as Bankruptcy Trustee, Examiner, Chief Restructuring Officer, S.E.C. Corporate Monitor and Receiver and State Court Receiver in numerous matters in the Southern and Middle Districts of Florida. Mr. Kapila has advised and represented debtors and creditors' committees in formulating, analyzing and negotiating plans of reorganization.  He is a recognized expert in fraudulent conveyance and insolvency issues and has provided expert testimony and extensive litigation support services to law firms involving complex insolvency issues and commercial damages.  He is a sitting trustee on the panel of U.S. Bankruptcy Trustees in the Southern District of Florida.

Mr. Kapila has conducted numerous forensic and fraud investigations, and has worked in conjunction with the S.E.C., the Federal Bureau of Investigation and the United States Attorney's Office.

Mr. Kapila has also provided a wide variety of tax services to clients throughout his career. Consulting with and offering tax planning strategies and ideas to bankruptcy trustees is also a significant part of his responsibilities.

Mr. Kapila has spoken to various groups including the New York Law School, St. Thomas University Law School, National Conference of Bankruptcy Judges, Receiver's Forum, Association of Insolvency and Restructuring Advisors, Florida Institute of Certified Public Accountants, National Business Institute, and the American Bankruptcy Institute on topics related to insolvency, under-performing businesses and insolvency taxation.

* Regulated by the State of Florida.



Kapila/Mukamal

CPAs, Forensic and Insolvency Advisors

## SONEET R. KAPILA, CPA*, CIRA, CFE, CFF
skapila@kapilamukamal.com

### Accomplishments

- Fellow, American College of Bankruptcy - 2013
- Best Trustee - Daily Business Review's *Best of 2012*
- Key Partners Award Honoree – South Florida Business Journal (2010)
- Bronze Award/Medal – 3rd highest score, examination of the Association of Insolvency & Restructuring Advisors (1996)
- Published article - Hidden Resources in a Small Business

### Education/Qualifications

- MBA, Cranfield School of Management Studies, England
- Certified Public Accountant – Florida
- Certified Insolvency & Restructuring Advisor
- Certified Fraud Examiner
- Certified in Financial Forensics
- Institute of Chartered Accountants in England and Wales

### Professional Affiliations

- Florida Institute of Certified Public Accountants
- American Institute of Certified Public Accountants
- Association of Insolvency & Restructuring Advisors
- Association of Certified Fraud Examiners
- American Bankruptcy Institute
- National Association of Bankruptcy Trustees

### Volunteer Activities (Past and Present)

- Advisory Board – American Bankruptcy Institute Southeast Regional Conference (2012)
- Advisory Board – American Bankruptcy Institute Caribbean Insolvency Symposium (2010 – 2012)
- Association of Insolvency & Restructuring Advisors - past-Chairman and past-President
- Association of Insolvency & Restructuring Advisors – Board of Directors
- Lecturer to various groups on insolvency and litigation related topics, including insolvency taxation
- Member of the Grievances Committee of The Florida Bar
- Member of the American Arbitration Association's Panel of Arbitrators
- Member of the Board of Directors, Hialeah-Miami Springs-Northwest Dade Chamber of Commerce
- Chairman - Litigation Support Services Committee of the National Training and Experience Sharing Program of The American Group of CPA Firms
- Practice Review Committee – FICPA
- Bankers Cooperation Committee – Connecticut Society of CPAs



Kapila/Mukamal

CPAs, Forensic and Insolvency Advisors

# Settlement Administration / Liquidating Trustee

**SMF LIQUIDATING TRUST**
Soneet r. Kapila was named Chief Restructuring Officer and Liquidating Trustee of **SMF Energy Corporation**, a leading provider of petroleum product distribution services, transportation logistics and emergency response services to a wide spectrum of industries. SMF operated a fleet of over 200 specialized commercial vehicles from 34 locations serving 11 states. SMF was traded as "FUEL" on the NASDAQ.

**LOUIS J. PEARLMAN/TRANSCONTINENTAL AIRLINES – LIQUIDATING TRUSTEE**
Soneet R. Kapila was appointed Chapter 11 Trustee and Liquidating Trustee in these related cases that incorporate a classic Ponzi scheme of approximately $500 million and transactions intertwined in over 100 related entities. The number of investors and loss victims exceeds 1,400 and the case involves investigation of off-shore assets.

**FLORIDA GAMING CENTERS CREDITOR TRUST**
Soneet R. Kapila was appointed as the Creditor Trustee of the Florida Gaming Centers bankruptcy matter involving the Miami Jai Lai Casino.

**BRAY & GILLESPIE**
Soneet R. Kapila was appointed **Liquidating Trustee/Creditor Agent** post-confirmation in this significant bankruptcy matter involving **seventy-nine entities in the real estate and hospitality industry**. The Bray & Gillespie entities own multiple pieces of real estate including operating hotels, vacant land, and rental properties located along the coast of Daytona Beach in Volusia County. A significant portion of the real estate is direct oceanfront property. This engagement includes monitoring the financial performance and overall operations of the Debtors, assessing the viability of their business operations for reorganization or liquidation purposes and performing a forensic investigation of the past management conduct of the Debtors and their Principals. During the Chapter 11 proceeding, Kapila represented a major secured lender.

**PAN AMERICAN HOSPITAL CORPORATION**
Soneet R. Kapila was the Court appointed **Examiner** to **investigate the viability of this 146 bed acute care community hospital**, as well as corporate governance and the ability of management to operate this hospital as a Debtor-in-Possession. His duties included overseeing the sale of the Hospital as a Transaction Examiner. His recommendations resulted in a reconstitution of the Board of Directors, the appointment of an Interim Chief Operating Officer and a close monitoring of cash flow budgets and operations. His efforts resulted in the sale of the Hospital for $40 million.

**PICCADILLY CAFETERIAS, INC.**
Soneet R. Kapila was selected by the Creditors' Committee to be the **Plan Administrator** to **oversee and administer the affairs of the post-confirmation Debtor** and direct and manage litigation. His duties include overseeing and directing the claims adjudication process and making distributions to creditors, pursuing Chapter 5 avoidance actions and D&O litigation.

**DECORATOR INDUSTRIES, INC.**
Soneet Kapila was named **Liquidating Trustee** of this custom design manufacturer and supplier of **custom crafted bedding and window treatments** since 1953. They have offices throughout the United States and locally in Pembroke Pines (Cooper City.)

**SECURITIES AND EXCHANGE COMMISSION V. TEL-ONE, INC. et al.**
Soneet R. Kapila was appointed the **Claims Administrator/Disbursing Agent** in this **"pump and dump" scheme** in this securities fraud case by the Federal District Court. His duties encompassed administering approximately $2,000,000 to loss claimants and determining the authenticity of the claimants' damages.

# Settlement Administration / Liquidating Trustee

**SOUTHEAST BANKING CORPORATION**
K&C is the **accountant and financial consultant** to Jeffrey H. Beck, the Chapter 7 Bankruptcy Trustee. We have provided numerous services covering a wide gamut of *forensic, litigation support, complex tax consultations and asset tracing*. We have assisted the Trustee in analyzing, reviewing and marshaling the claims of a multi-million dollar creditor body with complex inter-creditor arrangements.

**THE STRADA CREDITORS TRUST**
Soneet R. Kapila was selected **Liquidating Trustee** in this *real estate condominium* case to administer post-confirmation assets and litigation.

**MEDCO, INC., TRANSAMERICA WIRELESS SYSTEMS, INC.**
**AND INTERCONTINENTAL TELECOMMUNICATIONS CO.**
K&C was the **accountant and financial consultant** to the SEC Receiver on these matters. In addition to the investigative and forensic services we provided, we assisted the Receiver to distribute the funds of the estate to the defrauded investors and other creditors.

**MARGARITA Y AMIGASRESTAURANT**
Soneet Kapila was appointed **Settlement Administrator** and charged with the responsibility to perform due diligence for the validity of the claims and disbursing substantial settlement proceeds to several hundred class action participants.

**KRYPTON BROADCASTING CORP.**
Soneet R. Kapila was the **Disbursing Agent** of *two significant television station corporations* where in excess of $20 million was disbursed. His duties required him to insure all creditors' claims had been properly adjudicated as well as all tax compliance matters had been addressed prior to release of funds.

**G-SITE ASSOCIATES, A PARTNERSHIP**
After serving as **Accountant to the Official Committee of Unsecured Creditors**, Soneet R. Kapila was appointed the Post-Confirmation President and CEO of this *significant real estate developer* and home builder bankruptcy case to liquidate the Debtor's assets and disburse funds to the creditors. He liquidated the actual operations of the Debtor, pursued several causes of action, insured tax compliance and thereafter distributed monies to the creditors.

**SOFTOUCH, INC.**
Soneet R. Kapila was the appointed **Disbursing Agent** to administer post-confirmation liquidation of cash and disbursing to creditors with claims.

**BELVEDERE CONSTRUCTION**
Soneet R. Kapila was the **Liquidating Trustee** and succeeded to be the Liquidating Disbursing Agent. He distributed several millions of dollars to creditors having adjudicated their claims and insuring compliance with regulatory and tax matters.

**ARENA DEVELOPMENT COMPANY V. BROWARD COUNTY**
KCO was retained by The Special master as **accountants and financial consultants** to analyze the propriety of the multi-million dollar "prevailing wage" claims relating to the National Car Rental Arena and facilitated the distribution of funds.

**U.W. LIQUIDATING CO.**
Soneet R. Kapila was the **Liquidating Trustee** and pursued several causes of action, including a liability lawsuit against an accounting firm, to provide a return to creditors in an estate with minimal assets.

**BYEBYENOW.COM**
Soneet R. Kapila was appointed the **Liquidating Trustee** upon confirmation of this Chapter 11 proceeding. He investigated and pursued recovery actions for voidable transfers and tort claims against professionals in order to maximize return for the Creditors.

# **EXHIBIT 3**

# DynaVox Corporate Structure
## (Exhibit 3)

# EXHIBIT 4

# DynaVox Corporate Timeline



**1983** World's first eye tracking AAC system developed at Carnegie Mellon

**1989** Boardmaker software introduced – first symbol-based authoring tool

**1991** First DynaVox-branded AAC system with touch screen and dynamic display

**2001** Company successfully leads industry efforts to secure Medicare coverage for AAC

**2007** DynaVox Vmax introduced, first communication device with full Windows PC functionality

**2010** Introduction of the Maestro, most successful device to date

**2013-2014** Company launches major new product roll-out

**1983** DynaVox founded

**1998** Company sold to Sunrise Medical

**2004** Vestar Capital Partners acquires a majority share of Sunrise Medical

**2004** Vestar Capital Partners invests additional capital to facilitate the spin-off of DynaVox from Sunrise Medical

**2004** Company acquires Mayer-Johnson and Endiku

**2010** IPO on NASDAQ Exchange

1980  1985  1990  1995  2000  2005  2010  2013

Exhibit 4